

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| Francine Yates, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | )     Case No. |
| | ) |
| The Chicago Transit Authority | ) |
| The City of Chicago | ) |
| The State of Illinois | )     **08CV4597** |
| John H. Stroger Hospital | )     **JUDGE DOW** |
| DePaul University | )     **MAGISTRATE JUDGE COLE** |
| Eastbank Storage, | ) |
| | ) |
| | ) |
| Defendants. | ) |
| | ) |

Complaint for Plaintiff – Francine Yates

RECEIVED
Aug 13, 2008
AUG 1 3 2008 TC
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT,

Francine Yates
14114 S. Edbrooke Avenue
Chicago, IL 60827
(312) 351-5635
Pro Se

# POINTS AND AUTHORITIES

720 ILCS 5/46-1 Insurance Fraud. .....................................................................18

720 ILCS 5/29B-1 Money Laundering. ...............................................................18

720 ILCS 5/8 Conspiracy.................................................................................19

775 ILCS 5/6-101 Part (B) Aiding and Abetting, Coercion.....................................32

720 ILCS 5/31-4 Obstructing Justice.................................................................32

720 ILCS 5/33-1 Bribery.................................................................................33

720 ILCS 5/12 7.5 Cyberstalking......................................................................37

720 ILCS 5/16D-3 Computer Tampering............................................................38

The Illinois Human Rights Act (775 ILCS 5/1-102)..............................................43

720 ILCS 5/11-9 Public Indecency....................................................................43

720 ILCS 5/11-20 Obscenity............................................................................44

H.R. 985...................................................................................................71

720 ILCS 5/12-7.4 Aggravated Stalking............................................................112

720 ILCS 5/33-3 Official Misconduct...............................................................113

720 ILCS 5/ 26-1 Disorderly Conduct..............................................................113

The Endangered Species Act (ESA) 7 U.S.C. § 136, 16 U.S.C. § 1531 et seq....................118

720 ILCS 5/8 1.1 Solicitation of Murder. .........................................................134

720 ILCS 5/8 1.2 Solicitation of Murder for Hire.................................................134

720 ILCS 5/8-4 Attempted Murder...................................................................134

720 ILCS 5/9-3.3 Drug-induced homicide..........................................................134

720 ILCS 5/12-3.3 Aggravated Battery. ............................................................135

720 ILCS 5/12-4.1 Heinous Battery.................................................................135

720 ILCS 5/20-1 Arson.................................................................................135

# Case Law

*Jennings v. Southwood, 446 Mich. 125, 521 N.W.2d 230 (1994)*.....................................2

*Francine Yates v. The Chicago Transit Authority 2004CF2159, 21BA41078.*...............40

*Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority  06-3107.*.....................................40

*Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893*.....................................50

*New York Times Co. v. Sullivan, 376 U.S. 254 (1964).*.....................................84

*R v Seward (2005) EWCA Crim 1941*.....................................93

*Sorrell v. McGuigan (4th Cir 2002.)* .....................................106

*Karolina v. The City of Chicago*.....................................110

*Gates v. Collier (1972)*.....................................114

*Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990).*...............124

*R v Morrison (2003) 1 W.L.R.1859*.....................................128

# Tables

Table of Notable Disbarments.....................................8

Table of Homelessness Statistics.....................................69

# I. BACKGROUND

This case is about the oppression of a young, single, African-American, mentally disabled woman who became homeless because of the ignorance, small-mindedness and stupidity of others. It is about a woman who helped pave the way for some and produce hope for others who have remained silent, waiting for management to arrest and bring a rest to their chaotic, hostile and disrespectful work environment. That woman's name is Francine Yates. Through perseverance, strength of character, tenacity, endurance and stamina, Francine Y. did the right thing by exposing the truth about what really goes on behind corporate walls. The plaintiff, Francine Yates (Francine Y.), fought for her civil rights by engaging in the protected activities of filing employment charges of discrimination in 2004, 2006 and 2007 against the Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights. The case originated as a sexual harassment lawsuit which escalated into many charges of related employment discrimination. This case should have been filed as an amendment to the above referenced appellate case which is 1-06-3107. However, that case was fraudulently dismissed in an effort to get the plaintiff, Francine Y., to embezzle money as an absurd remedy which would allow her to receive her settlement. Because Francine Y. would not engage in fraud at the request of Mayor Richard Daley and his entourage, she has been belittled, mocked, ridiculed, coerced, harassed, sexually harassed, threatened, cyber-harassed, stalked, retaliated against, intimated by police officers, humiliated, placed under heavy surveillance, poisoned through an attempted drug-induced homicide, falsely arrested, wrongfully incarcerated, intentionally given a criminal background, and defamed as someone who is psychotic. The intent of the plaintiff's oppressors and harassers was to get the plaintiff to embezzle money from insurance claim funds and launder the funds into a remote, off-shore bank account or hold onto the embezzled portion

for the conspirators in her private accounts. In the case 1-06-3107, Rod Blajoevich was a behind the scene conspirator because the plaintiff's appeal named the Illinois Department of Human Rights as a defendant. This employment agency is regulated and governed by the State of Illinois. It is the responsibility of the Governor to approve all lawsuit settlements against the State of Illinois.

On June 13, 2008, the plaintiff placed a call to the FBI headquarters and spoke with Patrick Fitzgerald's office, making them aware of the entire situation involving CTA, the City of Chicago, the State of Illinois, and all other conspirators and harassers involved with the case. Patrick Fitzgerald's office has contacted the Chicago Transit Authority, the City of Chicago and the State of Illinois to investigate the plaintiff's complaint surrounding fraud, embezzlement, money laundering, police officer intimidation and coercion.

Francine Y.'s, involvement in this case originated from the fact that she was coerced through willful indifference, conscious indifference and wantonness on behalf of Mayor Richard Daley and his entourage. Mayor Richard Daley and his entourage have consistently throughout time been personified as being "THE MAFIA." In *Jennings v. Southwood 446 Mich. 125, 521 N.W.2d 230 (1994),* the Supreme Court was asked to interpret the term "willful misconduct." The Court noted in passing that it is unfortunate that the judiciary and the Legislature have used the phrase "willful and wanton misconduct," as opposed to "willful or wanton misconduct" but concluded that the phrases "willful misconduct" and "willful and wanton misconduct" possess distinct meanings. The term "willful" requires a finding of actual intent to harm, the Court concluded, while the term "wanton" is an intent-inferred from reckless conduct. Mayor Richard

Daley and his entourage's intent was to inflict harm on the plaintiff. Their intent to do so was reckless and done with malice.

Because many individuals have perceived them as such, they have been coerced into breaking laws, aiding, abetting, impeding and obstructing justice. While many have been paid, bribed and threatened, others have surrendered their unannounced, active, and willful participation. Individuals have cringed at the thought and sound of Mayor Richard Daley's name. Some even hide from his presence. However, this innate perpetual fear that resides in the minds and hearts of these individuals is in and of itself a "false fear." *775 ILCS 5/6-101 Part (B) Aiding and Abetting; Coercion.* It is illegal to aid, abet, compel or coerce a person to commit any violation of the Human Rights Act. *720 ILCS 5/31-4 Obstructing Justice.* A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information.

## II. ARGUMENT AND DISCUSSION

### *Charge 1: Fraud, Fraudulent Practices, Conspiracy, Racketeering, Extortion & Bribery*

Fraud, in addition to being a criminal act, is also a type of civil law violation known as a tort. A tort is a civil wrong for which the law provides a remedy. A civil fraud typically involves the act of intentionally making a false representation of a material fact, with the intent to deceive, which is reasonably relied upon by another person to that person's detriment. A "false representation" can take many forms, such as: a false statement of fact, known to be false at the time it was made; a statement of fact with no reasonable basis to make that statement; a promise of future performance made with an intent, at the time the promise was made, not to perform as promised;

3

a statement of opinion based on a false statement of fact; a statement of opinion that the maker knows to be false; or an expression of opinion that is false, made by one claiming or implying to have special knowledge of the subject matter of the opinion. "Special knowledge" in this case means knowledge or information superior to that possessed by the other party, and to which the other party did not have equal access.

Perjury is also an act of fraud. It is defined as the act of lying or making verifiably false statements on a material matter in a court of law or in any of various sworn statements in writing. It is important that the false statement be material to the case at hand, that it could affect the outcome of the case. Perjury is considered a serious offense as it can be used to usurp the power of the courts; resulting in miscarriages of justice; or as in the case of 1-06-3107, overt abortions of justice. In the United States, the general perjury statute under Federal law provides for a prison sentence of up to five years.

On or around November 28, 2007, the plaintiff submitted a petition for rehearing brief through the Appellate Court. The case, 1-06-3107 was denied without any legal reason. A group of at least three appellate court judges conspired with Huberman, Daley and Blajeovich through coercion by aiding, abetting and obstructing justice. More than likely bribery was used in an effort to have the judges fraudulently dismiss the plaintiff's case. The case was dismissed in an effort for the defendants to make the settlement with Francine Y. outside of court so that the settlement amount would not appear on the court records. On or around November 17, 2007, Ronald Huberman started sending the plaintiff, Francine Y., bulk emails in the form of junk mail in an effort to coerce her into embezzling funds from CTA's, the City of Chicago and the State of Illinois claim funds. The defendants wanted the plaintiff to attach millions of dollars to her

4

settlement and either launder the money into an off-shore remote bank account or hold onto their embezzled portion within her private accounts. Along with the emails relating to embezzlement were emails referencing dating, marriage, babies, sex, buying a private jet, owning land in Costa Rica, losing weight, colon cleansing, growing hair, cosmetic surgery (face-lift), LASIK surgery as well as others. The plaintiff was confused by some of these emails because she had heard a rumor that Ronald Huberman was an out-of-the-closet homosexual. The plaintiff maintained contact with Ronald Huberman by responding to some of the emails because she was angry, she wanted her money and she was testing her homosexual hypothesis because he placed many people in her path to deliberately confuse her by making references that he was a homosexual. Francine Y. also made Ronald Huberman aware of the fact that she would not become a political front for him, a front for his homosexual lifestyle or any embezzled money. She transmitted as much as possible in an effort to gather information on Ronald Huberman and eventually report it to the appropriate authorities. However, when Francine Y. saw Ronald Huberman in person, she did not believe that he was a homosexual. The reason for this was the fact that he was wearing runt over, soft-soled, granny glob-hopper shoes. You can tell a lot about a person by the type of shoes that they are wearing; however, this fact is not always an absolute. Most wealthy homosexual men, if not all, will not disgrace themselves by wearing worn out shoes with a semi-expensive suit. The fact that Ronald's shoes were in the shape that they were in told the plaintiff that he was a man who was preoccupied with working long hours and someone who was not involved in a serious, monogamous relationship. As a result, he did not have time to shop for shoes nor did he have a woman in his life which could have helped him make time. Ronald Huberman also tries hard to camouflage his authentic, Israeli accent by using proper corporate yuppie talk. The thing that wounded the plaintiff the most was the fact that Ronald failed to

5

mention his own inadequacies while he engaged in the acts of intentional infliction of emotional and mental distress. He never mentioned the fact that he has a head full of grey hair, a face full of wrinkles, the fact that he has a very large nose, he's short, the fact that he's young, a tooth is missing in his mouth (lower right, near the back molar), the fact that he has funny looking ears just like the plaintiff's brother, that male patterned baldness might be knocking at his door, that he looks older than he actually is, the fact that he is extremely ignorant, the fact that he is immature and most importantly the fact that most women are looking for a man that has a large/sizeable penis and a legitimate bank roll.

The plaintiff; Francine Y., believed that Ronald Huberman's true intent was to pay her 25% of her settlement from CTA along with appropriate compensatory damages, 0% from the City of Chicago and 0% from the State of Illinois. The plaintiff also believed that Ronald Huberman wanted to marry her in an effort to steal the remaining 75% of her settlement from CTA's claim fund, the entire 100% from the City of Chicago's claim fund and the entire 100% from the State of Illinois claim fund by floating the checks to her to hold in her private accounts. They would have made the checks payable to the plaintiff as if they had paid her the full damages. Francine Y. believed that Ronald Huberman's motive for planning to marry her was to use her as a scapegoat in order to live as an open, legitimate billionaire. She also believed that it was his intent to take out double indemnity life insurance policies from various sources, buy a private jet, place the plaintiff on the jet, crash the jet, collect the insurance money and gain rights as beneficiary to Francine Y.'s money along with the embezzled money. What else would someone like Ronald Huberman want with a fat, four-eyed, ghetto, African-American, mentally disabled, homeless, Christian woman? Lastly, the plaintiff believed that the underlying motive for the

additional, continued harassment was done in an effort to get the plaintiff to file other charges of discrimination in an effort to embezzle more money for the defendants. For example, Ronald Huberman coerced a doctor at Stroger's hospital into sexually harassing Francine Y. This was done to coerce the plaintiff into filing a charge of discrimination against the hospital. Mayor Richard Daley's brother; John Daley, presides over the finances at Stroger's hospital. This would have necessitated a speedy settlement for the defendants. The plaintiff refused to engage in the act of insurance fraud and money laundering, so the defendants persecuted her on a daily basis while she lived in the Pacific Garden Mission's homeless shelter.

Another act of fraud is the fact that Governor Rod Blajeovich is instrumental in keeping over 1,100 individuals wrongfully incarcerated. Most of the inmates that have been falsely imprisoned are primarily blacks. This is fraud and conspiracy to commit fraud. Governor Rod Blajeovich and Lisa Madigan are political rivals. However, they have the common goal of engaging in the act of fraud. As Attorney General for the State of Illinois, Lisa Madigan was instrumental in signing off on the plaintiff's employment discrimination case which caused it to bypass the trial courts altogether. Other individuals on her legal team willfully participated in the act of fraud by aiding and abetting through the use of coercion. The plaintiff's case had more than enough substantial evidence to proceed into a trial court of law. More than likely there have been many similar employment cases where the employees have been defrauded because the defendants have remained willfully indifferent to settle the employment discrimination claims and minimize workplace discrimination. The employees within the Illinois Department of Human Rights have a fiduciary responsibility to help the employees, not engage in fraud or

7

impede justice. Employers cannot continuously break the law, undermine the wounded and deny employees their right to obtain effective and speedy remedies which are specified within the law. The petitioner's that were defrauded were mostly minorities without legal representation and claims which had disability discriminations and/or a large number of employment discrimination charges. Aiding, abetting, coercing and accepting bribes are all crimes of fraud. As Attorney General, Lisa Madigan had a fiduciary responsibility and duty to ensure that defined and established legal proceedings were strictly followed. She breached that duty when she remained willfully and consciously indifferent by willfully engaging in fraud. As Governor of the State of Illinois, Rod Blajeovich has the fiduciary responsibility of ensuring that Lisa Madigan and her legal team are abiding by federal, state and local laws. He became a conspirator in the act of fraud by remaining willfully and consciously indifferent through impeding and obstructing justice. Any house divided against itself becomes desolate and is brought to ruin.

[1]**Disbarment** is a revocation of an attorney's right to practice law and argue cases. Generally, disbarment is imposed as a sanction for conduct indicating that an attorney is not fit to practice

---

[1] **Notable Disbarments**

Former Vice President Spiro Agnew, having pleaded no contest (which subjects a person to the same penalties as a guilty plea) to charges of bribery and tax evasion, was disbarred from Maryland, the state of which he had previously been governor. Former President Richard Nixon was disbarred from New York in 1976 for obstruction of justice related to the Watergate scandal.

In 2001, former President Bill Clinton resigned from the Supreme Court bar rather than face near-certain disbarment. In a separate, but related action, the Arkansas bar moved to disbar Clinton, but offered a deal that saw him suspended for five years. Because he was allowed to reapply to the bar after the suspension ended in 2006, his punishment is not considered disbarment. Because disbarment is not always permanent, his punishment was functionally identical to disbarment.

In 2007, Mike Nifong, the District Attorney of Durham County, North Carolina who presided over the 2006 Duke University lacrosse case, was disbarred for prosecutorial misconduct related to his handling of the case.

law, willfully disregarding the interests of a client, or engaging in fraud which impedes the administration of justice.    To be disbarred is considered a great embarrassment and shame, even if one no longer wishes to pursue a career in the law.  The Illinois Department of Human Rights' legal team, Lisa Madigan, the Chicago Transit Authority's legal team which worked on the plaintiff's case, Mayor Richard Daley and Governor Rod Blajeovich willfully disregarded the interests of the plaintiff and engaged in fraud while doing so.  Because the defendants committed the civil torts of fraud, intentional infliction of emotional distress, intentional inflection of mental distress as well as negligent intentional infliction of emotional and mental distress,  the act of disbarment should be imposed as a sanction for conduct indicating that an attorney or group of attorneys; in this case, are not fit to practice law.  They willfully disregarded the interests of a client, engaging in fraud which impeded the administration of justice.  Since the plaintiff, Francine Y., has been subjected to shame, embarrassment, indignity and disgrace, this judicial penalty is an effective remedy along with the other damages to help make the plaintiff whole. The plaintiff is asking that the conspirators with legal licences be permanently disbarred and separated from service for intentionally breaking the law and impeding justice.  The plaintiff has a fiduciary responsibility to the United States legal system to protect and defend the constitutional and legal rights of its citizens as a future legal practitioner.


A third incident of fraud is the fact that while the plaintiff worked for the Harris Trust & Savings Bank, she noticed that Wayne Ross; a CTA employee, was issued bi-weekly checks paid directly out of CTA's pension plan.  Irma Muniz; a CTA employee, would send the directives over to Harris Trust and Savings Bank to have the checks issued.  Also, other employees within CTA's pension department were being issued checks out of CTA's pension plan as well.  Employees

such as James Forte and others under the direction of Irma Muniz. If these checks were issued in lieu of work performed on the pension plan, then they should have been issued out of payroll or CTA's expense account. Many of CTA's employees have been venting because millions, possibly billions of dollars have been embezzled from CTA's pension fund. Lastly, several attorneys created a fraudulent contract which enabled Frank Kruesi to walk off of CTA's payroll with millions of dollars. After this event, the attorneys who underwrote the fraudulent contract were separated from employment with the Chicago Transit Authority. More than likely, they received compensation in lieu of their performance by willfully engaging in the act of fraud.

Also, the plaintiff discovered last year that CTA's Board of Directors have been creating fraudulent contracts. Many of the contracts were used to intentionally separate the plaintiff from service with the CTA. Also, the fact the Carole Brown is on CTA's board and RTA's board presents a huge conflict of interest. Carole Brown is also a banker who works for an investment banking firm. This is another conflict of interest as well since government funds have been embezzled within the CTA. Some of the members of CTA's Board of Directors consist of a black woman with a finance degree and an MBA, a Christian pastor, a white woman who is an entrepreneur, an attorney and a man that is disabled. The plaintiff; Francine Y. has similar attributes. She is a black woman who is disabled, she has a finance degree and an MBA, she is a Christian who wants to become an attorney and an entrepreneur. The Board of Directors intentionally disregarded the plaintiff and never considered themselves when they assisted in the annihilation of Francine Y. by inflicting cruel, inhumane and unjust acts of employment discrimination upon the plaintiff. They turned a deaf ear through ignorance, stupidity and small-mindedness by aiding, abetting and obstructing justice. They never cared if the plaintiff lived or

died. The only thing that the Board of Directors, Ronald Huberman, Mayor Richard Daley and Governor Rod Blajeovich have not done to the victim is called her a nigger to her face and killed her. For whatsoever a man sows that shall he also reap.

A fourth fact is that Pamela Beavers is the General Manager of the DBE/EEOC department within CTA. This is a conflict of interest as well. These functions should be two separate and distinct functions to ensure that acts of fraud in minority business contracting and employment discrimination are not taking place. Pamela Beavers was aware that the plaintiff filed an employment discrimination lawsuit against the Chicago Transit Authority. She was a behind the scene conspirator because the fraudulent acts that took place within Francine Y.'s employment discrimination case were continued violations within the company. Pamela Beavers also defrauded the plaintiff by intentionally ignoring her. However, Pamela Beavers remained willfully indifferent and participated in the act of defrauding the plaintiff by having others within the EEOC department tell the plaintiff that she did not have enough substantial evidence to support a claim of employment discrimination. Also, Thelma Crigler and Ellis Jackson worked on the plaintiff's employment discrimination case as well. They all had prior knowledge of the fraud and fraudulent employment practices relating to EEOC discrimination cases. They did nothing but remained willfully indifferent by aiding and abetting. Because the employees had knowledge of the fraud and the fact that they remained willfully indifferent by continuing to be employed with the CTA and engaging in fraud, they have become accomplices. As General Manager of DBE/EEOC processes, Pamela Beavers had a fiduciary responsibility to inform CTA about the dangers of admitting fraudulent documents into legal proceedings as well as the high cost of damages relating to employer liability.

11

Marquis Systems is a vendor for the CTA which subcontracts with Apro in an effort to sell CTA U-Passes. Walter Silmon, Jr. is an employee with Apro who has been engaging in fraud by selling stolen CTA U-Passes to individuals. He has often tried to peddle a U-PASS to a homeless woman among other persons he has been successful with selling the U-Passes to. As General Manager of the Disadvantaged Business Enterprise group, Pamela Beavers should have thorough monitoring and theft prevention practices in place to safeguard against fraud. Also, if CTA has been deliberately violating EEOC affirmative action polices by not contracting with women and other minority businesses, they are breaking the law and willfully engaging in fraud. More than likely, there has been money extorted in an effort to ensure that certain contractors gain privileged rights to contracts. This is fraud.


A fifth incident of fraud is the fact that the plaintiff, Francine Y.'s storage lockers, secured from Eastbank Storage Company were illegally searched between December 2007 and April 2008. Eastbank Storage is located in Bridgeport. Bridgeport is a city that Mayor Daley used to live in. The plaintiff's storage lockers contained many valuable possesions such as fur coats, expensive purfume, expensvie handbags, leather coats, new trench coats, designer shoes, designer silk scarves, jewelry, new designer clothing, furniture and legal documents. Ronald Huberman made references in an email about some items contained within the plaintiff's backpack that only she knew had been placed there. He also sent the plaintiff emails about Victoria Secret's lingerie. The plaintiff had a new collection of Victoria Secret's lingerie that she had collected over a number of years. These items were also contained within her storage locker. Francine Y. was planning on getting married before the employment discrimination occurred; however, the

collection of lingerie was a hobby for the plaintiff. Francine Y. believed that Ronald Huberman's and Mayor Richard Daley's motive for illegally opening her storage lockers was to provoke the plaintiff into filing a lawsuit against Eastbank Storage Company. The plaintiff also believed that Mayor Richard Daley and his entourage wanted to gain control of the Eastbank Storage facility through the filing of a lawsuit on behalf of the plaintiff against Eastbank Storage Company. Francine Y. believed that the conspirators were going to buy the building from her after she gained control of it from the lawusit because the company would have to surrender the building in an effort to satisfy the full damages sustained from the lawsuit. Eastbank Storage Company also sits on the river in a prime area in Bridgeport where a lot of recent development has taken place. Lastly, an article was printed in the newspaper about a Project Manager in Mayor Richard Daley's administration who lost his job because he was managing a project where the land in Bridgeport was sold to a developer for a fraudulent price. The land for the project was located on a river bank in Bridgeport. This would have given Mayor Richard Daley and his entourage motive for accessing the plaintiff's storage and wanting to gain control over the building.

The owner of Eastbank Storage Company created a fraudulent contract by sending the plaintiff a letter dated April 11, 2008 stating that Eastbank Storage sold the contents of the plaintiff's lockers on April 3, 2008. Eastbank also stated in the letter that the contents within the lockers were purchased by Eastbank Storage. However, pursuant to Illinois Rev. St. Chapter 114, Section 801-807, Eastbank Storage had the right to exercise a lien against the contents of the storage units except for the miscellaneous items contained within the lockers. The plaintiff was never extended the opportunity to receive any of the miscellaneous items like her legal

13

documents. Illinois Rev. St. Chapter 114, Section 801-807 states that if the customer which owns the contents within the lockers has not paid the owner after two months than the contents within the storage lockers becomes the property of the owner. The owner does not have to purchase the contents in the lockers, they legally become the possession of the owner. The plaintiff was given a new contract with the offer to buy back the contents of her storage lockers for a reduced price. A customer service employee signed off on the contract and executed the contract on behalf of Eastbank Storage Company.

Much of the neighborhood in Bridgeport, IL was an Irish-American enclave, and it still is today. In the 1830s, large numbers of immigrants from Ireland started settling in this working-class neighborhood. Although the Irish are Bridgeport's oldest and most famous ethnic group, Bridgeport has also been home to a large number of other groups. Today, there are large numbers Lithuanians, Mexican-Americans and Chinese-Americans. However, Bridgeport remains racially segregated because there are almost no blacks living in the community. The African-Americans have been racially segregated from the community by sectors of the City of Chicago being designated, allocated and stereotyped as being defined where "blacks live". This is racial discrimination and it also is fraud because the civil rights movement in the 1960's ended segregation in public housing. Because Bridgeport has become integrated with many Mexican and Chinese residents, appropriate measures need to be taken to ensure that fire codes are not being violated. If there are more than the minimum number of people allowed living in one condominium unit based upon square footage, then fire codes are being violated. Since the rise in immigration and the recent influx of condominium development in the Bridgeport area, the City of Chicago and the developers are liable if the inspectors have not been making appropriate

14

inspections to ensure that fire codes are not being violated. This can be done by effectively censoring the people.

Also, the Equal Employment Opportunity Commission governs businesses in their recruitment processes through the use of affirmative action plans. These policies are aimed at a historically socio-politically non-dominant group (typically, minority men or women of all racial groups) intended to promote its access to education or employment. The rationale behind affirmative action is a desire to redress effects of actual or perceived, past or current discrimination that is regarded as unfair. It also serves to encourage public institutions such as universities, hospitals and police forces to be more representative of the population. This is commonly achieved through targeted recruitment programs aimed at applicants from socio-politically disadvantaged groups. In some cases affirmative action involves giving preferential treatment to these groups. Mayor Richard Daley has broken the law regarding affirmative action quotas based upon EEOC guidelines. The Superintendents of the Chicago Police department over the last twenty to thirty years have all been men. There has not been a single woman Superintendent of Police (Top Cop) hired within the City of Chicago. Also, over the last twenty to thirty years there have only been three black males hired to fill this role. This is blatant racial and gender discrimination.

Lastly, a principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with that profession. A fiduciary is a person or group of people who stand in a position of trust. That trust represents a significant obligation to care for the interests of others. Inherent in practicing as Presidents, Mayors and Governors is the fiduciary responsibility that authoritative persons or a group of persons in charge accept, placing the interests of others above themselves. An agent is a person or group of persons who perform

an act for another. Inherent in this act is fiduciary responsibility and dual agency, which can also be referred to as mixed agency. This is a situation where a person/authoritative figure performs or acts for two others. The two people involved are the employee and the entity the agents are employed with. President Ronald Huberman, Mayor Richard Daley, Governor Rod Blajeovich and the police officers which aided and abetted failed as an agents acting on behalf of the City of Chicago and the State of Illinois.     They did not fulfill their fiduciary responsibilities to the plaintiff, Francine Y., or to the state and local governments. Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate. It was also done with malice. They placed their own interests above the interests of an innocent, mentally disabled, homeless, African-American, Christian woman. They were skilled in the law, but took no measure to use the law to protect, defend or assist the plaintiff. The plaintiff, Francine Y., needed their help more than anything else.

The Chicago Transit Authority, the City of Chicago and the State of Illinois committed the workplace torts of intentional infliction of emotional distress, intentional infliction of mental distress and negligent intentional infliction of emotional and mental distress upon the plaintiff. A reckless disregard for the likelihood of causing the plaintiff distress occurred when the plaintiff's appellate case was fraudulently dismissed for no valid legal reason. The plaintiff, Francine Y., was outraged when she discovered that her case was denied for fraudulent reasons mixed with the intent to conspire against her. Francine Y. was vulnerable because she was a woman who was mentally ill, homeless and without legal representation. The defendants were aware of all of these facts. The defendants were in a position of power, so they tried to take advantage of the plaintiff. Lastly, the CTA, the City of Chicago and the State of Illinois owed

the plaintiff the fiduciary responsibility and duty of giving her appellate brief a correct, just and ethical evaluation based on all the substantial evidence and facts relating to her case. These actions; subsequent actions, and all other actions that followed made the plaintiff's emotional and mental distress greater than it was from the beginning. The plaintiff became deeply wounded, humiliated and severely traumatized. Francine Y.'s depression and anxiety became worse as she remained in her traumatic, homelessness environment with the threat of Chicago police officers belittling, harassing, stalking and keeping her under heavy surveillance. The retaliation grew worst as the plaintiff was falsely arrested, wrongfully incarcerated and defamed as being a criminal and someone who is psychotic.

The **Whistleblower Enhancement Protection Act of 2007** prohibits retaliation against public employees who report official wrongdoing. The Whistleblower Act states that "a state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority. A federal agency violates the Whistleblower Protection Act if it takes, fails to take or threatens by failing to take a personnel action with respect to any employee or applicant because of any disclosure of information by the employee or applicant that he or she reasonably believes evidences a violation of a law, rule or regulation; gross mismanagement; a gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety. **H.R. 985 720 ILCS 32-2 Perjury.** (a) A person commits perjury when, under oath or affirmation, in a proceeding or in any other matter where by law such oath or affirmation is required, he makes a false statement, material to the issue or point in question, which he does not believe to be true. (b) Proof of Falsity. An indictment or information for perjury alleging that the offender, under

17

oath, has made contradictory statements, material to the issue or point in question, in the same or in different proceedings, where such oath or affirmation is required, need not specify which statement is false. At the trial, the prosecution need not establish which statement is false. (c) Admission of Falsity. Where the contradictory statements are made in the same continuous trial, an admission by the offender in that same continuous trial of the falsity of a contradictory statement shall bar prosecution therefore under any provisions of this Code. (d) A person shall be exempt from prosecution under subsection (a) of this Section if he is a peace officer who uses a false or fictitious name in the enforcement of the criminal laws, and such use is approved in writing as provided in Section 10-1 of "The Liquor Control Act of 1934", as amended, Section 5 of "An Act in relation to the use of an assumed name in the conduct or transaction of business in this State", approved July 17, 1941, as amended, or Section 2605-200 of the Department of State Police Law (**20 ILCS 2605/2605-200**). However, this exemption shall not apply to testimony in judicial proceedings where the identity of the peace officer is material to the issue, and he is ordered by the court to disclose his identity. (e) Sentence. Perjury is a Class 3 felony punishable for up to five years. **720 ILCS 5/46-1 Insurance Fraud.** (a) A person commits the offense of insurance fraud when he or she knowingly obtains, attempts to obtain, or causes to be obtained, by deception, control over the property of an insurance company or self-insured entity by the making of a false claim or by causing a false claim to be made on any policy of insurance issued by an insurance company or by the making of a false claim to a self-insured entity, intending to deprive an insurance company or self-insured entity permanently of the use and benefit of that property. **720 ILCS 5/29B-1 Money Laundering.** (a) A person commits the offense of money laundering: 1.5) when he or she transports, transmits, or transfers, or attempts to transport, transmit, or transfer a monetary instrument: (A) with the intent to promote the carrying on of the

unlawful activity from which the criminally derived property was obtained; or (B) knowing, or having reason to know, that the financial transaction is designed in whole or in part:  i) to conceal or disguise the nature, the location, the source, the ownership or the control of the criminally derived property; or ii) to avoid a transaction reporting requirement under State law; or  (2) when, with the intent to: (A) promote the carrying on of a specified criminal activity as defined in this Article; or (B) conceal or disguise the nature, location, source, ownership, or control of property believed to be the proceeds of a specified criminal activity as defined by subdivision (b)(6). **720 ILCS 17-24 Fraudulent Schemes and Artifices.** (a) Fraud by wire, radio, or television. (1) A person commits wire fraud when he or she:  (A) devises or intends to devise a scheme or artifice to defraud or to obtain money or property by means of false pretenses, representations, or promises; and (B)(i) transmits or causes to be transmitted from within this State;  or (ii) transmits or causes to be transmitted so that it is received by a person within this State;  or (iii) transmits or causes to be transmitted so that it is reasonably foreseeable that it will be accessed by a person within this State:  any writings, signals, pictures, sounds, or electronic or electric impulses by means of wire, radio, or television communications for the purpose of executing the scheme or artifice.  (2) A scheme or artifice to defraud using electronic transmissions is deemed to occur in the county from which a transmission is sent, if the transmission is sent from within this State, the county in which a person within this State receives the transmission, and the county in which a person who is within this State is located when the person accesses a transmission.  (3) Wire fraud is a Class 3 felony.  **720 ILCS 5/8 Conspiracy.** (a) Elements of the offense. A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such

agreement is alleged and proved to have been committed by him or by a co-conspirator. (b) Co-conspirators. It shall not be a defense to conspiracy that the person or persons with whom the accused is alleged to have conspired: (1) Has not been prosecuted or convicted, or (2) Has been convicted of a different offense, or (3) Is not amenable to justice, or (4) Has been acquitted, or (5) Lacked the capacity to commit an offense. (c) Sentence. A person convicted of conspiracy may be fined or imprisoned or both not to exceed the maximum provided for the offense which is the object of the conspiracy, except that if the object is an offense prohibited by Sections 11-15, 11-16, 11-17, 11-19, 24-1(a)(1), 24-1(a)(7), 28-1, 28-3 and 28-4 of the "Criminal Code of 1961", approved July 28, 1961, as amended, or prohibited by Sections 404 or 406 (b) of the "Illinois Controlled Substances Act", enacted by the 77th General Assembly, or an inchoate offense related to any of the aforesaid principal offenses, the person convicted may be sentenced for a Class 3 felony however, conspiracy to commit treason, first degree murder, aggravated kidnapping, aggravated criminal sexual assault, or predatory criminal sexual assault of a child is a Class 1 felony, and conspiracy to commit any offense other than those specified in this subsection, and other than those set forth in Sections 401, 402, or 407 of the Illinois Controlled Substances Act, shall not be sentenced in excess of a Class 4 felony. The **Racketeer Influenced and Corrupt Organizations Act** (commonly referred to as **RICO Act** or **RICO**) is a United States federal law that provides for extended penalties for criminal acts performed as part of an ongoing criminal organization. It also provides a civil cause of action for those injured by violations of the act. RICO was enacted by section 901(a) of the Organized Crime Control Act of 1970 (Pub.L. 91-452, 84 Stat. 922, enacted 1970-10-15). RICO is codified as Chapter 96 of Title 18 of the United States Code, 18 U.S.C. § 1961-1968. It was intended to make it easier to prosecute organized crime figures, but has been applied in several other cases as well. Under the

20

law, **racketeering activity** means: Any violation of state statutes against gambling, murder, kidnapping, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in the Controlled Substances Act); Any act of bribery, counterfeiting, theft, embezzlement, fraud, dealing in obscene matter, obstruction of justice, slavery, racketeering, gambling, money laundering, commission of murder-for-hire, and several other offenses covered under the Federal criminal code (Title 18); Embezzlement of union funds; Bankruptcy or securities fraud; Drug trafficking; Money laundering and related offenses; Bringing in, aiding or assisting aliens in entering the country (if the action was for financial gain); Acts of terrorism. **Extortion, Outwresting**, or **Exaction** is a criminal offense, which occurs, when a person unlawfully obtains either money, property or services from a person, entity, or institution, through coercion. Refraining from doing harm is sometimes euphemistically called *protection.* Extortion is commonly practiced by organized crime groups. The actual obtainment of money or property is not required to commit the offense. Making a threat of violence or a lawsuit which *refers* to a requirement of a payment of money or property to halt future violence or lawsuit is sufficient to commit the offense. Exaction refers not only to extortion or the unlawful demanding and obtaining of something through force, additionally, exact in its formal definition means the infliction of something such as pain and suffering or to make somebody endure something unpleasant. In the United States, extortion may also be committed as a federal crime across a computer system, phone, by mail or in using any instrument of "interstate commerce". Extortion requires that the individual sent the message "willingly" and "knowingly" as elements of the crime. The message only has to be sent (but does not have to reach the intended recipient) to commit the crime of extortion. Extortion is distinguished from blackmail. In blackmail, the blackmailer threatens to do something which

would be legal or normally allowed. **720 ILCS 5/33-1 Bribery.** A person commits bribery when with intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public officer, public employee, juror or witness would not be authorized by law to accept; or (c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or (e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness. (f) Sentence. Bribery is a Class 2 felony. **720 ILCS 5/29A-2 Accepting a Bribe.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs. **720 ILCS 5/29A-2 Commercial Bribe Receiving.** An

22

employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs. **720 ILCS 5/33-3 Official Misconduct.** A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts: (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is forbidden by law to perform; or (c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law. A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his office or employment or position as a special government agent. In addition, he commits a Class 3 felony. **775 ILCS 5/7-105 Equal Employment Opportunities; Affirmative Action.** In order to establish and effectuate the policies of equal employment opportunity and affirmative action, the Department shall, with respect to state executive departments, boards, commissions and instrumentalities and any party to a public contract: (A) Policies; Rules; Regulations. Establish equal employment opportunity and affirmative action policies, rules and regulations which specify plans, programs and reporting procedures. Such rules may provide for exemptions or modifications as may be necessary to assure the continuity of federal requirements in State agencies supported in whole or in part by federal funds. (B) Minimum Compliance Criteria. Establish minimum compliance criteria and procedures for evaluating equal employment opportunity and affirmative action programs and plans. (C) Technical Assistance. Provide technical assistance, training, and advice

for the establishment and implementation of required programs. (D) Meetings. Hold meetings at least annually with the head of each State agency and when necessary with any party to a public contract to: (1) Review equal employment opportunity plans and progress, performance and problems in meeting equal opportunity goals. (2) Recommend appropriate changes to the plans and procedures and the methods employed to implement the plans. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.* (See Exhibits in Appendix Section)

## Charge 2: Aiding, Abetting, Coercion, Obstructing Justice, Intimidation, Extortion & Bribery

Tracy Robertson is an employee with CTA who works as a secretary in the front office. More than likely, she is Ronald Huberman's Chief of Staff's secretary. Tracy has been telling Ronald Huberman personal things about the plaintiff. This is evident because the plaintiff often discussed having a business and a Christian ministry with Tracy. Ronald Huberman transmitted things related to ministry and being a Christian in the emails that he sent to the plaintiff. Tracy Robertson is a Christian who befriended Francine Y. under false pretenses. She knew that Francine Y. was a Christian because the plaintiff disclosed her religion to Tracy, they had lunch together on several occasions, Francine Y. attended Tracy's church a few times and the two often engaged in conversations about Christian things. However, when Francine Y. filed an employment discrimination lawsuit, Tracey Robertson betrayed her by looking down on her, frowning at the plaintiff's personal appearance, treating the plaintiff like she was smelly and not good enough by deliberately avoiding her. Tracy Robertson also took directions from Joyce Coleman; Vice President of Human Resources, for the Chicago Transit Authority. Those instructions requested that Tracy Robertson not help the plaintiff by being a witness when she was being retaliated against. However, Tracy Robertson failed to mention her own inadequacies

such as extremely crooked teeth, a very bad marriage, gossiping too much, leaking information

to an accomplice; Angela King, and wearing outdated, cheap, runt-down boots. The plaintiff is

not sure if Tracy Robertson received anything which was of monetary or non-monetary value

from the defendants for her instrumental performance in aiding, abetting and obstructing justice.


Secondly; Darlene Pruitt, a homeless guest living in the PGM homeless facility aided and abetted

by reporting on the plaintiff. Darlene has a sister; Stephanie Pruitt, who is a bus driver for the

Chicago Transit Authority. Darlene Pruitt repeatedly watched the plaintiff while she was at

PGM, Stroger's hospital and when she saw the plaintiff in public. Darlene reported information

pertaining to the plaintiff to Stephanie Pruitt, who in turn reported it to a manager within CTA

and eventually it went up the chain to Ronald Huberman. Darlene became jealous because her

underlying motive was to become employed with the CTA and she thought that betraying the

plaintiff would help her secure a job. Darlene Pruitt often questioned the plaintiff by asking her

if she thought that Ronald Huberman was cute. When she discovered that Ronald Huberman

liked Francine Y., she tried to defame the plaintiff as someone who has a hygiene problem. One

night while living at the PGM homeless facility, the plaintiff went to the bathroom to brush her

teeth. At this point she was still waiting for an appointment to get her wisdom teeth pulled.

Darlene Pruitt was aware that the plaintiff had been on Stroger's dentist list. Darlene stopped the

plaintiff to ask a political question which was of no interest to her. She made it appear as if the

plaintiff had the worst case of dragon breath on the planet. However, Darlene Pruitt failed to

mention her own inadequacies of being overweight, homeless for about twelve years, hot flashes,

very sweaty in the summer from the hot flashes, jealous, a busy-body in others business and

funky feet. After this incident, Ronald Huberman started sending the plaintiff junk emails

relating to toothpaste and having bad teeth. The plaintiff is not sure if Darlene Pruitt received anything which was of monetary or non-monetary value from the defendants for her instrumental performance in aiding, abetting and obstructing justice. The plaintiff is also not aware if Darlene Pruitt was extended the opportunity to participate in CTA's under cover shopper program with the promise of receiving some future reward.

Third of all, the plaintiff transmitted from computers within DePaul University's alumni lab. Ronald Huberman had undercover shoppers coming into the alumni lab at DePaul University to keep the plaintiff under heavy surveillance while she used the computers to look for jobs and study for her project management certification. One black man with dreadlocks and a medium build followed the plaintiff while she was eating lunch in the student center at DePaul University. The plaintiff believed that the man could have been an undercover police officer. Francine Y. is not sure how the undercover shoppers gained access inside the alumni lab because the students are required to have identification cards in order to get inside the computer lab. More than likely, some of DePaul University's employees must have aided and abetted with the stalking, harassment and heavy surveillance by letting the harassers into the lab or by issuing fictitious alumni identification cards. Lastly, about a week or two after the plaintiff reported the fraud to the media, Ronald Huberman authorized the removal of the old computers in the alumni lab which is located in the library at DePaul University. They were taken out and replaced with new ones. The time frame of the removal of the computers was during the Easter break for the DePaul University students. This was done in an effort to conceal evidence because the modems contained the deleted emails. If DePaul University can't produce a receipt of purchase and the

computers themselves with untapped modems, then they have participated in aiding, abetting and obstructing justice.

A fourth act is the fact that Francine Y. refused to engage in the act of fraud and as a result, Ronald Huberman and Mayor Richard Daley sent two female police officers to harass the plaintiff while she lived at the Pacific Garden Mission homeless facility. The officers with the fraudulent names of Miriam Martinez and Nassira Tokash repeatedly harassed, stalked and kept the plaintiff under heavy surveillance in an effort to coerce her into embezzling money for Ronald Huberman, Mayor Richard Daley and Governor Rod Blajeovich. The two female police officers remained willfully and consciously indifferent while aiding, abetting and obstructing justice. They also used psychological intimidation against the plaintiff. Some forms of the psychological intimidation the officers enacted were pretending to be homeless women, pretending to be mentally ill, mocking the plaintiff by wearing similar cotton panties, wearing a similar bandanna and carrying a Whole Foods bag the next day after the plaintiff was seen with one. This psychological intimidation stemmed from growing racial tensions of these particular Mexican's lack of concern and overall disregard for African Americans.

Also, Miriam Martinez knew about the emails because she made a reference to an email address that Ronald Huberman set up which was GreggGoldsholl@solvedebts.com. She also made references to the fact that the plaintiff did not have an attorney for the prior lawsuit case that she filed. This officer knew that the plaintiff had attended and graduated from Robert Morris College as well as the plaintiff's age. The only way that she could have known this is that someone inside the CTA had given her this information. Miriam Martinez stated to Francine Y.,

"why don't you call your attorney and tell him that someone is harassing you via email. I don't believe you have one." She knew that some of the emails had been deleted because she stated to the plaintiff, "the evidence is on the modem." Miriam Martinez also made references that Ronald Huberman was Francine Yates' lover, the fact that they both had green eyes and that they would have a green-eyed baby. The plaintiff; Francine Y., replied, "no, he's not." Francine Y. asked the officer if Ronald Huberman was gay. The officer shook her head with the gesture that means "no." Francine Y. asked the officer if the reason Ronald Huberman perpetuated the fact that he was gay was because he was trying to protect his credibility in an effort to become the Mayor of Chicago. The officer shook her head with the gesture that means "yes." Francine Y. also asked the officer if Ronald Huberman's intent was to kill her. The officer rolled her eyes at the plaintiff and said "no, he wants to make you a billionaire." Francine Y. did not trust the police officer because she had told many lies while living at PGM's homeless facility. Miriam Martinez asked the plaintiff if she saw something on the reports at CTA that she should not have seen and stated that the primary reason why CTA could not let the plaintiff come back to work was because she saw something on the reports that she should not have seen. The plaintiff replied, "no, I don't care what they steal as long as they don't steal from me." Miriam Martinez replied "yeah, right. I want my money." After the conversation, the officer moved to a different seat within the homeless facility. The money that Miriam Martinez made a reference to is money that she was promised in the form of a bribe to harass and intimidate the plaintiff. Francine Y. was also affiliated with the United Methodist Church, a church which professes and practices Christianity. This church is located across from the Daley Center. Officer Miriam Martinez occasionally followed the plaintiff during the time she would have free lunch on

28

Tuesdays at the church. She kept the plaintiff under heavy surveillance and reported frequently on the plaintiff to Ronald Huberman.

In February 2008, the plaintiff walked to the 17th and State police station to file a report on Barbara Rawlings. A fat, white male officer wearing glasses filed the report, but failed to make the arrest. The plaintiff emailed Ronald Huberman about the complaint. More than likely, Huberman gave instructions not to make the arrest because he also had PGM to send the plaintiff to Stroger's hospital for psychiatric evaluation after she complained about Barbara Rawlings and the officers that were living in the PGM's homeless facility.

The plaintiff placed both female officers under investigation. In May 2008, Francine Y. learned from Patrick Quefurth that the first investigation had been trashed. She went to the 35th street station and the desk officer called internal affairs for the plaintiff. The plaintiff left a message for internal affairs and no one called her back. More than likely, Jodi Weiss was aiding and abetting as well. Also, Patrick Quefurth must have leaked information to Ronald Huberman regarding the June 30, 2008 independent review charge the plaintiff filed. This is evident because Ronald Huberman has sent the plaintiff several more emails after that date. Some of the emails have been sexual in nature.

Another act of aiding and abetting took place when the plaintiff was falsely arrested on May 26, 2008. A black, homeless female named Kenyatta assisted with the arrest. Nassira Tokash asked Kenyatta to watch the plaintiff and make sure she left the mission in the morning. The false arrest was made outside of PGM in an effort to make sure that the plaintiff did not have any

witnesses. Rhonda Davis; a PGM employee, was also instrumental in aiding and abetting with the false arrest. Rhonda Davis let a plain clothes, white female officer wait inside the building near the baggage room in an effort to stake out Francine Y. to ensure that she left the mission. The officers' intent was to defame the plaintiff as a suspect and apprehend her at Dominicks which is located on 14th and Canal Street. The plaintiff was staked out and apprehended at Dominicks after she left the mission. Many other officers also assisted the defendants by aiding and abetting. Four officers participated in the false arrest; a Hispanic female with the fraudulent name of Nassira Tokash, a black male with the name of officer Melchor, a white male officer and a white female officer. While being processed after the false arrest, another white male police officer aided and abetted by mentioning the password of Costa Rica to the plaintiff. The plaintiff has since learned that Costa Rica is a prime area for laundering money. A second white male officer aided by wearing a black Dubai T-shirt. These officers may have received a pay-off in the form of a bribe or a future promise to pay for performance. All of the officers remained willfully and consciously indifferent while aiding, abetting and trying to coerce the plaintiff into embezzling money for Ronald Huberman, Mayor Richard Daley and Governor Rod Blajoevich. Nassira Tokash made a statement to the plaintiff before the arrest that she has money and the plaintiff did not. Nassira Tokash patted the front pocket on her jeans and one could see the impression that was made from a wad of money. Also, the plaintiff engaged in a conversation about the officers and Ronald Huberman with someone outside of the mission. This individual told the plaintiff that the officers might have received between $1,000 and $2,000 to keep the plaintiff under surveillance as well as for the other acts they performed. The white, male police officer that mentioned the words "Costa Rica" must have known something about extortion, bribery, fraud, embezzlement and money laundering.

While surfing websites at Harold Washington Library, Nassira Tokash followed the plaintiff and watched the websites the plaintiff looked at. This is one of the prime reasons why Ronald Huberman had the other cop to walk by the plaintiff in a Dubai T-shirt. He wanted Francine Y. to know that he staged the false arrest. Ronald Huberman often used clues to let the plaintiff know that he was behind this entire ordeal. For example, Miriam Martinez came into PGM's homeless facility with a Robert Morris College book bag. When the plaintiff asked her about the school, Miriam Martinez stated that she no longer attended Robert Morris College but had transferred to Malcolm X College. Francine Y. attended and graduated from Robert Morris College years ago. The only way Miriam Martinez could have acquired this information relating to the plaintiff is the fact that Ronald Huberman retrieved the information from the plaintiff's employment file. Also, the name Miriam is distinctively Jewish because in the Bible, Moses' sister's name was Miriam. The leg of the bird that was placed in the plaintiff's path was an emerald green mixed with an olive green. The color green is synonymous with being Irish and olive represents the symbol for the outpouring of the Holy Spirit. Another prima facie clue that Ronald Huberman was behind the conspiracy to commit fraud was the fact that he instructed a note to be left on PGM's telephone board. The note stated" "CHASE THE MAYOR ENEMIES ALL WHOM ARE IN HOPE OF INHERITANCE ROMAN 6:23."

Lastly, on June 30, 2008, the plaintiff came to the 17th and State police station to retrieve a copy of the police report from the false arrest which was never given to her. She also wanted to file a complaint against Kenyatta. Kenyatta is a black, female homeless woman who assisted Nassira Tokash relating to the false arrest on May 26, 2008. The plaintiff mentioned to officer King that Kenyatta was supposedly on the run for something she did in Texas. She asked if they would

31

arrest her. He replied, "no." The plaintiff was not allowed to fill out a police report against Kenyatta nor was she given a copy of the report that was made against her on May 26, 2008. A black female officer went through a door behind the complaint desk and brought out between twenty and fourty police officers. The officers were primarily white and male. There were also black officers as well as female officers which participated in the harassment. They intimidated the plaintiff by surrounding her and watching her when she came to the station on June 30, 2008 to retrieve a copy of the police report. The officer's physical proximity in relation to where the plaintiff was standing was such of a nature that the plaintiff felt her physical safety was threatened within an environment which should have been conducive to safety and protecting the innocent.

**775 ILCS 5/6-101 Part (B) Aiding and Abetting, Coercion.** It is illegal to aid, abet, compel or coerce a person to commit any violation of the Human Rights Act. **720 ILCS 5/31-4 Obstructing Justice.** A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information. **Police Brutality** is the intentional use of excessive force, usually physical, *but potentially also in the form verbal attacks and psychological intimidation*, by a police officer, prison officer or other law enforcement officer. It may be carried out at the initiative of an individual officer, or in response to orders given to the officer, or in response to governmental or administrative policies. **Extortion, Outwresting,** or **Exaction** is a criminal offense, which occurs, when a person unlawfully obtains either money, property or services from a person, entity, or institution, through coercion. Refraining from doing harm is sometimes euphemistically called *protection*. Extortion is commonly practiced by organized crime groups.

The actual obtainment of money or property is not required to commit the offense. Making a threat of violence or a lawsuit which *refers* to a requirement of a payment of money or property to halt future violence or lawsuit is sufficient to commit the offense. Exaction refers not only to extortion or the unlawful demanding and obtaining of something through force, additionally, exact in its formal definition means the infliction of something such as pain and suffering or to make somebody endure something unpleasant. In the United States, extortion may also be committed as a federal crime across a computer system, phone, by mail or in using any instrument of "interstate commerce". Extortion requires that the individual sent the message "willingly" and "knowingly" as elements of the crime. The message only has to be sent (but does not have to reach the intended recipient) to commit the crime of extortion. Extortion is distinguished from blackmail. In blackmail, the blackmailer threatens to do something which would be legal or normally allowed. **720 ILCS 5/33-1 Bribery.** A person commits bribery when with intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public officer, public employee, juror or witness would not be authorized by law to accept; or (c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (d) He receives, retains or agrees to accept any property or personal advantage which he is not

33

authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or (e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness. (f) Sentence. Bribery is a Class 2 felony. **720 ILCS 5/29A-2 Commercial Bribe Receiving.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs. **15 ILCS 335/14A Fictitious or unlawfully altered identification card.** b.) It is a violation of this Section for any person: 1. To knowingly possess, display, or cause to be displayed any fictitious or unlawfully altered identification card; 2. To knowingly possess, display, or cause to be displayed any fictitious or unlawfully altered identification card for the purpose of obtaining any account, credit, credit card or debit card from a bank, financial institution or retail mercantile establishment; 3. To knowingly possess any fictitious or unlawfully altered identification card with the intent to commit a theft, deception or credit or debit card fraud in violation of any law of this State or any law of any other jurisdiction; 4. To knowingly possess any fictitious or unlawfully altered identification card with the intent to commit any other violation of any law of this State or any law of any other jurisdiction for which a sentence to a term of imprisonment in a penitentiary for one year or more is provided; 5. To knowingly possess any fictitious or unlawfully altered identification card while in unauthorized possession of any document, instrument or device capable of defrauding another; 6. To

34

knowingly possess any fictitious or unlawfully altered identification card with the intent to use the identification card to acquire any other identification document; 7. To knowingly issue or assist in the issuance of any fictitious identification card; 8. To knowingly alter or attempt to alter any identification card; 9. To knowingly manufacture, possess, transfer, or provide any identification document whether real or fictitious for the purpose of obtaining a fictitious identification card; 10. To make application for the purpose of obtaining a fictitious identification card for another person; 1. To obtain the services of another person to make application for the purpose of obtaining a fictitious identification card. (c) Sentence. 1. Any person convicted of a violation of paragraph 1, 10, or 11 of subsection (b) of this Section shall be guilty of a Class 4 felony. A person convicted of a second or subsequent violation shall be guilty of a Class 3 felony and shall be sentenced to a minimum fine of $500 or 50 hours of community service, preferably at an alcohol abuse prevention program, if available. 2. Any person convicted of a violation of paragraph 1 of subsection (b) of this Section who at the time of arrest had in his possession two or more fictitious or unlawfully altered identification cards shall be guilty of a Class 4 felony. 3. Any person convicted of a violation of paragraph 2 through 9 of subsection (b) of this Section shall be guilty of a Class 4 felony. A person convicted of a second or subsequent violation shall be guilty of a Class 3 felony. (d) This Section does not prohibit any lawfully authorized investigative, protective, law enforcement or other activity of any agency of the United States, State of Illinois or any other state or political subdivision thereof. **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status,

35

sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. _The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107._ _(See Exhibits in Appendix Section)_

### Charge 3:  Cyber-Harassment, Cyber-Stalking, Computer Fraud & Computer Tampering
Ronald Huberman has sent the plaintiff; Francine Y., between 150-300 pieces of junk email on a daily basis on or around November 17, 2007 in an effort to coerce her into embezzling money from the CTA's claim fund, the City of Chicago's claim fund and the State of Illinois' claim fund. To date the plaintiff has over 42,000 pieces of junk email remaining that was sent to her. However, there have been many more pieces that were sent to the plaintiff, but some of those pieces have been deleted.    The emails have consisted of content making references to embezzlement, sexual acts and activities, losing weight, colon cleansing, LASIK surgery as well as other elements relating to the plaintiff. The plaintiff was sent junk emails pertaining to not having enough life insurance and ending up in a wheelchair. She perceived these pieces of junk mail to be threats against her safety as well as her life.    Also, Ronald Huberman stole the plaintiff's password to her email. One day while on line, the plaintiff responded to some emails. Ronald Huberman was on line as well and he switched screens while the plaintiff was typing and made a reference to her petition for rehearing brief. "He stated, there, there now. Play nice now." In the beginning the plaintiff thought this entire ordeal was a sick joke, so she deleted

some of the emails because they were tying up her email. The plaintiff was also in denial that something like this could be happening to her. She realized it was real when the police officers showed up at the Pacific Garden Mission.

The plaintiff transmitted from computers within DePaul University's alumni lab. Ronald Huberman had undercover shoppers coming into the alumni lab at DePaul University to keep the plaintiff under heavy surveillance while she used the computers to look for jobs and study for her project management certification. One black man with dreadlocks and a medium build followed the plaintiff while she was eating lunch in the student center at DePaul University. The plaintiff believed that the man could have been an undercover police officer. Francine Y. is not sure how the undercover shoppers gained access inside the alumni lab because the students are required to have identification cards in order to get inside the computer lab. More than likely, one of DePaul University's employees must have aided and abetted with the stalking, harassment and heavy surveillance of the plaintiff. Lastly, about a week or two after the plaintiff reported the fraud to the media, Ronald Huberman had all of the computers in the alumni lab at DePaul University taken out and replaced with new ones. The time frame of the removal of the computers was during the Easter break for the DePaul University students. This was done in an effort to conceal evidence because the modems contained the deleted emails. If DePaul University can't produce a receipt of purchase and the computers themselves with untapped modems, then they have participated in aiding, abetting and obstructing justice.

Lastly, Miriam Martinez, the officer that stalked and followed the plaintiff knew about the emails because she made a reference to an email address that Ronald Huberman set up which was

37

GreggGoldsholl@solvedebts.com.  Miriam Martinez stated to Francine Y., "why don't you call your attorney and tell him that someone is harassing you via email. I don't believe you have one. The evidence is on the modem."

**720 ILCS 135/0.01 - 135/2 Harassing and Obscene Communications Act, 720 ILCS 135/0.01 Harassing and Obscene Communications Act 1957 and 720 ILCS 135/1 Sending Obscene Messages.** Any person in this State who sends messages or uses language or terms which are obscene, lewd or immoral with the intent to offend by means of or while using a telephone or telegraph facilities, equipment or wires of any person, firm or corporation engaged in the transmission of news or messages between states or within the State of Illinois is guilty of a Class B misdemeanor. The use of language or terms which are obscene, lewd or immoral is prima facie evidence of the intent to offend. **720 ILCS 5/12 7.5 Cyberstalking.** (a) A person commits cyberstalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions, harasses another person through the use of electronic communication and: (1) at any time transmits a threat of immediate or  future bodily harm, sexual assault, confinement, or restraint and the threat is directed towards that person or a family member of that person, or (2) places that person or a family member of that  person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint. (b) As used in this Section:  "Harass" means to engage in a knowing and willful course of conduct directed at a specific person that alarms, torments, or terrorizes that person. "Electronic communication" means any transfer of signs, signals, writings, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire, radio, electronmagnetic, photoelectric, or photo optical system. "Electronic communication" includes transmissions by a computer through the Internet to another computer. (c) Sentence. Cyberstalking is a Class 4 felony. A second or subsequent

conviction for cyberstalking is a Class 3 felony. **720 ILCS 5/16D-5 Computer Fraud.** (a) A person commits the offense of computer when he knowingly:  (1) Accesses or causes to be accessed a computer or any part thereof, or a program or data, for the purpose of devising or executing any scheme, artifice to defraud, or as part of a deception; (2) Obtains use of, damages, or destroys a computer or any part thereof, or alters, deletes, or removes any program or data contained therein, in connection with any scheme, artifice to defraud, or as part of a deception; or (3) Accesses or causes to be accessed a computer or any part thereof, or a program or data, and obtains money or control over any such money, property, or services of another in connection with any scheme, artifice to defraud, or as part of a deception. **720 ILCS 5/16D-3. Computer Tampering.** (a) A person commits the offense of computer tampering when he knowingly and without the authorization of a computer's owner, as defined in Section 15-2 of this Code, or in excess of the authority granted to him:  (3) Accesses or causes to be accessed a computer or any part thereof, or a program or data, and damages or destroys the computer or alters, deletes or removes a computer program or data; (4) Inserts or attempts to insert a "program" into a computer or computer program knowing or having reason to believe that such "program" contains information or commands that will or, may damage or destroy that computer, or any other computer subsequently accessing or being accessed by that computer, or that will or may alter, delete or remove a computer program or data from that computer, or any other computer program or data in a computer subsequently accessing or being accessed by that computer, or that will or may cause loss to the users of that computer or the users of a computer which accesses or which is accessed by such "program"; (5) Falsifies or forges electronic mail transmission information or other routing information in any manner in connection with the transmission of unsolicited bulk electronic mail through or into the computer network of an

39

electronic mail service provider or its subscribers; (b) Sentence. (1) A person who commits the offense of computer tampering as set forth in subsection (a)(1), (a)(5), or (a-5) of this Section shall be guilty of a Class B misdemeanor (4) If the injury arises from the transmission of unsolicited bulk electronic mail, the injured person, other than an electronic mail service provider, may also recover attorney's fees and costs, and may elect, in lieu of actual damages, to recover the lesser of $10 for each and every unsolicited bulk electronic mail message transmitted in violation of this Section, or $25,000 per day. The injured person shall not have a cause of action against the electronic mail service provider that merely transmits the unsolicited bulk electronic mail over its computer network. (5) If the injury arises from the transmission of unsolicited bulk electronic mail, an injured electronic mail service provider may also recover attorney's fees and costs, and may elect, in lieu of actual damages, to recover the greater of $10 for each and every unsolicited electronic mail advertisement transmitted in violation of this Section, or $25,000 per day. (6) The provisions of this Section shall not be construed to limit any person's right to pursue any additional civil remedy otherwise allowed by law. (c) Whoever suffers loss by reason of a violation of subsection (a)(4) of this Section may, in a civil action against the violator, obtain appropriate relief. In a civil action under this Section, the court may award to the prevailing party reasonable attorney's fees and other litigation expenses. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or

unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(B) Freedom from Sexual Harassment-Employment and Higher Education.** To prevent sexual harassment in employment and sexual harassment in higher education.    **The 1970 Illinois Constitution, Article I, Section 20:    Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.  (See Exhibits in Appendix Section)*

### Charge 4:  Sexual Harassment, Obscenity, Indecent Exposure/Basis:  Gender

Francine Y. is a female.  She has been sexually cyber-harassed by Ronald Huberman because she would not willfully engage in the acts of embezzlement and money laundering.   Ronald Huberman; a male CTA employee, has sent several sexually explicit emails to the plaintiff.  He also had a police officer with the fraudulent name of Miriam Martinez to place the green leg of a dangerous bird in the plaintiff's path while she was on her way to look for work.  There is a sexual harassment law which states that a dangerous animal contributes to a hostile working environment.  Looking for work does constitute a working environment.  Also, one female police officer; Miriam Martinez,  made a comment in December of 2007 that she would rather have smaller breasts than to have the big breasts that Francine Y. has.  Miriam Martinez was an active duty police officer during the time she perpetrated a homeless person while living at the Pacific Garden Mission.   She engaged in the acts of sexual harassment, official misconduct and disorderly conduct.  Miriam Martinez also engaged in the acts of public indecency and obscenity

41

by raising her shirt up and showing the plaintiff her grotesque looking stretch marks on her abdomen. The exposure was made in PGM's public hallway when the plaintiff was proceeding toward the line to go down for breakfast. Hopefully it was not done to entice the plaintiff because Francine Y. is a 100% heterosexual. The plaintiff never encouraged this behavior, but remained willfully indifferent by walking pass the officer. Nassira Tokash sexually harassed the plaintiff by repeatedly wearing similar cotton panties in an effort to mock her. Nassira Tokash also walked through the changing area displaying her nudity from the waist up. The was done to mock one of the homeless women who was more than likely a drug addict and possibly afflicted with a mental illness as well. It was also used as an act of obscenity and indecent exposure to entice lesbians. The Pacific Garden Mission has a rule that the women cannot disrobe or dress in the bunk area. The mission also stated that the guests need to cover their nudity with a towel when proceeding from the changing area to the showers. Nassira Tokash was an active duty police officer during the time she perpetrated a homeless person while living at PGM. She engaged in the acts of sexual harassment, indecent exposure, obscenity, official misconduct and disorderly conduct. The plaintiff is a 100% heterosexual. Francine Y. and many other women complained to the staff at the PGM homeless facility about the sexual advances and innuendos they were subjected to by other women living in the mission because they became offended by their actions. Another act of sexual harassment was performed when the plaintiff was being processed after the false arrest. Francine Y. was asked by officer Melchor to give her identifying features or marks. The plaintiff stated that she has pretty eyes and large breasts. While the plaintiff was being processed, three black male officers watched and made sexually explicit remarks to the plaintiff. These officers were officer Doyle, officer Melchor and officer Hayes. They were laughing and stated, "that's right with those big ass titties (meaning breasts) and that

42

big ass." The plaintiff told the officers that she did not play that. Lastly, while the plaintiff was being frisked by a Mexican, female police officer, the officer reached and placed her hand under the plaintiff's bra and felt all around the rim of it, rubbing up against the plaintiff's breasts. She stated, "oh, you have on a wire frame bra." The officer also touched the plaintiff in a way which felt sexual in nature. The female police officer amused herself by raising the plaintiff's shirt up while she frisked her. Officer Melchor stood up so that he could get a good look through the glass. The plaintiff told the female police officer while being frisked that officer Melchor was watching through the glass window. She asked the officer if she could stop raising up her shirt because officer Melchor could see through the glass window. It was as if the officers performed this routine on a daily basis when women came in to be processed. Officers Dolye and Hayes came out of nowhere prepared to watch what appeared to be a routine show that was reenacted on a daily basis. The show included sexual harassment, harassment, mockery, ridicule and inappropriate laughing with the use of a female police officer assisting and aiding them. Lastly, another act of sexual harassment that Ronald Huberman subjected the plaintiff to was the fact that he instructed a white, male doctor to examine the plaintiff in the emergency room at Stroger's hospital. The doctor engaged in a single malicious act of sexual harassment by pulling back the plaintiff's inner and outer labia flaps around her vagina with his hand in an effort to insert a metal object for a pap smear. He also asked Francine Y. if she had ever had an abortion or a miscarriage before. Before the exam, the plaintiff complained to the doctor about a stomach ache. She thought she might have still been ill from the poison within her system which came from the attempted drug-induced homicide. The doctor gave the plaintiff a phony pap smear and told the plaintiff to call for her results. He also gave the plaintiff her release form with a phony telephone number on it to call for results. The number stated to press #1 for the dentist and

maybe #2 or #3 for prenatal care.   Several days later, the plaintiff came back to the emergency room to ask about her results; however, there were no results and another physician gave her a prescription to get a yeast infection pill from the pharmacist.

**775 ILCS 5/1-102 (B) Freedom from Sexual Harassment-Employment and Higher Education.** To prevent sexual harassment in employment and sexual harassment in higher education. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion.   **720 ILCS 5/11-9 Public Indecency.**  (a) Any person of the age of 17 years and upwards who performs any of the following acts in a public place commits a public indecency:  (1) An act of sexual penetration or sexual conduct as defined in Section 12-12 of this Code; or (2) A lewd exposure of the body done with intent to  arouse or to satisfy the sexual desire of the person. Breast-feeding of infants is not an act of public indecency.  (b) "Public place" for purposes of this Section means any place where the conduct may reasonably be expected to be viewed by others. (c) Sentence. Public indecency is a Class A misdemeanor. A person convicted of a third or subsequent violation for public indecency is guilty of a Class 4 felony.  **720 ILCS 5/11-20 Obscenity.**  (a) Elements of the Offense. A person commits obscenity when, with knowledge of the nature or content thereof, or recklessly failing to exercise reasonable inspection which would have disclosed the nature or content thereof, he; (1) Sells, delivers or provides, or offers or agrees to sell, deliver or provide any obscene writing, picture, record or other representation or embodiment of the obscene; or (2) Presents or directs an obscene play, dance or other performance or participates directly in that portion thereof which makes it obscene; or  (3) Publishes, exhibits or otherwise makes available anything obscene; or (4) Performs an obscene act or otherwise presents an obscene exhibition of his body for gain.  **720 ILCS 5/33-3 Official Misconduct.**  A public officer or employee or

special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts: (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is forbidden by law to perform; or (c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law.    A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his office or employment or position as a special government agent. In addition, he commits a Class 3 felony.    **720 ILCS 5/ 26-1.  Disorderly Conduct.**  a) A person commits disorderly conduct when he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078.*    *(See Exhibits in Appendix Section)*

### *Charge 5:  Discrimination/Basis:  Disability = Major Depression & Anxiety*
The plaintiff; Francine Y., was diagnosed with anxiety and major depression in December of 2003.  The plaintiff's illnesses are defined and protected under the ADA and Section 504 of the Rehabilitation Act. The Chicago Transit Authority was aware of the plaintiff's illnesses because they gave her a referral to see a physician and placed her on a medical leave of absence to be treated for her illnesses.  The plaintiff's illnesses were sustained from her work environment because of the retaliation and harassment associated with the lawsuit she filed. The Illinois Department of Human Rights and the Appellate Court systems were all made aware of these facts.  Because the plaintiff was discriminated against and separated from employment with the CTA because of her disabilities, the defendants broke the law.  They segregated her by stating

45

that she was unfit to be an employee with CTA based upon fraudulent disabilities that they diagnosed her with.    The ADA prohibits employers from discriminating against qualified applicants in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment.

The plaintiff was discriminated against because of her disabilities because she was treated differently than other, similarly situated employees within CTA's work environment.    Steven Byk is a white male employee who has at least one disability which is defined and protected under the Americans with disability act.    He was not separated from service because of his disability nor was he treated as if he was psychotic and dangerous because of his disability.    He remains on CTA's payroll as an active employee and the medical insurance company continues to cover his healthcare.    There are other employees who are probable using their medical insurance for pshyscian visits as well as medication.    Those individuals might be Ron Cabai and Angela King.    Angela King was also a behind the scene conspirator because she was instrumental in having the defendants diagnose the plaintiff with paranoia.    She was seen mocking the plaintiff about being crazy and Francine Y. filed an internal EEOC complaint against her.    She was one the of main conspirators who was primarily responsible for the plaintiff being diagnosed with paranoia.

On Feburary 4, 2008, the plaintiff reported a homeless guest; Barbara Rawlings, to the management at the PGM homeless facility who threatened to do bodily harm to her and who amused herself by repeatedly assaulting the plaintiff through the act of bumping into her.    Some of the acts of assault against the plaintiff were done verbally in the form of death threats.    The plaintiff; Francine Y., had a witness who could attest to Barbara Rawlings behavior.    However,

46

Ms. Gurlean intentionally ignored the plaintiff's complaint and conspired to discriminate against her because of her disabilities while simultaneously defaming her as being someone that is psychotic. The staff took no disciplinary action against Barbara Rawlings, but remained willfully and consciously indifferent. On Feburary 6, 2008 the plaintiff asked to see another staff member to report the physical and verbal abuse that she experienced at the hands of Barbara Rawlings. The plaintiff also mentioned the fact that the staff should ask Pastor Phil why the MAFIA had police officers living in PGM. Again, the staff at PGM remained willfully and consciously indifferent by ignoring the plaintiff's complaint. Some of the members of PGM's staff made phone calls and conspired with Ronald Huberman by giving the plaintiff a referral to see a psychiatrist at Stroger's hospital because she made the complaints. Francine Y. was discriminated against because the staff at PGM told her that she could not live at the PGM if she did not see a doctor at Stroger's hospital. The ADA states that it is unlawful to discriminate against a person because they have a disability by denying them access to the use of public accommodations. The Pacific Garden Mission is defined under the ADA as being a place which facilitates public accommodations. The plaintiff was made to see a primary health care physician as well as a psychiatrist because she opposed unlawful discrimination.

The motive for the PGM not calling 911 to have the Chicago police officers assist with an arrest regarding Barbara Rawlings was the fact that Barbara Rawlings was friends and/or acquaintances with Chanel. Chanel is a female homeless guest that Miriam Martinez provoked and carried out the act of police brutality against. Also, Barabara Rawlings did not like Miriam Martinez because she was creating conflicts within the mission. More than likely Ronald Huberman gave PGM as well as the police officers instructions not to make the arrest. Lastly, another motive for

47

not making the arrest was the fact that Barbara Rawlings might have had some criminal charges in her background as well as other reasons which were related to the Pacific Garden Mission. In March 2008, the plaintiff learned that Barbara Rawlings had been involved in a verbal confrontation as well as a physical altercation with another homeless PGM guest. After this incident, the staff at PGM took disciplinary action against Barbara Rawlings.

The psychiatrist stated in the plaintiff's medical file that he needed more information before he could make an accurate diagnosis. The psychiatrist and college interns disclosed the plaintiff's protected health information to Ronald Huberman who in turn disclosed it to Pastor Phil at the PGM homeless facility. This is evident because the following Saturday, Pastor Phil preached the plaintiff's life by mentioning information contained within the notes that the interns had written down.

Another incident of discrimination and defamation involved Miriam Martinez sitting by Francine Y. in chapel almost on a daily basis. The officer kept mocking the homeless people that she felt were mentally ill, inclusive of the plaintiff. Miriam Martinez mocked the homeless by repeatedly talking to herself as if she was mentally ill. The plaintiff never encouraged or engaged in this behavior because she felt it was wrong, sinful and extremely offensive. Francine Y. was perceived as being psychotic because she complained about the abuse that she was being subjected to. The plaintiff was intentionally perceived to be psychotic because she opposed unlawful discrimination and the fact that she was affiliated with homeless people who have psychotic illnesses. The plaintiff also received an email mocking her about psychotic medication after this incident. Ronald Huberman has been sending the plaintiff emails in the form of junk mail since November 2007. During and prior to this time, Ronald Huberman kept the plaintiff

48

under heavy surveillance by PGM's staff, homeless guests and at least two female police officers.

**The Americans with Disabilities Act of 1990 (ADA)** prohibits discrimination on the basis of disabilities in employment, state and local government, public accommodations, commercial facilities, transportation, and telecommunications. The ADA also prohibits private employers, state and local governments, employment agencies and labor unions from discriminating against qualified individuals with disabilities in job application procedures, hiring, firing, advancement, compensation, job training, and other terms, conditions, and privileges of employment. The ADA covers employers with fifteen or more employees, including state and local governments. It also applies to employment agencies, labor organizations and to the United States Congress. To be protected by the ADA, one must have a disability or have a relationship or association with an individual with a disability. An individual with a disability is defined by the ADA as a person who has a physical or mental impairment that substantially limits one or more major life activities, a person who has a history or record of such an impairment, or a person who is perceived by others as having such an impairment. Major life activities are activities that an average person can perform with little or no difficulty such as walking, breathing, seeing, hearing, speaking, learning, and working. A qualified employee or applicant with a disability is an individual who, with or without reasonable accommodation, can perform the essential functions of the job in question. An employer is required to make a reasonable accommodation to the known disability of a qualified applicant or employee if it would not impose an "undue hardship" on the operation of the employer's business. Reasonable accommodations may include, but are not limited to making existing facilities used by employees readily accessible to and usable by persons with disabilities; job restructuring, modifying work schedules,

49

reassignment to a vacant position; acquiring or modifying equipment or devices, adjusting or modifying examinations, training materials, or policies and providing qualified readers or interpreters. An undue hardship is defined as an action requiring significant difficulty or expense when considered in light of factors such as an employer's size, financial resources, and the nature and structure of its operations. *42 U.S.C. § 12111–12117.* **Title II of the ADA** has two sections. These sections relate to public services and public transportation. Both sections state that a "public entity" can be any state or local government or any department or agency thereof. The lack of accessibility or certain services can be considered discrimination, regardless of who it actually affects. The first section covers public agencies (local, county, state, etc., government and their units). That section generally requires the agencies to comply with regulations similar to **Section 504 of the Rehabilitation Act.** These rules cover access to all programs offered by the entity. Access includes physical access described in the Uniform Federal Accessibility Standards or the ADA Standards for Accessible Design and access that might be obstructed by discriminatory policies or procedures of the entity. The other section of Title II is specific to public transportation provided by public entities. This section requires the provision of paratransit services by public entities. *42 U.S.C. § 12131–12165.* Under **Title III of the ADA,** no individual may be discriminated against on the basis of disability with regards to the full and equal enjoyment of the goods, services, facilities, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. "Public accommodations" include most places of lodging such as hotels, recreation, transportation, education, dining, stores, care providers, and places of public displays, among other things. *42 U.S.C. § 12181–12189.* **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from**

**Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. *Olmstead v. L.C. (98-536) 527 U.S. 581 (1999) 138 F.3d 893.* *(See Exhibits in Appendix Section)*

### Charge 6: Harassment/Basis: Gender

The plaintiff; Francine Y. is a female employee who complained about the harassment she was experiencing in CTA's workplace by Ernest Payne. Edmund Oparah is a male, similarly situated employee who complained about Ernest Payne as well. Edmund complained to Francine Y. several times during business hours within CTA's work environment about the abuse and harassment that he was being subjected to by Ernest Payne. Some days the harassment became so intolerable, Edmund cried in front of Francine Y. and she gave him a Kleenex. Edmund Oparah was granted a transfer off of Ernest Payne's team, the plaintiff; Francine Y. was not. Edmund Oparah has not been harassed or retaliated against in the magnitude of Francine Y. He was not fraudulently separated from service, he was not diagnosed with fraudulent psychotic mental illnesses, he was not stalked, ridiculed, mocked, placed under heavy surveillance, threatened, poisoned through the use of an attempted drug-induced homicide, cyber harassed, cyber sexually harassed, sent an illegal search warrant to have his storage lockers illegally accessed, fraudulently given a criminal background or falsely arrested. Other incidences of harassment included: Miriam Martinez harassing the plaintiff about eating chicken, cloning

51

herself with the attributes of others, harassing the plaintiff about contracting diabetes, constantly watching the plaintiff, keeping the plaintiff under heavy surveillance, following and stalking the plaintiff, reporting on the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, mocking the plaintiff about mentally ill, mocking the plaintiff about not having an attorney, mocking the plaintiff about being fat, telling the plaintiff that she would end up dead on the side of a road, mocking the plaintiff about having large breasts, slandering the plaintiff about being Ronald Huberman's lover and harassing the plaintiff for not having money. When Miriam Martinez made references to eating chicken and having diabetes, she stereotyped the plaintiff as being black. However, Francine Y. is bi-racial, she eats other foods besides chicken and she does not have diabetes. The other officer; Nassira Tokash, harassed the plaintiff by watching her, keeping the plaintiff under heavy surveillance, wearing similar cotton panties, displaying her nudity from the waist up, wearing a similar bandanna, carrying a Whole Foods bag the next day after the plaintiff was seen with one, carrying a blackberry telephone and a pink razor blade into the dormitory area when she was forbidden by the staff to do so, cloning herself with the attributes of others, stalking and following the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, forging a false domestic battery, staging a false arrest, not showing up in court, lying on the plaintiff, telling the plaintiff that she needs to loose weight, telling the plaintiff that she needs to change her pants, telling Francine Y. that she sits around all day and does nothing and mocking her that she did not have any money. Nassira Tokash also mocked the plaintiff on May 25, 2008 by saying, "I want you out, out in the morning and then you will see."

The argument started because the plaintiff stated that she knew Spanish and French. It intensified and the plaintiff told the officer that she needed to find a cosmetic surgeon to fix her feet. The heels of the officer's feet were badly damaged and the plaintiff made mental notes to use them as identifying marks. Francine Y. also stated that she was not going to embezzle any money. Nassira Tokash became angry and placed a call on her blackberry, told vicious lies and staged a false arrest the very next day. Miriam Martinez and Nassia Tokash are both Mexicans. There have been a lot of factual issues reported where Mexicans have been intentionally discriminating against blacks. Many of them are developing a growing perpetual hatred against blacks because they feel as if they are competing for jobs. Also, individuals have made the plaintiff aware that one of the initiation processes to become a Latin King is to kill a black female. This is racial hatred and it is also murder.

Some other issues of harassment consisted of Officer Melchor harassing the plaintiff by yelling at her to get into the police car, to shut up when she was asking questions and trying to explain that it was a false arrest, issuing a false police report, snatching the plaintiff's bag, harassing the plaintiff about her weight, mocking the plaintiff that her driver's license had expired and that she was arrested on her birthday. The plaintiff's bag had pens in it because it was broken and the plaintiff's hand was scraped against the pen when officer Melchor snatched the bag. Francine Y. showed officer Melchor her hands, but no one gave her a band-aid or sent her to Stroger's hospital to receive medical attention. He claimed that her hands had been chewed on. He placed the plaintiff in a cell with a female which had not been handcupped. As a result, he did nothing to help the plaintiff but ignored her by remaining willfully indifferent. While being processed, a black female officer that frisked the plaintiff mocked the plaintiff because she made a statement

about God. A second, young black female told the black officer that frisked the plaintiff to check off "did not respond" to a question while she was filling out paperwork relating to the plaintiff. This is fraud. The plaintiff became angry and made both officers aware that she did in fact respond to the question. The officer making the report quickly changed it. Another, fat, black female officer put the plaintiff's glasses on the table when she was instructed to put them in the paper eyeglass holder. The plaintiff was also visually impaired and needed her glasses to see. Her glasses were taken away from her when she was wrongfully incarcerated and placed into a holding cell.

Lastly, on June 30, 2008, the plaintiff came to the 17th and State police station to retrieve a copy of the police report from the false arrest which was never given to her. She also wanted to file a complaint against Kenyatta. Kenyatta is a black, female homeless woman who assisted Nassira Tokash with the false arrest on May 26, 2008. The plaintiff mentioned to officer King that Kenyatta was supposedly on the run for something she did in Texas. She asked if they would arrest her. He replied, "no" because other officers were watching and they coerced him into lying. The plaintiff was not allowed to fill out a police report against Kenyatta nor was she given a copy of the police report that was made against her on May 26, 2008. A black female officer went through a door behind the complaint desk and brought out between twenty and fourty police officers. The officers were primarily white and male. There were also black officers as well as female officers. They intimidated the plaintiff by surrounding her and staring at her when she came to the station on June 30, 2008 to retrieve a copy of the police report. The officer's physical proximity in relation to where the plaintiff was standing was such of a nature

54

that the plaintiff felt her physical safety was threatened within an environment which should have been conducive to safety and protecting the innocent.

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078.* *(See Exhibits in Appendix Section)*

### *Charge 7: Harassment/Basis: Race; Ethnicity = Black, African-American*
The plaintiff, Francine Y., is a black, female employee who complained about the harassment she was experiencing in CTA's workplace by Ernest Payne. Bernadine Majewski is a white, similarly situated female employee, who complained about Ernest Payne as well. Bernadine Majewski was granted a transfer from off of Ernest Payne's team; the plaintiff, Francine Y. was not. Bernadine has not been harassed or retaliated against in the magnitude of Francine Y. Bernadine Majewski was not fraudulently separated from service, she was not diagnosed with fraudulent psychotic mental illnesses, made to become homeless, followed and stalked, ridiculed,

mocked, placed under heavy surveillance, threatened, poisoned through the use of an attempted drug-induced homicide, cyber harassed, sexually harassed, harassed, sent an illegal search warrant to have her storage locker searched, falsely arrested or given a fraudulent criminal background. The harassment consisted of Ronald Huberman sending the plaintiff between 150-300 junk emails per day and having others inside and outside of the PGM homeless facility to harass the plaintiff as well. Ronald Huberman is a bi-racial Jewish male. There has been a great deal of animosity stemming from the Jewish disregard for blacks because of the bondage that they were forced into while Pharaoh was king of Egypt. That incident has nothing to do with African-Americans. African-Americans are one of the most hated groups of people on the face of the earth. Other incidences of harassment included Miriam Martinez harassing the plaintiff about eating chicken, harassing the plaintiff about contracting diabetes, constantly watching the plaintiff, following and stalking the plaintiff, placing the plaintiff under heavy surveillance, reporting on the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, telling the plaintiff that she would end up dead on the side of a road, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, mocking the plaintiff about being mentally ill, mocking the plaintiff about not having an attorney, mocking the plaintiff about being fat, mocking the plaintiff about having large breasts, slandering the plaintiff about being Ronald Huberman's lover, selling the plaintiff out for pennies, nickels, dimes and harassing the plaintiff for not having money. When Miriam Martinez made references to eating chicken and having diabetes, she stereotyped the plaintiff as being black. However, Francine Y. is bi-racial, she eats other foods besides chicken and she does not have diabetes. Nassira Tokash harassed the plaintiff by watching her, wearing similar cotton panties, displaying her nudity from the waist up, wearing a similar bandanna, carrying a

56

Whole Foods bag the day after the plaintiff was seen carrying one, stalking and following the plaintiff, keeping the plaintiff under heavy surveillance, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, forging a false domestic battery, not showing up in court, mocking the plaintiff about being mentally ill, carrying a razor blade and a cellular telephone in the dormitory when they were forbidden by the staff, staging a false arrest, lying on the plaintiff, telling the plaintiff that she needs to stop eating for two months to loose weight, telling the plaintiff that she needs to change her pants, telling the plaintiff that she sits around all day and does nothing, selling the plaintiff out for pennies, nickels, dimes and telling the plaintiff that she did not have any money. Nassira Tokash mocked the plaintiff on May 25, 2008 by saying, " I want you  out, out in the morning and then you will see." The argument started because the plaintiff stated that she knew Spanish and French.  It intensified and the plaintiff told the officer that she needed to find a cosmetic surgeon to fix her feet.  The officer's feet were badly damaged, so the plaintiff made mental notes to use them as identifying marks. The plaintiff also stated that she was not going to embezzle any money.  Nassira Tokash became angry and placed a call on her blackberry, told vicious lies and staged a false arrest the next day.


Miriam Martinez and Nassia Tokash are both Mexicans.  There have been a lot of factual issues reported where Mexicans have been intentionally discriminating against blacks.  Many of them are developing a growing perpetual hatred against blacks because they feel as if they are competing for jobs.  Also, individuals have made the plaintiff aware that one of the initiation processes to become a Latin King is to kill a black female.  This is racial hatred and it is also murder.

Another issue of harassment consisted of officer Melchor harassing the plaintiff by yelling at her to get into the police car, to shut up when she was asking questions and trying to explain that it was a false arrest, issuing a false police report, snatching the plaintiff's bag, harassing her about her weight, mocking the plaintiff that her driver's license had expired and that she was arrested on her birthday. Also, the plaintiff's bag had pens in it because it was broken and the plaintiff's hand was scraped against the pen when officer Melchor snatched the bag. Francine Y. showed officer Melchor her hands, but no one gave her a band-aid or sent her to Stroger's hospital to receive medical attention. He claimed that her hands had been chewed on. As a result, he did nothing to help the plaintiff but ignored her by remaining willfully indifferent. Lastly, on June 30, 2008, the plaintiff came to the 17th and State police station to retrieve a copy of the police report from the false arrest which was never given to her. She also wanted to file a complaint against Kenyatta. Kenyatta is a black homeless woman who assisted Nassira Tokash with the false arrest on May 26, 2008. The plaintiff mentioned to officer King that Kenyatta was supposedly on the run for something she did in Texas. She asked if they would arrest her. He replied, "no" because other officers were watching him and they coerced him into lying. The plaintiff was not allowed to fill out a police report against Kenyatta nor was she given a copy of the report that was made against her on May 26, 2008. A black female officer went through a door behind the complaint desk and brought out between twenty and fourty police officers. The officers were primarily white and male. There were also black officers as well as female officers. They intimidated the plaintiff by surrounding her and staring at her when she came to the station on June 30, 2008 to retrieve a copy of the report. The officer's physical proximity in relation to where the plaintiff was standing was such of a nature that the plaintiff felt her physical

safety was threatened within an environment which should have been conducive to safety and protecting the innocent.

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. . **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078. (See Exhibits in Appendix Section)*

### *Charge 8: Harassment/Basis: Marital Status = Single, Unmarried*
The plaintiff, Francine Y., is single female employee who complained about the harassment she was experiencing in CTA's workplace by Ernest Payne. The defendants had knowledge of the plaintiff's marital status. Edmund Oparah is a married male, similarly situated employee, who complained about Ernest Payne as well. Edmund Oparah has not been harassed or retaliated against in the magnitude of Francine Y. Edmund Oparah was not fraudulently separated from service, he was not diagnosed with fraudulent psychotic mental illnesses, made to become homeless, followed and stalked, ridiculed, mocked, placed under heavy surveillance, threatened,

poisoned through the use of an attempted drug-induced homicide, cyber harassed, sexually harassed, harassed, sent an illegal search warrant to have his storage locker searched, falsely arrested or given a fraudulent criminal background.   The harassment consisted of Ronald Huberman sending the plaintiff between 150-300 junk emails per day and having others inside and outside of the PGM homeless facility to harass the plaintiff as well.  Ronald Huberman is also a single male employee with the CTA.  Other incidences of harassment included Miriam Martinez harassing the plaintiff about eating chicken, harassing the plaintiff about contracting diabetes, constantly watching the plaintiff, following and stalking the plaintiff, placing the plaintiff under heavy surveillance, reporting on the plaintiff, placing the green leg of a dangerous bird in the plaintiff's path, telling the plaintiff that she would end up dead on the side of a road, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, mocking the plaintiff about being mentally ill, mocking the plaintiff about not having an attorney, mocking the plaintiff about being fat, mocking the plaintiff about having large breasts, slandering the plaintiff about being Ronald Huberman's lover, selling the plaintiff out for pennies, nickels, dimes and harassing the plaintiff for not having money.  When Miriam Martinez made references to eating chicken and having diabetes, she stereotyped the plaintiff as being black.  However, Francine Y. is bi-racial, she eats other foods besides chicken and she does not have diabetes.  Nassira Tokash harassed the plaintiff by watching her, wearing similar cotton panties, displaying her nudity from the waist up, wearing a similar bandanna, carrying a Whole Foods bag the day after the plaintiff was seen carrying one, stalking and following the plaintiff, keeping the plaintiff under heavy surveillance, placing the green leg of a dangerous bird in the plaintiff's path, poisoning and attempting to kill the plaintiff through the use of a drug-induced homicide, using a fictitious name and identity, forging a false domestic

60

battery, not showing up in court, mocking the plaintiff about being mentally ill, carrying a razor blade and a cellular telephone in the dormitory when they were forbidden by the staff, staging a false arrest, lying on the plaintiff, telling the plaintiff that she needs to stop eating for two months to loose weight, telling the plaintiff that she needs to change her pants, telling the plaintiff that she sits around all day and does nothing, selling the plaintiff out for pennies, nickels, dimes and telling the plaintiff that she did not have any money. Nassira Tokash mocked the plaintiff on May 25, 2008 by saying, " I want you out, out in the morning and then you will see." The argument started because the plaintiff stated that she knew Spanish and French. It intensified and the plaintiff told the officer that she needed to find a cosmetic surgeon to fix her feet. The officer's feet were badly damaged, so the plaintiff made mental notes to use them as identifying marks. The plaintiff also stated that she was not going to embezzle any money. Nassira Tokash became angry and placed a call on her blackberry, told vicious lies and staged a false arrest the next day.

Miriam Martinez and Nassia Tokash are both Mexicans. There have been a lot of factual issues reported where Mexicans have been intentionally discriminating against blacks. Many of them are developing a growing perpetual hatred against blacks because they feel as if they are competing for jobs. Also, individuals have made the plaintiff aware that one of the initiation processes to become a Latin King is to kill a black female. This is racial hatred and it is also murder.

Another issue of harassment consisted of officer Melchor harassing the plaintiff by yelling at her to get into the police car, to shut up when she was asking questions and trying to explain that it

61

was a false arrest, issuing a false police report, snatching the plaintiff's bag, harassing her about her weight, mocking the plaintiff that her driver's license had expired and that she was arrested on her birthday. Also, the plaintiff's bag had pens in it because it was broken and the plaintiff's hand was scraped against the pen when officer Melchor snatched the bag. Francine Y. showed officer Melchor her hands, but no one gave her a band-aid or sent her to Stroger's hospital to receive medical attention. He claimed that her hands had been chewed on. As a result, he did nothing to help the plaintiff but ignored her by remaining willfully indifferent. Lastly, on June 30, 2008, the plaintiff came to the 17th and State police station to retrieve a copy of the police report from the false arrest which was never given to her. She also wanted to file a complaint against Kenyatta. Kenyatta is a black homeless woman who assisted Nassira Tokash with the false arrest on May 26, 2008. The plaintiff mentioned to officer King that Kenyatta was supposedly on the run for something she did in Texas. She asked if they would arrest her. He replied, "no" because other officers were watching him and they coerced him into lying. The plaintiff was not allowed to fill out a police report against Kenyatta nor was she given a copy of the report that was made against her on May 26, 2008. A black female officer went through a door behind the complaint desk and brought out between twenty and fourty police officers. The officers were primarily white and male. There were also black officers as well as female officers. They intimidated the plaintiff by surrounding her and staring at her when she came to the station on June 30, 2008 to retrieve a copy of the report. The officer's physical proximity in relation to where the plaintiff was standing was such of a nature that the plaintiff felt her physical safety was threatened within an environment which should have been conducive to safety and protecting the innocent.

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20:   Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. . **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078. (See Exhibits in Appendix Section)*

### *Charge 9:  Harassment/Basis:  Religion; Religious Persecution = Christianity*
The plaintiff; Francine Y., is a Christian.  This fact was commonly known throughout the office. It was also evident because the plaintiff mentioned it in her petition for rehearing brief.  Also, she was living at a Christian homeless mission known as the Pacific Garden Mission.  Ronald Huberman has sent the plaintiff emails mocking her about the fact that she was attending church. He knew she was attending church because he placed the plaintiff under heavy surveillance. Tracy Robertson, an employee with CTA who works as a secretary in the front office, has been telling Ronald Huberman personal things about the plaintiff.  Tracy Robertson is a Christian who befriended Francine Y. under false pretenses.   She knew that Francine Y. was a Christian because the plaintiff disclosed her religion to Tracy, they had lunch together on several

occasions, Francine Y. attended Tracy's church a few times and the two often engaged in conversations about Christian things.   However, when Francine Y. filed an employment discrimination lawsuit, Tracey Robertson betrayed her by looking down on her, frowning at the plaintiff's personal appearance, deliberately avoiding her and treating the plaintiff like she was smelly and taboo.   Tracy Robertson also took directions from Joyce Coleman; Vice President of Human Resources, for the Chicago Transit Authority.   Those instructions requested that Tracy Robertson not help the plaintiff by being a witness when she was being retaliated against. However, Tracy Robertson failed to mention her own inadequacies such as extremely crooked teeth, a very bad marriage, gossiping too much, leaking information to an accomplice; Angela King, and wearing outdated, cheap, runt-down boots.   More than likely, she is Ronald Huberman's Chief of Staff's secretary.   Francine Y. was also affiliated with the United Methodist Church, a church which professes and practices Christianity.   This church is located across from the Daley Center.   Officer Miriam Martinez occasionally followed the plaintiff during the time she would have free lunch on-Tuesdays at the church.   Ronald Huberman is Jewish.   He made a statement to Francine Y. via email that he prays to a higher power.   This means that he is not an atheist and the higher power that he prays to is not the God of Israel that Francine Y. prays to.   There have been many recorded incidents throughout history where Jews have persecuted Christians because of their faith.   Another incident of religious persecution is the black female police officer mocking the plaintiff while she frisked her because she made a religious statement about God.   Ronald Huberman has cyber harassed and persecuted the plaintiff because of her religious beliefs.   He has had others to mock, belittle, stalk, ridicule, harass, sexually harass, oppress and persecute the plaintiff as well.   Lastly, Ronald Huberman mocked the plaintiff about her religious beliefs because he had someone to print a note and

attach it to the phone board within PGM's homeless ministry. The note stated: "CHASE THE MAYOR ENEMIES ALL WHOM ARE IN HOPE OF INHERITANCE ROMAN 6:23."

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. **Title VII of Civil Rights Act of 1964** states that is unlawful to discriminate on the basis of race, color, sex, national origin, disability or religion. *Francine Yates v. The Chicago Transit Authority, 2004CF2159 21BA41078.* *(See Exhibits in Appendix Section)*

## Charge 10: Harrasment/Basis: Retaliation for disclosing Religion and Religious Affiliation

The plaintiff engaged in the protected activities of filing an employment charge of discrimination against the CTA, the Illinois Department of Human Rights and the City of Chicago in 2004, 2006 and 2007. Also, On June 13, 2008, the plaintiff engaged in the protected activity of complaining to the FBI under the direction of Patrick Fitzgerald's office about the additional harassment, sexual harassment, fraud, a false arrest, heavy surveillance and coercion that she was experiencing from Ronald Huberman and Mayor Richard Daley. The plaintiff, Francine Y., is a Christian. This fact was commonly known throughout the office. It was also evident because

the plaintiff mentioned that she was a Christian in her petition for rehearing brief. Also, she was living at a Christian homeless mission known as the Pacific Garden Mission. Tracy Robertson, an employee with CTA who works as a secretary in the front office, has been telling Ronald Huberman personal things about the plaintiff. Tracy Robertson is a Christian who befriended Francine Y. under false pretenses. She knew that Francine Y. was a Christian because the plaintiff disclosed her religion to Tracy, they had lunch together on several occasions, Francine Y. attended Tracy's church a few times and the two often engaged in conversations about Christian things. However, when Francine Y. filed an employment discrimination lawsuit, Tracey Robertson betrayed her by looking down on her, frowning at the plaintiff's personal appearance, deliberately avoiding her and treating the plaintiff like she was smelly and taboo. Tracy Robertson also took directions from Joyce Coleman; Vice President of Human Resources, for the Chicago Transit Authority. Those instructions requested that Tracy Robertson not help the plaintiff by being a witness when she was being retaliated against. However, Tracy Robertson failed to mention her own inadequacies such as extremely crooked teeth, a very bad marriage, gossiping too much, leaking information to an accomplice; Angela King, and wearing outdated, cheap, runt-down boots. More than likely, she is Ronald Huberman's Chief of Staff's secretary. Francine Y. was also affiliated with the United Methodist Church, a church which professes and practices Christianity. This church is located across from the Daley Center. Officer Miriam Martinez occasionally followed the plaintiff during the time she would have free lunch on Tuesdays at the church. Ronald Huberman is Jewish. He made a statement to Francine Y. that he prays to a higher power. This means that he is not an atheist and the higher power that he prays to is not the God of Israel that Francine Y. prays to. There have been many recorded incidents throughout history where Jews have persecuted Christians because of their faith.

66

Ronald Huberman mocked the plaintiff about her religious beliefs because he had someone to print a note and attach it to the phone board within PGM's homeless ministry.   The note stated "CHASE THE MAYOR ENEMIES ALL WHOM ARE IN HOPE OF INHERITANCE ROMAN 6:23."   Ronald Huberman has cyber harassed and persecuted the plaintiff because of her religious beliefs.  He has had others to mock, belittle, stalk, ridicule, harass, sexually harass, oppress and persecute the plaintiff as well.  The defendant's adverse actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation.

**The Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination.  Retaliation occurs when an employer, employment agency, or labor organization takes an adverse action against a covered individual because he or she engaged in protected activities. **775 ILCS 5/6-101(A)(2006).   775 ILCS 5/6-101 (A).  Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act.  *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.*  *(See Exhibits in Appendix Section)*

### Charge 11: Harassment/Basis:  Retaliation for being Homeless and having a Disability

In 2004, 2006 and 2007, the plaintiff engaged in the protected activities of complaining about unlawful workplace discrimination.  On June 13, 2008, the plaintiff placed a call to the FBI under the direction of Patrick Fitzgerald's office.  She complained about fraud, embezzlement,

coercion, harassment, sexual harassment and police intimidation. The plaintiff, Francine Y., was diagnosed with anxiety and major depression in December of 2003. The plaintiff's illnesses are defined and protected under the ADA and Section 504 of the Rehabilitation Act. The Chicago Transit Authority was aware of the plaintiff's illnesses because they gave her a referral to see a physician and placed her on medical leave of absence to be treated for her illnesses. The plaintiff's illnesses were sustained from her work environment because of the retaliation and harassment associated with the lawsuit she filed. The Illinois Department of Human Rights and the Appellate Court systems were all made aware of these facts. As a result of the discrimination lawsuit, the plaintiff also became homeless. The Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights were all made aware of this prima facie fact because the plaintiff mentioned it in her brief and provided a physical address for the homeless shelter. The retaliation consisted of several acts. One act was the fact that the plaintiff's storage lockers in Bridgeport were illegally accessed. The owners and some of the employees at Eastbank Storage were aware that the plaintiff was homeless and the fact that she was in the middle of a legal proceeding with CTA and the City of Chicago.

Also, on Feburary 4, 2008, the plaintiff reported a homeless guest to the management at the PGM homeless facility who threatened to do bodily harm to her and repeatedly assaulted her by bumping into her. The staff took no disciplinary action against the homeless woman. On Feburary 6, 2008 the plaintiff asked to see another staff member to report the physical and verbal abuse. The plaintiff also mentioned the fact that they should ask Pastor Phil why the MAFIA had police officers living in PGM. Some of the members of PGM's staff, made phone calls and

conspired with Ronald Huberman by giving the plaintiff a referral to see a psychiatrist at Stroger's hospital because she made the complaints.

Secondly, Miriam Martinez sat by Francine Y. in chapel almost on a daily basis. She kept mocking the homeless people that she felt were mentally ill, inclusive of the plaintiff. Miriam Martinez mocked the homeless by repeatedly talking to herself as if she was mentally ill. The plaintiff never encouraged or engaged in this behavior because she felt it was wrong, sinful and extremely offensive. The plaintiff was intentionally perceived to be psychotic because she complained, opposed unlawful discrimination and the fact that she was affiliated with homeless people who have psychotic illnesses. The plaintiff also received an email mocking her about psychotic medication. Ronald Huberman has been sending the plaintiff emails in the form of junk mail since November 2007. During and prior to this time, Ronald Huberman had the plaintiff under heavy surveillance by PGM's staff, homeless guests and at least two police officers. Lastly, between July and August 2007, the plaintiff called 911 and filed a charge of verbal assault against Gail Craig. A white male officer and a hispanic male officer responded, they made no arrest and did not give the plaintiff a court date because she was homeless. In February 2008, the plaintiff made another report against a homeless woman by the name of Barbara Rawlings. A fat, white male police officer with glasses at the 17th and State station made the report. However, he did not give the plaintiff a court date because she was homeless. The defendant's adverse actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation.

Over the past eight years, advocates and homeless shelter workers from around the country have received news reports of men, women and even children being harassed, kicked, set on fire, beaten to death, and even decapitated. From 1999 through 2006, there have been 614 acts of violence by housed people, resulting in 189 murders of homeless people and 425 victims of non-lethal violence in 200 cities from 44 states and Puerto Rico.  Most hate crimes/violent acts against the homeless are committed not by organized hate groups, but by individual citizens who harbor a strong resentment against a certain group of people. Some are "mission offenders," who believe they are on a mission to cleanse the world of a particular evil. Others are "scapegoat offenders," who violently act out their resentment toward the perceived growing economic power of a particular racial or ethnic group. Still others are "thrill seekers," those who take advantage of a vulnerable and disadvantaged group in order to satisfy their own pleasures. Thrill seekers; ordinary citizens, are the most common perpetrators of violence against people who are homeless.



[2]EIGHT YEARS ANALYSIS (1999—2006) HATE CRIMES / VIOLENCE STATISTICS

[2]Anti-Defamation League, http://www.adl.org/legislative_action/hatecrimes_briefing.html
Leadership Conference on Civil Rights, www.civilrights.org
Anti-Defamation League, http://www.adl.org/legislative_action/hatecrimes_briefing.html

Total number of violent acts over 8 years: 614
Total number of deaths over 8 years: 189
Total number of non-lethal attacks over 8 years: 425
Number of cities where crimes occurred over 8 years: 200
Number of states where crimes occurred over 8 years: 44 states plus Puerto Rico
Age ranges of the accused/convicted: from 11 to 75 years of age
Age ranges of the victims: from 4 months old to 74 years of age
Gender of victims: Male: 359   Female: 48

**Title I of the American with Disabilities Act** states that it is unlawful to retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act. **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to

provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **(H) Unfounded Charges.** To protect citizens of this State against unfounded charges of unlawful discrimination, sexual harassment in employment and sexual harassment in higher education, and discrimination based on citizenship status in employment. **The 1970 Illinois Constitution, Article I, Section 20: Individual Dignity** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. **The Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination. Retaliation occurs when an employer, employment agency, or labor organization takes an adverse action against a covered individual because he or she engaged in protected activities. **775 ILCS 5/6-101(A)(2006).** *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.* *(See Exhibits in Appendix Section)*

### *Charge 12: Harassment/Basis: Retaliation for Whistle Blowing*
The **Whistleblower Enhancement Protection Act of 2007** prohibits retaliation against public employees who report official wrongdoing. Francine Y. was an employee with the Chicago Transit Authority in their Capital Investment Department until she was fraudulently separated from service for opposing unlawful discrimination. Because the plaintiff has been afflicted with disabilities that are defined and protected by the ADA and Section 504 of the Rehabilitation Act, the statute of limitations have been tolled on her prior employment discrimination case against

the CTA, the City of Chicago and the State of Illinois. The Whistleblower Act states that "a state or local government entity may not suspend or terminate the employment of, or take other adverse personnel action against, a public employee who in good faith reports a violation of law by the employing governmental entity or another public employee to an appropriate law enforcement authority." The plaintiff, Francine Y., is seeking protection under the Whistleblower Act because she reported fraudulent wrongdoing on behalf of the Chicago Transit Authority, the City of Chicago, the State of Illinois as well as other accomplices. This information was disclosed to the Federal Bureau of Investigations under the direction or Patrick Fitzgerald's office on June 13, 2008. **H.R. 985**

A federal agency violates the Whistleblower Protection Act if it takes or fails to take (or threatens to take or fail to take) a personnel action with respect to any employee or applicant because of any disclosure of information by the employee or applicant that he or she reasonably believes evidences a violation of a law, rule or regulation; gross mismanagement; gross waste of funds; an abuse of authority; or a substantial and specific danger to public health or safety.

In 2004, 2006 and 2007, the plaintiff engaged in the protected activities of filing an employment charge of discrimination against the CTA, the City of Chicago and the State of Illinois. On June 13, 2008, the plaintiff engaged in the protected activity of placing a call to the Federal Bureau of Investigations under the direction of Patrick Fitzgerald's office. She complained about the harassment, coercion and intent to fraudulently embezzle and launder money from CTA's claim fund, the City of Chicago's claim fund and the State of Illinois' claim fund that Ronald Huberman and Mayor Richard Daley was subjecting her to. The acts of retaliation the plaintiff, Francine Y., experienced at the hands of Ronald Huberman, Mayor Richard Daley and Governor

Rod Blajcovich are as follows: *1.)* sending the plaintiff between 150 and 300 pieces of junk mail every day since November 17, 2008, as of the date of the filing of this case, some emails continue to flow; *2.)* sending at least two female police officers to watch, stalk, belittle, invade the plaintiff's privacy and harass the plaintiff; *3.)* sensoring the media by printing an ad between June and July about a nurse who was falsely arrested and won a lawsuit for 7.7 million, printing an ad about the Latin King gangs involved with a homicide next to the nurse's ad, this was done to mock the plaintiff because Ronald Huberman had placed a tap on her telephone; *4.)* mocking the plaintiff about being homeless, having impacted wisdom teeth and the diarrhea she experienced from the poison by having preachers at the PGM facility preach the plaintiff's life; *5.)* aiding, abetting and obstructing justice through the removal of DePaul University's computers within their alumni lab and replacing them with new computers. the plaintiff discovered that the computers had been changed after she contacted the media, the plaintiff deleted a lot of the emails because she thought it was a joke in the beginning and she was also in denial that something like this could be happening to her, also the plaintiff was suffering from extreme anxiety and depression; *6.)* gaining illegal access to the plaintiff's medical files from Stroger's hospital; *7.)* gaining illegal access into the plaintiff's storage lockers; *8.)* having a male doctor examine the plaintiff in the emergency room at Stroger's hospital by pulling back the plaintiff's inner and outer labia flaps around her vagina with his hand in an effort to insert a metal object for a pap smear, the plaintiff complained to the doctor about a stomach ache; she thought she might have still been ill from the poison within her system which came from the attempted drug-induced homicide; *9.)* having the doctor in the emergency room at Stroger's hospital give the plaintiff a phony pap smear, the doctor told the plaintiff to call for her results, the plaintiff came back to the emergency room to ask about her results, there were no results and

another physician gave her a prescription to get a yeast infection pill from the pharmacist; *10.)* having the doctor in the emergency room at Stroger's hospital give the plaintiff her release form with a phony number on it to call for results, the number stated to press #1 for the dentist and maybe #2 or #3 for prenatal care; *11.)* illegally wire tapping the plaintiff's home telephone (708) 841-5612; *12.)* illegally wire tapping both of the plaintiff's cellular telephones (312) 351-5635; *13.)* illegally wire tapping the plaintiff's girlfriend telephone (773) 737-6451; *14.)* having the arresting officers harass and sexually harass the plaintiff while she was being processed; *15.)* having Patrick Quefurth at the Independent Police Review board report on the plaintiff, aid and abet; *16.)* having internal affairs trash the first investigation that the plaintiff filed against the police officer with the alias of Miriam Martinez; *17.)* having a white, female employee by the name of Nancy from the Appellate Court aid and abet by coming to Robert Morris College on three days during the week ending August 2, 2008 and again on August 9, 2008 to use the computers when she possibly could have been there to watch the plaintiff, also another black male employee watched the items that the plaintiff requested out of her file and possibly reported on her, having a black female and a white, fat female employee tell the plaintiff on August 4, 2008 that she could not make any copies from her appellate file because the case was closed; *18.)* having the plaintiff falsely arrested; *19.)* charging the plaintiff with a battery that she did not commit; *20.)* arresting the plaintiff on her birthday, having officer Melchor mock the plaintiff about her weight and the fact that it was her birthday; *21.)* detaining the plaintiff in jail without just cause; *22.)* intentionally keeping the plaintiff homeless; *23.)* bribing the police officers and the Appellate Court judges to obstruct justice; *24.)* trying to coerce the plaintiff into embezzling and laundering money; *25.)* trying to steal the plaintiff's damages from her first lawsuit; *26.)* mocking the plaintiff by having Lydia Williams at the IDHR call the plaintiff in November 2004

to ask the plaintiff what she was looking for in the form of damages to settle the suit, but not giving the plaintiff anything; **27.)** mocking the plaintiff by having Lydia Williams at the IDHR tell the plaintiff that she did not have a right to ask that the harassers be disciplined when she called the plaintiff in November 2004 to ask about a settlement; **28.)** mocking the plaintiff by having Lydia Williams at the IDHR tell the plaintiff that the defendants were not going to give her the job back; **29.)** placing the green leg of an endangered spieces in the plaintiff's path; **30.)** the judge at the Harrison/Kedzie court house telling the plaintiff that he did not care when she mentioned that she was a law student and that she was falsely arrested for not embezzling money for Mayor Daley; **31.)** the judge at the Harrison/Kedzie court house changing the stay of leave from 162 to 120 days when he could have dismissed the case altogether; **32.)** allowing a fake battery charge to interfere with the plaintiff's new job that she was going to start at Motorola; **33.)** having PGM's staff and homeless guests watching, following and listening to the plaintiff's conversations; **34.)** having Yolanda, an employee with the Illinois Department of Human Rights, remove a document from the plaintiff's file in October 2007 when she went to retrieve it from her IDHR file; the document was related to the disability extension benefit that CTA's board was in a position to offer the plaintiff; however they never did; **35.)** having police officers not assist the plaintiff in making an arrest; **36.)** having police officers stare and surround the plaintiff on June 30, 2008 when she came to retrieve a copy of the police report; **37.)** telling the plaintiff in October 2008 that she could not review her file and retrieve copies when CTA knew she was advocating for herself; **38.)** having a group of Appellate court judges deny the plaintiff's case for no valid legal reason; **39.)** forbidding the plaintiff from receiving her telephone messages from two friends prior to Christmas, this was done in an effort to keep the plaintiff from leaving PGM so that the denial letter from the appellate brief could be given to her on Christmas eve; **40.)**

giving the denied appellate court letter to the plaintiff on Christmas eve when the case was denied two weeks prior to Christmas; **41.)** placing a note on the telephone board telling the plaintiff to help put the Mayor's enemies to flight; **42.)** illegally gaining access inside the plaintiff's storage lockers; **43.)** conspiring to have the plaintiff engage in racketeering, **44.)** when the plaintiff called 911 in 2003 on Ron Durr; a CTA employee, for blocking her path, the officers, (a white male and a white female) did not give the plaintiff a police report nor did they arrest the employee who was blocking the plaintiff's path, this was an act of sexual harassment as well as the threat to do bodily harm to the plaintiff, and also another continued violation for the City of Chicago with its police officers; **45.)** contesting the plaintiff's right to receive unemployment benefits when CTA involuntarily separated the plaintiff from service; **46.)** towing the plaintiff's car in October 2007 after she complained about Mayor Richard Daley; **47.)** having others in public use scare tactics to test the plaintiff's level of fear and homophobic tendencies; **48.)** having a city employee to give the plaintiff a bag with about 25 rolls of toilet paper in it; **49.)** giving the police officers the plaintiff's personal information; **50.)** trying to use the plaintiff as a scapegoat because she has clean credibility; **51.)** having Nassira Tokash carry a pink razor blade and a blackberry on the night of May 25, 2008. The defendant's adverse actions followed the plaintiff's protected activities within such a reasonable period of time, directly raising the inference of retaliatory motivation. **The Title VII Civil Rights Act of 1964** states that an employer may not fire, demote, harass or otherwise "retaliate" against an individual for filing a charge of discrimination, participating in a discrimination proceeding, or otherwise opposing unlawful discrimination. Retaliation occurs when an employer, employment agency, or labor organization takes an adverse action against a covered individual because he or she engaged in protected activities. **Title I of the American with Disabilities Act** states that it is unlawful to

retaliate against an individual for opposing employment practices that discriminate based on disability or for filing a discrimination charge, testifying, or participating in any way in an investigation, proceeding or litigation under the Americans with Disabilities Act. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.* *(See Exhibits in Appendix Section)*

## Charge 13: HIPPA Violation

On Feburary 4, 2008, the plaintiff reported Barbara Rawlings; a homeless guest, to the management at the PGM homeless facility for threatening to do bodily harm to her and repeatedly assaulting her by bumping into her. The staff took no disciplinary action against the homeless woman. On Feburary 6, 2008 the plaintiff asked to see another staff member to report the physical and verbal abuse. The plaintiff also mentioned the fact that they should ask Pastor Phil why the MAFIA had police officers living in PGM. Some of the members of PGM's staff, made phone calls and conspired with Ronald Huberman by giving the plaintiff a referral to see a psychiatrist at Stroger's hospital because she made the complaints. The psychiatrist stated in the plaintiff's medical file that he needed more information before he could make an accurate diagnosis. The psychiatrist and college interns disclosed the plaintiff's protected health information to Ronald Huberman who in turn disclosed it to Pastor Phil at the PGM homeless facility. This is evident because the following Saturday after the plaintiff went to Stroger's hospital for psychiatric treatment, Pastor Phil preached the plaintiff's life by mentioning information contained within the notes that the interns had written down. Also, after this incident, Ronald Huberman made a reference via email relating to psychotic medications. Lastly, Ronald Huberman also gained illegal access to the plaintiff's medical file from Stroger's hospital. He mocked her by sending a junk email that she was being treated for a yeast infection.

The only way he could have known this is the fact that the plaintiff was treated at Stroger's hospital for the condition and notes relating to the treatment were placed within the plaintiff's medical file. Stroger's hospital violated the HIPPA Law because Ronald Huberman was given the plaintiff's identifiable protected health information relating to her physical and mental health. This act states that the individual has the right to have their medical health information protected by not being transmitted or communicated verbally, electronically, through written documents or via any other form of media without the individual's knowledge and consent. Francine Y. never gave Ronald Huberman or anyone at the PGM homeless mission permission to retrieve and share her protected health information. **The Health Insurance Portability and Accountability Act of 1996 (HIPAA), Public Law 104-191,** was enacted on August 21, 1996 to protect individual's health information. The Privacy Rule protects all *"individually identifiable health information"* held or transmitted by a covered entity or its business associate, in any form or media, whether electronic, paper, or oral. The Privacy Rule calls this information *"protected health information (PHI)."* OCR Privacy Rule Summary 4 Last Revised 05/03 *"Individually identifiable health information"* is information, including demographic data, that relates to: the individual's past, present or future physical or mental health or condition,  the provision of health care to the individual, or  the past, present, or future payment for the provision of health care to the individual, and that identifies the individual or for which there is a reasonable basis to believe can be used to identify the individual. Individually identifiable health information includes many common identifiers (e.g., name, address, birth date, social security number). The Privacy Rule excludes from protected health information employment records that a covered entity maintains in its capacity as an employer and education and certain other records subject to, or defined in,

the Family Educational Rights and Privacy Act, **20 U.S.C. §1232g**. *(See Exhibits in Appendix Section)*

### Charge 14: Defamation of Character

Defamation of character is a false and unprivileged spoken word or written publication which exposes any living person to hatred, contempt, ridicule, or which causes him/her to be shunned or avoided, or which has a tendency to injure him/her in his/her trade or occupation. The plaintiff, Francine Y., is a public service official because she worked in the Capital Investment office of the Chicago Transit Authority. Because of her disabilities, the statute of limitations have been tolled on the case that she filed against the Chicago Transit Authority, the City of Chicago and the Illinois Department of Human Rights. Francine Y. expects to win her case and return to work as a public service official. The plaintiff opposed unlawful discrimination and engaged in the protected activity of complaining about harassment, sexual harassment and retaliation in 2004, 2006 and 2007. In November 2007, Ronald Huberman, Mayor Richard Daley and Governor Rod Blajeovich conspired and tried to get the plaintiff to embezzle and launder money for them by attaching millions of dollars to her lawsuit settlement. Francine Y. refused to engage in fraud at the request of the defendants. As a result, Ronald Huberman gave verbal and/or written instructions to Nassira Tokash as well as other police officers and members of PGM's staff that he was going to have the plaintiff falsely arrested. Those instructions and performed acts of fraud will injure the plaintiff's reputation as being a public service official and a future high-powered U.S. Attorney. They will also affect the way she is perceived by others.

On May 26, 2008, the plaintiff; Francine Y., was staked out by four Chicago police officers and demanded to get into the officer's car. Rhonda Davis and Kenyatta; women living at PGM's homeless mission, actively and willfully participated in the false arrest. Francine Y. was held in contempt and defamed as being a criminal because Nassira Tokash filed a fraudulent domestic battery charge against the plaintiff. The charge stated that Francine Y. physically assaulted Nassira Tokash on her upper body. This is a blatant lie because Francine Y. never physically assaulted anyone on May 26, 2008. The plaintiff was falsely arrested, finger printed, given a criminal profile, falsely imprisoned and intentionally detained within a correctional facility for a crime which she never committed. Nassira Tokash offered no substantial evidence as proof that the domestic battery did in fact occur. There were no complaining witnesses that positively identified the presupposed suspect nor was there any expert eyewitness testimony to corroborate Nassira Tokash's false claim. Also, the plaintiff was staked out after she left PGM's homeless mission alone in an effort to apprehend her without any witnesses. The arrest was calculated and the timing of the event was made with precision. The arresting officers refused to give the plaintiff a copy of the police report and the name of the person which made the false allegations and complaint against her. Nassira Tokash disguised her identity as a homeless woman through the use of perpetration, identity theft, identity cloning and forgery. About two weeks following the premeditated false arrest; on June 9, 2008, Nassira Tokash passed the plaintiff while she walked down the same sidewalk on State street as the plaintiff. As officer Tokash crossed the plaintiff's path, she veered to the very edge of the sidewalk, as if she was avoiding a fat, dangerous, black, mentally ill criminal that would inflict harm upon her. Nassira Tokash also tried to defame the plaintiff as being someone that had a hygiene problem. The officer shunned the plaintiff and made statements that the plaintiff needed to change her pants while living in

81

PGM's homeless facility. This was done as an act of retaliation and defamation because Francine Y. emailed Ronald Huberman to let him know that the other officer, Miriam Martinez, would not shower or wash her hair while living in the PGM homeless facility. Francine Yates wore the same pants more than one day out of the week because it was convenient, she was not sexually active, she did not want to get into confrontations with the staff over clothing and because she was truly homeless. The plaintiff washed her clothes at the laundromat when she had money and at her friend's house when she did not have money. Also, PGM made the homeless guests place their clothes in a hot box every night in an effort to sterilize the clothing. The clothes were steamed at pressures above three hundred degrees Fahrenheit. This process made the clothes fresh everyday. The plaintiff has seen officer Tokash wear the same underwear on a daily basis as well as wear her jeans on a consecutive daily basis. This information is relevant because the plaintiff is homeless and the officer was just a perpetrator. Nassira Tokash ostracized the plaintiff and caused her to become exposed to hatred. She also reported this information to Ronald Huberman because he sent the plaintiff junk emails pertaining to washers and dryers which ridiculed and harassed her. As a result, this act of defamation could potentially hurt the plaintiff's credibility when she returns to work, causing her to become ridiculed, belittled and rejected. Francine Y. became deeply wounded, offended and severely humiliated by the way the police officers, PGM's staff and some of the homeless guests were treating her based on directions and instructions given to them by Ronald Huberman.

Another act of defamation occurred when Ronald Huberman gave PGM's staff verbal instructions to send the plaintiff to Stroger's hospital after she complained about the verbal and physical abuse that Barbara Rawlings subjected her to. After the plaintiff came from Stroger's

hospital, Barbara Rawlings ridiculed her by stating that she was crazy. The plaintiff is not sure how Barbara Rawlings received her protected health information. Francine Y. was defamed as being psychotic because she opposed unlawful discrimination. Lastly, officer Miriam Martinez slandered the plaintiff's name between December 2007 and January 2008 by stating in front of others that the plaintiff was Ronald Huberman's lover, the fact that they both had green eyes and that they would have a green-eyed baby. This is a blatant lie because Francine Y. has never met Ronald Huberman personally and the plaintiff has not been sexually active for a number of years. The plaintiff perceived the officer to be saying that she was a prostitute or possibly a desperate woman who was sleeping with any man that she could find. This act of slander could hurt the plaintiff by her being ridiculed and mocked about the rumor that she is seeing someone who is perceived as being a homosexual. The slander could also cause her to become shunned and avoided by others. Lastly, the slander could greatly damage the plaintiff's career because Ronald Huberman has been personified and perceived as being "THE MAFIA." Ronald Huberman is also a part of Mayor Daley's entourage. A fat, black male police officer has been spreading rumors at the Mexican bazaar on 12th street that Ronald Huberman's father is the head of the CIA in Israel and that Ronald Huberman is "big time" gay. The plaintiff does not have any political or personal ties with Mayor Daley and his entourage. She intends to remain unattached to anyone associated with Mayor Daley's administration. Francine Y. became deeply wounded, offended and severely humiliated by the way Ronald Huberman, the police officers, PGM's staff and some of the homeless guests were treating her. These acts of defamation were intentional, reckless and done with malice. As a result, the plaintiff's anxiety and depression heightened. She also became severely traumatized.

A principle difference between working in an occupation and practicing a profession is the fiduciary responsibility that comes with that profession. A fiduciary is a person or group of people who stand in a position of trust. That trust represents a significant obligation to care for the interests of others. Inherent in practicing as Presidents, Mayors and Governors is the fiduciary responsibility that authoritative persons or a group of persons in charge accept, placing the interests of others above themselves. An agent is a person or group of persons who perform an act for another. Inherent in this act is fiduciary responsibility and dual agency, which can also be referred to as mixed agency. This is a situation where a person/authoritative figure performs or acts for two others. The two people involved are the employee and the entity the agents are employed with. President Ronald Huberman, Mayor Richard Daley, Governor Rod Blajeovich and the police officers which aided and abetted failed as agents acting on behalf of City of Chicago and the State of Illinois. They did not fulfill their fiduciary responsibilities to the plaintiff; Francine Y., or to the state and local governments. Their intent to outwardly deceive, inflict pain and break the law was intentional and deliberate. It was also done with malice. They placed their own interests above the interests of an innocent, mentally ill, homeless, African-American, Christian woman. They were skilled in the law, but took no measure to use the law to protect, defend or assist the plaintiff. The plaintiff; Francine Y., needed their help more than anything else.

The Chicago Transit Authority, the City of Chicago and the State of Illinois also committed the workplace torts of intentional infliction of emotional distress, intentional infliction of mental distress and negligent intentional infliction of emotional and mental distress upon the plaintiff. A reckless disregard for the likelihood of causing the plaintiff distress occurred when the

84

plaintiff was falsely arrested and falsely imprisoned for no valid legal reason. The plaintiff, Francine Y., was outraged when she discovered that she was being arrested for fraudulent reasons mixed with the intent to conspire against her. Francine Y. was vulnerable because she was a woman who was mentally disabled, homeless and without legal representation. The defendants were aware of all of these facts. The defendants were in a position of power, so they tried to take advantage of the plaintiff. Lastly, the CTA, the City of Chicago and the State of Illinois owed the plaintiff the fiduciary responsibility and duty of giving her a chance to tell her side of the story during the arrest, provide eyewitness testimony and receive a copy of the complaint that was filed against her. The plaintiff was intentionally ignored. These actions; subsequent actions, and all other actions that followed made the plaintiff's emotional and mental distress greater than it was from the beginning. The plaintiff became deeply wounded, humiliated and severely traumatized. Francine Y.'s depression and anxiety became worse when she was involuntarily detained within a correctional facility through the use of force by four police officers that staked her out and staged the false arrest. Francine Y. also became mentally exhausted due to other tense circumstances surrounding the false arrest. *New York Times Co. v. Sullivan, 376 U.S. 254 (1964)* *(See Exhibits in the Appendix Section)*

**735 ILCS 5/13-201 Defamation - Privacy.** Actions for slander, libel or for publication of matter violating the right of privacy, shall be commenced within one year next after the cause of action accrued. **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military

service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **The 1970 Illinois Constitution states in Section 20: Individual Dignity.** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. *(See Exhibits in Appendix Section)*

### *Charge 15: Identity Theft, Identity Cloning, Fictitious Identification, Perpetration & Forgery*
Two female, Chicago police officers that Ronald Huberman, Mayor Richard Daley and Governor Rod Blajoevich assigned to harass, watch and stalk the plaintiff were actually homeless perpetrators living within the Pacific Garden Mission's homeless shelter. The first officer; Miriam Martinez, committed the crimes of Criminal Identity Theft, Identity Cloning and Perpetration because she used another person's identification with the intent to aid, abet and coerce the plaintiff into embezzling money for the defendants. The officer used the fraudulent

name of Miriam Martinez and perpetrated herself as being a homeless woman so that she could keep the plaintiff under heavy surveillance. Miriam Martinez commited the act of identity cloning by acquiring several personal identifiers and impersonating a woman who she is truly not. This was done for the sole purpose of committing fraud and concealing herself from legal authorities, the plaintiff and the staff members within PGM's homeless facility. The officer cloned herself as someone who was not married, a woman with one son, someone who had previous military experience and someone which transitioned on to become a current paralegal student at Malcolm X College. She also cloned herself as a former Robert Morris College student by carrying a backpack from the school and stating that she had changed schools. These were blatant lies. Miriam Martinez also committed the crime of carrying, displaying and possessing fictitious identification. This is evident because upon entering PGM's homeless mission, she provided the staff members with a piece of fraudulent photo identification and possibly a fraudulent social security number as proof of who she claimed to be. More than likely she was instrumental in assisting with the issuance of the fictitious identification. Miriam Martinez willfully engaged in these unlawful acts which she knew were forbidden by the law. The officer's conduct provoked and irritated the plaintiff to the point where it disturbed her peace. Miriam Martinez made the plaintiff aware that she was promised money in exhange for her performance of the fraudulent acts. Her identifying marks and features are: Mexican decent, thick, old-fashinoned glasses, very big nose, crooked teeth, grotesque looking stretch marks on the abdomen, short, thin build, corned toes and long, wavy black hair with streaks of grey. The officer claimed that she was forty years of age. The plaintiff was able to ascertain the fact that the woman was a police officer because of the type of shoes she was wearing. You can tell a lot about a person by the type of shoes that they are wearing, but this fact is not always an absolute.

The second officer; Nassira Tokash, committed the crimes of Identity Theft, Identity Cloning, Perpetration and Forgery. Nassira Tokash committed the crimes of Criminal Identity Theft and Perpetration because she used another person's identification with the intent to aid, abet and coerce the plaintiff into embezzling money for the defendants. The officer used the fraudulent name of Nassira Tokash and perpetrated herself as being a homeless woman so that she could keep the plaintiff under heavy surveillance. Nassira Tokash also committed the crime of carrying, displaying and possessing fictitious identification. This is evident because upon entering the mission, she provided the staff members with a piece of fraudulent photo identification and possibly a fraudulent social security number as proof of who she claimed to be. More than likely she was also instrumental in assisting with the issuance of the fictitious identification. Nassira Tokash willfully engaged in these unlawful acts which she knew were forbidden by the law. The officer's conduct provoked and irritated the plaintiff to the point where it disturbed her peace. Nassira Tokash also made a statement to the plaintiff saying "that's why I have money and you don't." She patted her left front pocket as if she had received the money that she was promised in exhange for her performance of the fraudulent acts. Nassira Tokash also commited the crime of Identity Cloning by acquiring several personal identifiers and impersonating a woman who she is truly not. This was done for the sole purpose of committing fraud, concealing herself from legal authorities, the plaintiff and the staff members within PGM's homeless facility. The personal identifiers that Nassira Tokash cloned herself as having were as follows: going through a domestic violence situation with her husband, her husband had custody of her children, she worked for Day Labor, she was originally from Egypt, she had a black mother, she had a white father and that she was thirty-nine years of age. The officer's identifying features and marks are: Mexican decent, tall, thin build, long, black hair that was

88

dyed in the back with a burgandy-reddish color, large birth mark splattered over three-fourths of her back, grotesque looking marks on the heels of her feet, they were reddish in color as if they have been peeled. Lastly, Nassira Tokash committed the crime of forgery because she signed off on a false domestic battery charge against the plaintiff with the intent to defraud her. The officer printed and signed the name Nassira Tokash on the police report and delivered the document to Officer Melchor which was used to falsely imprison the plaintiff. Nassira Tokash did not provide a physcial address or telephone number on the report, instead she forged a person's name that does not belong to her. This was done to complete the performance of the fraudulent acts in an effort to receive the money that was promised to her. However; during this process, the defendants made three huge mistakes. The first mistake is that Nassira Tokash did not have an authentic Middle-Eastern accent, her accent was of Mexican decent. Secondly, Nassira Tokash stated that she was from Egypt and that her father was white. Most; if not all, Arabic men that live or have migrated from Egypt find it a great offense and insult to be mistaken as being white. To be mistaken or identified as being black or African is an honor. Lastly, another homeless woman living within the PGM mission positively identified Nassira Tokash as being an officer that worked at the Harrison and Kedzie police station. *R. v Seward (2005) EWCA Crim 1941.* *(See Exhibits in the Appendix Section)*

Identity theft may be used to facilitate crimes including *illegal immigration,* terrorism, and espionage. Identity theft may also be a means of blackmail. There are also cases of identity cloning to attack payment systems, including medical insurance. The criminal identity theft laws are tightly related to and directly deal with the identity theft issue. **Identity Theft and Assumption Deterrence Act.** This act is also known as the "Identity Theft Act" and deals directly with the identity theft issue. This law makes it a federal crime when someone:

*"knowingly transfers or uses, without lawful authority, a means of identification of another person with the intent to commit, or to aid or abet, any unlawful activity that constitutes a violation of Federal law, or that constitutes a felony under any applicable State or local law."* .

**The Identity Theft Penalty Enactment Act** law was passed on July 15, 2004 when President Bush signed a law requiring tougher punishment for criminals convicted of identity theft. This law increases existing penalties for the identity theft crime, identifies aggravated identity theft as a criminal offense, and establishes mandatory penalties for aggravated identity theft.**Identity Cloning and Concealment** is a situation, where a criminal acquires personal identifiers, and then impersonates someone for the purpose of concealment from authorities. This may be done by a person who wants to avoid arrest for crimes, by a person who is working illegally in a foreign country, or by a person who is hiding from creditors or other individuals. Unlike credit-dependent financial crimes, concealment can continue for an indeterminate amount of time without ever being detected. Additionally, the criminal might attempt to obtained fraudulent documents or IDs consistent with the cloned identity to make the impersonation even more convincing and concealed. **15 ILCS 335/14A Fictitious or unlawfully altered identification card.** b.) It is a violation of this Section for any person: 1. To knowingly possess, display, or cause to be displayed any fictitious or unlawfully altered identification card; 2. To knowingly possess, display, or cause to be displayed any fictitious or unlawfully altered identification card for the purpose of obtaining any account, credit, credit card or debit card from a bank, financial institution or retail mercantile establishment; 3. To knowingly possess any fictitious or unlawfully altered identification card with the intent to commit a theft, deception or credit or debit card fraud in violation of any law of this State or any law of any other jurisdiction; 4. To knowingly possess any fictitious or unlawfully altered identification card with the intent to

commit any other violation of any law of this State or any law of any other jurisdiction for which a sentence to a term of imprisonment in a penitentiary for one year or more is provided; 5. To knowingly possess any fictitious or unlawfully altered identification card while in unauthorized possession of any document, instrument or device capable of defrauding another; 6. To knowingly possess any fictitious or unlawfully altered identification card with the intent to use the identification card to acquire any other identification document; 7. To knowingly issue or assist in the issuance of any fictitious identification card; 8. To knowingly alter or attempt to alter any identification card; 9. To knowingly manufacture, possess, transfer, or provide any identification document whether real or fictitious for the purpose of obtaining a fictitious identification card; 10. To make application for the purpose of obtaining a fictitious identification card for another person; 1. To obtain the services of another person to make application for the purpose of obtaining a fictitious identification card. (c) Sentence. 1. Any person convicted of a violation of paragraph 1, 10, or 11 of subsection (b) of this Section shall be guilty of a Class 4 felony. A person convicted of a second or subsequent violation shall be guilty of a Class 3 felony and shall be sentenced to a minimum fine of $500 or 50 hours of community service, preferably at an alcohol abuse prevention program, if available. 2. Any person convicted of a violation of paragraph 1 of subsection (b) of this Section who at the time of arrest had in his possession two or more fictitious or unlawfully altered identification cards shall be guilty of a Class 4 felony. 3. Any person convicted of a violation of paragraph 2 through 9 of subsection (b) of this Section shall be guilty of a Class 4 felony. A person convicted of a second or subsequent violation shall be guilty of a Class 3 felony. (d) This Section does not prohibit any lawfully authorized investigative, protective, law enforcement or other activity of any agency of the United States, State of Illinois or any other state or political subdivision thereof. **720 ILCS 5/17-**

**3 Forgery.** (a) A person commits forgery when, with intent to defraud, he knowingly: (1) makes or alters any document apparently capable of defrauding another in such manner that it purports to have been made by another or at another time, or with different provisions, or by authority of one who did not give such authority; or (2) issues or delivers such document knowing it to have been thus made or altered; or (3) possesses, with intent to issue or deliver, any such document knowing it to have been thus made or altered; or (4) unlawfully uses the digital signature, as defined in the **Financial Institutions Digital Signature Act 205 ILCS 705/1 et seq.**, of another; or (5) unlawfully uses the signature device of another to create an electronic signature of that other person, as those terms are defined in the **5 ILCS 175/1 et seq. Electronic Commerce Security Act** (b) An intent to defraud means an intention to cause another to assume, create, transfer, alter or terminate any right, obligation or power with reference to any person or property. As used in this Section, "document" includes, but is not limited to, any document, representation, or image produced manually, electronically, or by computer. (c) A document apparently capable of defrauding another includes, but is not limited to, one by which any right, obligation or power with reference to any person or property may be created, transferred, altered or terminated. A document includes any record or electronic record as those terms are defined in the **Electronic Commerce Security Act 5 ILCS 175/1. 720 ILCS 5/ 26-1. 720 ILCS 5/33-3 Official Misconduct.** A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts: (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is forbidden by law to perform; or (c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance

of any act a fee or reward which he knows is not authorized by law. A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his office or employment or position as a special government agent. In addition, he commits a Class 3 felony. **Disorderly Conduct.** (a) A person commits disorderly conduct when he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. *(See Exhibits in Appendix Section)*

**Charge 16:   Retail Theft, Aiding and Abetting a Fugitive, Coercion, Bribery & Extortion**
Nassira Tokash was often seen with a black, female homeless woman by the name of Kenyatta while she lived within PGM's homeless facility. Both women were seen at Harold Washington's Library together, they were seen at Dominick's together and walking down the street together. Kenyatta complained to the plaintiff; Francine Yates, in April of 2008 about an argument she had with a white, tall, slim homeless woman. Actually, Kenyatta, Nassira Tokash and the white homeless woman were seen hanging out together on more than one occasion while living within PGM. The argument stemmed from a theft that took place at Home Depot. A homeless man apparently stole some merchandise from Home Depot and asked the white woman to return it in an effort to receive a store merchanside credit. The white woman was promised something financial in return for exchanging the merchandise. The white homeless woman, Kenyatta and Nassira Tokash were all involved with the act of retail theft by defrauding the merchant because they had knowledge of the theft, remained willfully and consciously indifferent by not reporting the theft, carried, transferred, displayed, stored, offered for exchange and held the stolen item(s) in their possession, was in the company of the stolen items and made an exchange for goods which they had not purchased. They also exerted unauthorized control over the merchandise in

an effort to deprive the owner of its permanent use and benefit. The white woman had been recently released from jail as did Kenyatta. Kenyatta also made other homeless women living at PGM aware that she was on the run for something she did in Texas. Nassira Tokash was aware of this fact, yet she remained willfully and consciously indifferent by aiding and abetting a homelss fugitive. Nassira Tokash's motive for hanging around the homeless women was to gather information and spy on the mission because Mayor Richard Daley's office has received numerous complaints regarding the Pacific Garden Mission. The defendant's intent was to collect evidence against the mision in order to have the mission removed from its current downtown location. Kenyatta was also instrumental in aiding, abetting and assisting in the arrest of the plaintiff. On the morning of May 26, 2008, Nassira Tokash told Kenyatta to watch the plaintiff and make sure she left the mission in the morning. Kenyatta purposely stood at the back of the line several feet behind the plaintiff in an effort to stage the false arrest and stake the plaintiff out. More than likely, Nassira Tokash promised Kenyatta something through the use of coercion. This promise might have been money or the purchase of food for the plaintiff to eat while they shopped at Whole Foods. Officer Nassira Tokash was seen with a Whole Foods bag when she filled out the false domestic battery complaint against the plaintiff. This was done in an effort to mock the plaintiff because the day prior to the arrest, the plaintiff came into the mission with a Whole Foods bag with a bottle of water in the bag. Rhonda Davis; a PGM employee, was also instrumental in aiding and abetting with the false arrest. Rhonda Davis let a plain clothes, white female officer wait inside the building near the baggage room in an effort to stake out Francine Y. to ensure that she left the mission.

The plaintiff went to the 17th and State Street location on June 30, 2008 to fill out a police report on the officer and Kenyatta. The plaintiff was intentionally ignored. Francine Y. told the officers that Kenyatta had mentioned to others that she was on the run for something that she did in Texas. The plaintiff asked if they were going to have Kenyatta arrested. Officer King was coerced into lying because many other officers were watching. As a result, he replied and told the plaintiff "no." Kenyatta was never arrested. The officers remained willfully and consciously indifferent through the acts of aiding and abetting a fugitive.

In _R v Seward (2005) EWCA Crim 1941,_ the defendant was acting as the "front man" in the use of stolen credit cards and other documents to obtain goods. He obtained goods to the value of £10,000 for others who are unlikely ever to be identified. The Court of Appeal considered sentencing policy for deception offenses involving "identity theft" and concluded that a prison sentence was required. Henriques J. said:    "Identity fraud is a particularly pernicious and prevalent form of dishonesty calling for, in our judgment, deterrent sentences."

**720 ILCS 5/16A-3 Section. 16A-3. Offense of Retail Theft.** A person commits the offense of retail theft when he or she knowingly:  (a) Takes possession of, carries away, transfers or causes to be carried away or transferred, any merchandise displayed, held, stored or offered for sale in a retail mercantile establishment with the intention of retaining such merchandise or with the intention of depriving the merchant permanently of the possession, use or benefit of such merchandise without paying the full retail value of such merchandise; or (b) Alters, transfers, or removes any label, price tag, marking, indicia of value or any other markings which aid in determining value affixed to any merchandise displayed, held, stored or offered for sale, in a retail mercantile establishment and attempts to purchase such merchandise personally or in

consort with another at less than the full retail value with the intention of depriving the merchant of the full retail value of such merchandise; or (c) Transfers any merchandise displayed, held, stored or offered for sale, in a retail mercantile establishment from the container in or on which such merchandise is displayed to any other container with the intention of depriving the merchant of the full retail value of such merchandise; or (d) Under-rings with the intention of depriving the merchant of the full retail value of the merchandise; or (e) Removes a shopping cart from the premises of a retail mercantile establishment without the consent of the merchant given at the time of such removal with the intention of depriving the merchant permanently of the possession, use or benefit of such cart; or (f) Represents to a merchant that he or another is the lawful owner of property, knowing that such representation is false, and conveys or attempts to convey that property to a merchant who is the owner of the property in exchange for money, merchandise credit or other property of the merchant; or (g) Uses or possesses any theft detection shielding device or theft detection device remover with the intention of using such device to deprive the merchant permanently of the possession, use or benefit of any merchandise displayed, held, stored or offered for sale in a retail mercantile establishment without paying the full retail value of such merchandise. A violation of this subsection shall be a Class A misdemeanor for a first offense and a Class 4 felony for a second or subsequent offense; or (h) Obtains or exerts unauthorized control over property of the owner and thereby intends to deprive the owner permanently of the use or benefit of the property when a lessee of the personal property of another fails to return it to the owner, or if the lessee fails to pay the full retail value of such property to the lessor in satisfaction of any contractual provision requiring such, within 10 days after written demand from the owner for its return. A notice in writing, given after the expiration of the leasing agreement, by registered mail, to the lessee at the address given by the

lessee and shown on the leasing agreement shall constitute proper demand. **720 ILCS 5/16A-4 Section 16A-4. Presumptions.** If any person: (a) conceals upon his or her person or among his or her belongings, unpurchased merchandise displayed, held, stored or offered for sale in a retail mercantile establishment; and (b) removes that merchandise beyond the last known station for receiving payments for that merchandise in that retail mercantile establishment such person shall be presumed to have possessed, carried away or transferred such merchandise with the intention of retaining it or with the intention of depriving the merchant permanently of the possession, use or benefit of such merchandise without paying the full retail value of such merchandise. **720 ILCS 5/16A-5 Sec. 16A-5. Detention.** Any merchant who has reasonable grounds to believe that a person has committed retail theft may detain such person, on or off the premises of a retail mercantile establishment, in a reasonable manner and for a reasonable length of time for all or any of the following purposes: (a) To request identification; (b) To verify such identification; (c) To make reasonable inquiry as to whether such person has in his possession unpurchased merchandise and, to make reasonable investigation of the ownership of such merchandise; (d) To inform a peace officer of the detention of the person and surrender that person to the custody of a peace officer; (e) In the case of a minor, to immediately make a reasonable attempt to inform the parents, guardian or other private person interested in the welfare of that minor and, at the merchant's discretion, a peace officer, of this detention and to surrender custody of such minor to such person. A merchant may make a detention as permitted herein off the premises of a retail mercantile establishment only if such detention is pursuant to an immediate pursuit of such person. A merchant shall be deemed to have reasonable grounds to make a detention for the purposes of this Section if the merchant detains a person because such person has in his possession either a theft detection shielding device or a theft detection device remover. **720**

**ILCS 5/16A-6Section. 16A-6. Affirmative Defense.** A detention as permitted in this Article does not constitute an arrest or an unlawful restraint, as defined in Section 10-3 of this Code, nor shall it render the merchant liable to the person so detained. **720 ILCS 5/16A-7 Section 16A-7. Civil Liability.** (a) A person who commits the offense of retail theft as defined in Section 16A-3 paragraphs (a), (b) or (c) of this Code, shall be civilly liable to the merchant of the merchandise in an amount consisting of: (i) actual damages equal to the full retail value of the merchandise as defined herein; plus (ii) an amount not less than $100 nor more than $1,000; plus (iii) attorney's fees and court costs. (b) If a minor commits the offense of retail theft, the parents or guardian of said minor shall be civilly liable as provided in this Section; provided, however that a guardian appointed pursuant to the Juvenile Court Act or the Juvenile Court Act of 1987 shall not be liable under this Section. Total recovery under this Section shall not exceed the maximum recovery permitted under Section 5 of the "Parental Responsibility Law", approved October 6, 1969, as now or hereafter amended. (c) A conviction or a plea of guilty to the offense of retail theft is not a prerequisite to the bringing of a civil suit hereunder. (d) Judgments arising under this Section may be assigned. **720 ILCS 5/16A-8 Section 16A-8.** If any Section, clause, sentence, paragraph or part of this Article is for any reason adjudged by any court of competent jurisdiction to be invalid, such judgment will not affect, impair or invalidate the remainder thereof, but shall be confined in its operation to the Section, clause, sentence, paragraph or part thereof directly involved in the controversy in which such judgment shall have been rendered. **720 ILCS 5/16A-9 Section 16A-9.** Continuation of prior law. The provisions of this Article insofar as they are the same or substantially the same as those of Article 16 of this Code shall be construed as a continuation of such Article 16 and not as a new enactment. **720 ILCS 5/16A-10 Section 16A-10.** Sentence. (1) Retail theft of property, the full retail value of which does not exceed $150, is a

Class A misdemeanor. (2) A person who has been convicted of retail theft of property, the full retail value of which does not exceed $150, and who has been previously convicted of any type of theft, robbery, armed robbery, burglary, residential burglary, possession of burglary tools or home invasion is guilty of a Class 4 felony. When a person has any such prior conviction, the information or indictment charging that person shall state such prior conviction so as to give notice of the State's intention to treat the charge as a felony. The fact of such prior conviction is not an element of the offense and may not be disclosed to the jury during trial unless otherwise permitted by issues properly raised during such trial. (3) Any retail theft of property, the full retail value of which exceeds $150, is a Class 3 felony. When a charge of retail theft of property, the full value of which exceeds $150, is brought, the value of the property involved is an element of the offense to be resolved by the trier of fact as either exceeding or not exceeding $150 **775 ILCS 5/6-101 Part (B) Aiding and Abetting, Coercion.** It is illegal to aid, abet, compel or coerce a person to commit any violation of the Human Rights Act. **720 ILCS 5/31-4 Obstructing Justice.** A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information. **720 ILCS 5/33-1 Bribery.** A person commits bribery when with intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public

99

officer, public employee, juror or witness would not be authorized by law to accept; or  (c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness; or  (e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness.  (f) Sentence.  Bribery is a Class 2 felony.  **720 ILCS 5/29A-2 Commercial Bribe Receiving.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.    **Extortion, Outwresting,** or **Exaction** is a criminal offense, which occurs, when a person unlawfully obtains either money, property or services from a person, entity, or institution, through coercion. Refraining from doing harm is sometimes euphemistically called *protection*. Extortion is commonly practiced by organized crime groups. The actual obtainment of money or property is not required to commit the offense. Making a threat of violence or a lawsuit which *refers* to a requirement of a payment of money or property to halt future violence or lawsuit is sufficient to commit the offense. Exaction refers not only to extortion or the unlawful demanding and obtaining of something through force,

additionally, exact in its formal definition means the infliction of something such as pain and suffering or to make somebody endure something unpleasant. In the United States, extortion may also be committed as a federal crime across a computer system, phone, by mail or in using any instrument of "interstate commerce". Extortion requires that the individual sent the message "willingly" and "knowingly" as elements of the crime. The message only has to be sent (but does not have to reach the intended recipient) to commit the crime of extortion. Extortion is distinguished from blackmail. In blackmail, the blackmailer threatens to do something which would be legal or normally allowed.

***Charge 17:   False Arrest, False Imprisonment, Malicious Prosecution, Aggravated Stalking***
False imprisonment is depriving someone of freedom of movement by holding a person in a confined space or by physical restraint including being locked in a car, driven about without opportunity to get out, being tied to chair, or locked in a closet. It may be the follow-up to a false arrest (holding someone in the office of a department store, for example), but more often it resembles a kidnapping with no belief or claim of a legal right to hold the person. Therefore, false imprisonment is often a crime, and if proved is almost always the basis of a lawsuit for damages. False Arrest, False Imprisonment and Malicious Prosecution are also intentional torts which show how criminal and civil litigation overlap and eventually come to terms with each other. Malicious Prosecution is a separate cause of action, and initial criteria necessary to file such and action and has recently been modified by the Illinois courts.

On May 26, 2008, in the early morning, Francine Y. was staked out by four Chicago police officers and falsely arrested in the parking lot of Dominicks on 14th and Canal Street. Kenyatta and Rhonda Davis; homeless women, were also instrumental in aiding, abetting and assisting in

101

the arrest of the plaintiff. On May 26, 2008, Nassira Tokash told Kenyatta to watch the plaintiff and make sure she left the mission in the morning. Kenyatta purposely stood at the back of the line several feet behind the plaintiff in an effort to help stage the false arrest and stake the plaintiff out. More than likely, Nassira Tokash promised Kenyatta something through the use of coercion. This promise might have been money or the purchase of food for the plaintiff to eat while they shopped at Whole Foods. Officer Nassira Tokash was seen with a Whole Foods bag when she filled out the complaint against the plaintiff. This was done in an effort to mock the plaintiff because the day prior to the arrest, the plaintiff came into the mission with a Whole Foods bag with a bottle of water in the bag. Rhonda Davis; a PGM employee, was also instrumental in aiding and abetting with the false arrest. Rhonda Davis let a plain clothes, white female officer wait inside the building near the baggage room in an effort to stake out Francine Y. to ensure that she left the mission. More than likely there were other behind the scenes conspirators; PGM staff members, which helped to stage the false arrest as well.

The four police officers that participated in the crime of false arrest were Nassira Tokash (fraudulent name), officer Melchor (a black male), a white male officer (name unknown) and a white female officer (name unknown). The plaintiff was taken to the 17th and State street police station, finger printed, given a fraudulent criminal profile, falsely imprisoned, charged with a fraudulent domestic battery and intentionally detained within a correctional facility for a crime which she never committed. Nassira Tokash offered no substantial evidence as proof that the domestic battery did in fact occur. There were no complaining false witnesses who positively identified the suspect, nor was there any expert eyewitness testimony which corroborated Nassira Tokash's false claim. Also, the plaintiff was staked out after she left PGM's homeless mission

alone in an effort to apprehend her without any witnesses. However; while the plaintiff was forced into the police car, a white, middle-aged woman ran out of Dominicks in an effort to help the plaintiff. The woman was also a Dominicks' employee. The white, male officer which assisted with the arrest gave verbal and nonverbal directions with the use of his hand to the woman not to get involved.


Officer A. Melchor, officer D. Brown and officer Nassira Tokash committed the crime of issuing a false battery complaint against the plaintiff. The arresting officers refused to give the plaintiff a copy of the police report and the name of the person which made the false allegations against her. Nassira Tokash; the complaining officer, disguised her identity as a homeless woman through the use of perpetration, identity theft, identity cloning and forgery. The plaintiff; Francine Y., was falsely detained and charged with a fraudulent domestic battery that she did not commit. Nassira Tokash, stated that the plaintiff hit her on her upper body. This is a blatant lie. The plaintiff never hit anyone on May 26, 2008. Nassira Tokash's intent was to engage in the act of fraud and have the plaintiff falsely arrested and falsely imprisoned in an effort to receive a monetary reward which was promised to her. This act of fraud is known as extortion. The officer also engaged in the acts of aiding and abetting through coercion by the defendants.


The defendents commited the tort of false imprisonment because Francine Y. was involuntarily confined against her will because she would not engage in the act of fraud at the request of the defendents. When the plaintiff was apprenhended, she was locked in a police car through the use of physical force. She was also driven about without the opportunity to get out. The plaintiff was detained for a number of hours and held against her will. There was no way of escape

because the plaintiff was placed in a small cell that had no windows and the door was locked after she was placed in the cell. The plaintiff was conscious of the false arrest and false imprisonment. The officers had no reasonable grounds to make the arrest, no warrant for the arrest nor will they have a valid defense for the arrest in a true court of law. During the plaintiff's confinement within the jail cell at the 17th and State street police station, the plaintiff became more depressed than she was before the arrest. Her anxiety heightened as well.

The intent to falsely arrest, falsely imprison and involuntary confine the plaintiff was also an act of conspiracy that was calculated and premeditated. This is evident because the night before the arrest; on May 25, 2008, Nassira Tokash made a statement to the plaintiff that she wanted her out of PGM's homeless mission in the morning. She told her "I want you out, out in the morning and then you will see." The officer was in possession of a blackberry cellular telephone which she used to contact the defendants in an effort to premeditate the false arrest and the false imprisonment. The officers and the defendants were conscious of what they were doing and the timing of the event was carefully planned with precise calcuations in an effort to apprehend the plaintiff and cause her unnecessary duress. Because their intent to do so was willful, there is no presumption of innocence on behalf of the defendants.

The tort of malicious prosecution was committed by the defendents as well. The defendants' intent was to restrain the plaintiff because she would not engage in the act of embezzlement and money laundering. The restraint of the plaintiff's oppressors was forceful and made against the plaintiff's will. The false arrest was carefully planned and derived from the the intent to conspire against the plaintiff. It was also performed as an intentional malicious act in which the plaintiff;

Francine Y., gave the officers no probable cause to believe that she committed the offense of a domestic battery. When the plaintiff showed up for court on July 9, 2008, the domestic battery charge was dismissed in her favor with a stricken off, leave to reinstate.

Lastly, The officers did not follow correct procedures when arresting a woman. There should have been a woman officer making the arrest when the plaintiff was being staked out and demanded to get into the police officer's car. However, she was arrested by officer Melchor who is a male officer. The plaintiff asked for the person's name who made the complaint against her as well as a copy of the police report, the name was not given to her nor was an official complaint given. Francine Y. was never handcupped while she was in the police car. Also, Officer Melchor did not ask the plaintiff if she had any children in an effort to make sure that the children would be secured while the plaintiff was being arrested. The white male officer took the plaintiff's food from her when she was being falsely arrested and demanded to get into the police car. The plaintiff had a bottle of water, two cinnamon rolls and two oranges in her possession. The officer gave the plaintiff her food and she was allowed to eat in the back of the squad car. These are not standard procedures. Also, the plaintiff is not sure if the officer(s) which handled her food placed any foreign substances in the cinnamon rolls. Francine Y. could not watch all the officers because she was under a great deal of stress and pressure with the false arrest. Because the events transpired so quickly, the plaintiff was only able to focus on officer Melchor and Nassira Tokash. Also, Francine Y. became numb during the false arrest and its associated events and she is not aware if the cinnamon rolls made her ill. However, after the plaintiff ate the cinnamon rolls, she noticed that she has been experiencing recurring yeast infections.

File Date: _August 13, 2008_

Case No: _08cv 4597_

ATTACHMENT # _1_

EXHIBIT _Pages 106-150 and Appendix_

TAB (DESCRIPTION) _____

The plaintiff went to the 17th and State Street location on June 30, 2008 to fill out a police report on Nassira Tokash and Kenyatta. She was not allowed to do so. She also told the officers that Kenyatta had mentioned to others that she was on the run for something that she did in Texas. She asked if they were going to have Kenyatta arrested. Officer King replied "no" because other officers that were watching coerced him into lying. They never made the arrest. The officers remained willfully and consciously indifferent through the acts of aiding and abetting. While being processed and detained, the plaintiff was intimidated by being surrounded by several officers, sexually harassed, laughed at, ridiculed and mocked by officer Melchor that it was her birthday. The plaintiff showed officer Melchor and the other black female officer that frisked her the cuts around her fingers. She asked for a band-aid. It was not given to her, nor was she taken to Stroger's hospital to be treated for the cuts.

On July 9, 2008, the plaintiff made an appearance in court at the Harrison and Kedzie station. The arresting officers never showed up. The judge gave the plaintiff's case a stricken off with leave to reinstate for one hundred and sixty-two days. After the plaintiff complained about the false arrest, that it was tied to embezzlement, that she had made a report with the FBI and the fact that she was a law student, the judge replied that he did not care. When the plaintiff received a copy the judge's deposition, she discovered that the judge changed the stay of leave from one hundred and sixty-two days to one hundred and twenty days. Both of the acts performed by the judge were acts of retaliation because the plaintiff would not engage in the act of fraud at the request of the defendants.

**725 ILCS 5/107-2  Arrest.** 1) Arrest by Peace Officer. A peace officer may arrest a person when: (a) He has a warrant commanding that such person be arrested; or  (b) He has reasonable grounds to believe that a warrant for the person's arrest has been issued in this State or in another jurisdiction; or (c) He has reasonable grounds to believe that the person is committing or has committed an offense.  (2) Whenever a peace officer arrests a person, the officer shall question the arrestee as to whether he or she has any children under the age of 18 living with him or her who may be neglected as a result of the arrest or otherwise. The peace officer shall assist the arrestee in the placement of the children with a relative or other responsible person designated by the arrestee. If the peace officer has reasonable cause to believe that a child may be a neglected child as defined in the Abused and Neglected Child Reporting Act, he shall report it immediately to the Department of Children and Family Services as provided in that Act. (3) A peace officer who executes a warrant of arrest in good faith beyond the geographical limitation of the warrant shall not be liable for false arrest.  **720 ILCS 5/12-7.4. Aggravated Stalking.** (a) A person commits aggravated stalking when he or she, in conjunction with committing the offense of stalking, also does any of the following: (1) causes bodily harm to the victim; (2) confines or restrains the victim; or (3) violates a temporary restraining order, an order of protection, or an injunction prohibiting the behavior described in subsection (b)(1) of **Section 214 of the Illinois Domestic Violence Act of 1986 [750 ILCS 60/214].** (b) Sentence. Aggravated stalking is a Class 3 felony. A second or subsequent conviction for aggravated stalking is a Class 2 felony. **720 ILCS 5/33-3 Official Misconduct.** A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts: (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is

107

forbidden by law to perform; or (c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law. A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his office or employment or position as a special government agent. In addition, he commits a Class 3 felony. **720 ILCS 5/26-1. Disorderly Conduct**. (a) A person commits disorderly conduct when he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace.     *Sorrell v. McGuigan (4th Cir 2002.)* *(See Exhibits in Appendix Section)*

### Charge 18: Increased Surveillance, Stalking, Aggravated Stalking, Police Brutality, Intimidation, Threats, Threatening Public Officials, Offical Misconduct & Disorderly Conduct

The officers with the aliases of Miriam Martinez and Nassira Tokash followed, repeatedly stalked and harassed the plaintiff on more than two consecutive occasions without reasonable cause or legal justification while they impersonated homeless women living at the Pacific Garden Mission. Miriam Martinez kept the plaintiff under heavy surveillance by watching her, listening to her conversations and following her just about everywhere she went. The visible harassment inflicted on the plaintiff by Miriam Martinez continued daily for about two months until Miriam Martinez was dismissed from the Pacific Garden Mission for ninety days becaused she engaged in the act of police brutality. However, she continued to keep the plaintiff under heavy surveillance although she was dismissed from the mission.

Miriam Martinez also committed the act of aggravated stalking because she stalked the plaintiff on a daily basis for over two months while living at the PGM and she transmitted the threat of

future bodily harm by telling the plaintiff that she would end up dead on the side of a road. Nassira Tokash committed the act of aggravated stalking because she stalked the plaintiff on a daily basis for over two months while living at the PGM which placed the plaintiff's security in potential danger. As a result of the aggravated stalking, Nassira Tokash was instrumental in having the plaintiff apprehended through the use of a false arrest. The plaintiff was also restrained and detained by several officers who participated in the false arrest. Francine Y. was confined in a jail cell for a crime that she did not commit. Nassira Tokash also threatened the officer by telling her that she wanted her out of PGM on the night of May 25, 2008. The officer was seen with a pink razor blade as well as a blackberry telephone in her possession on the night of May 25, 2008. Francine Y. was threatened as well as intimidated by the fact that the officer was carrying a razor blade. Since Nassira Tokash was not truly homeless, she should have been able to shave her legs, underarms and genitals in her own home. The purpose for her having the razor blade may have been to inflict bodily harm on the plaintiff as well as to create an intentional homicide. Another factor is the fact that the plaintiff sleeps on her stomach which would have given the defendant a greater motive to attack the plaintiff, conceal the weapon along with the evidence and wrongfully incarcerate someone else who did not commit the crime. Because the officer carried a razor blade in her possession, the plaintiff was placed in imminent danger of immediate and future bodily harm.    PGM's rule was that the women could not have any razors because they were considered weapons. The mission also instituted a rule that all cellular telephones had to be locked up before the women proceeded to the dormitory. The razor blade was in the plaintiff's plastic toiletry bag at the time Nassira Tokash was bold enough to boast it in the plaintiff's face. Each night, the homeless guests receive a bag check before they are allowed to enter the dormitory. The staff said nothing about the fact that the officer carried a

109

razor and a cellular telephone which could easily be seen in the toiletry bag. They remained willfully and consciously indifferent by aiding and abetting. Nassira Tokash was instrumental in getting the plaintiff out of the mission by staging a premeditated false arrest with the use of a blackberry telephone. Ronald Huberman also uses a blackberry telephone.

Officer Melchor threatened the plaintiff by telling her that she would be thrown out of PGM for a fight that she did not commit. The plaintiff is a public service official because the statute of limitations from her prior employment discrimination lawsuit have been tolled. Officer Tokash, Martinez and Melchor conveyed threats to the plaintiff through the use of coercion with the promise to receive some financial and/or non-financial reward for engaging in fraud. The communication that was conveyed to the plaintiff placed the plaintiff in reasonable apprehension of immediate and/or future bodily harm.

Miriam Martinez would continuously mock the black homeless and mentally ill women while she lived at the homeless facility. She mocked them by talking to herself as if she was crazy and provoked them to wrath by making comments which offended them. On January 25, 2008, Miriam Martinez initiated a fight with Chanel, a homeless guest living within PGM. The fight was physical in nature which involved hitting, punching, grabbing, pushing and pulling hair. Their was also blood. This is an act of police brutality because a peace officer took advantage of a homeless black woman through the use of excessive physical force. The Chicago police department did not arrest the officer; Miriam Martinez, who was seen fighting Chanel. The plaintiff is not aware if Miriam Martinez offered the staff members at PGM a bribe in an effort to keep their mouths shut. The Chicago police department intentionally failed to perform their

110

fiduciary responsibilities and duties which were mandatory requirements of the law. The fight arose from growing tensions which Miriam Martinez intentionally created. The act of police brutality was also carried out through Miriam Martinez's and Nassira Tokash's verbal attacks of mocking the plaintiff, Francine Y., as well as through the use of the officer's psychological intimidation. The plaintiff feared that Nassira Tokash would carry out an intentional act of police brutality against her with the use of a razor blade which was seen in her possession. The psychological intimidation the officers enacted against the plaintiff were pretending to be homeless women, pretending to mentally ill, mocking the plaintiff by wearing similar cotton panties, wearing a similar bandanna and carrying a Whole Foods bag the next day after the plaintiff was seen with one. This psychological intimidation stemmed from growing racial tensions of these particular Mexican's lack of concern and disregard for African Americans. Also, the act of police brutality in the form of verbal attacks and psychological intimidation against the plaintiff was done in response to orders given to the officers by Mayor Richard Daley and his entourage.



Police officers subdue a man later identified as Robert Davis in the French Quarter of New Orleans on Oct. 8, 2005. A former police officer accused in the videotaped beating was acquitted last July by a judge who heard the case without a jury. www.usatoday.com

Federal prosecutors are targeting a rising number of law enforcement officers for alleged brutality, Justice Department statistics show. The heightened prosecutions come as the nation's largest police union fears that agencies are dropping standards to fill thousands of vacancies and "scrimping" on training.  Cases in which police, prison guards and other law enforcement authorities have used excessive force or other tactics to violate victims' civil rights have increased 25% (281 vs. 224) from fiscal years 2001 to 2007 over the previous seven years, the department says.  During the same period, the department says it won 53% more convictions (391 vs. 256). Some cases result in multiple convictions.  Federal records show the vast majority of police brutality cases referred by investigators are not prosecuted.  Similarly, in the case of Karolina v. The City of Chicago, (2007), officer Abbate was accused of beating a woman in a public place.  The beating involved punching, kicking, grabbing, slamming, throwing and the pulling of hair. Their  was also blood. Officer Abbate took advantage of a helpless woman the same way that officers Nassira Tokash and Miriam Martinez did.  Officer Abbate was also seen offering Karolina a bribe in an effort to keep her mouth shut.  The plaintiff was injured and a personal injury lawsuit had to be filed against the City of Chicago.

Miriam Martinez and Nassira Tokash performed these acts of official misconduct which they knew were forbidden by law.  Their intent to mock the plaintiff through aiding and abetting was to coerce her into engaging in the act of fraud.  Mariam Martinez's and Nassira Tokash's intent also was to receive a reward in the form of financial compensation from the defendants for performance of the acts.  Their conduct  and behavior was reckless and disorderly because they

112

disrupted the peace of the plaintiff as well as others who witnessed the harassment. The plaintiff's anxiety and depression heightened as a result. Francine Y. also became severely traumatized.

**The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations. **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public. **The 1970 Illinois Constitution states in Section 20: Individual Dignity.** To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned. **720 ILCS**

**5/12 7.3 Stalking.** (a) A person commits stalking when he or she, knowingly and without lawful justification, on at least 2 separate occasions follows another person or places the person under surveillance or any combination thereof and: (1) at any time transmits a threat of immediate or future bodily harm, sexual assault, confinement or restraint and the threat is directed towards that person or a family member of that person; or (2) places that person in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement or restraint; or (3) places that person in reasonable apprehension that a family member will receive immediate or future bodily harm, sexual assault, confinement, or restraint. **720 ILCS 5/12-7.4. Aggravated Stalking.** (a) A person commits aggravated stalking when he or she, in conjunction with committing the offense of stalking, also does any of the following: (1) causes bodily harm to the victim; (2) confines or restrains the victim; or (3) violates a temporary restraining order, an order of protection, or an injunction prohibiting the behavior described in subsection (b)(1) of Section 214 of the Illinois Domestic Violence Act of 1986 [750 ILCS 60/214]. b) Sentence. Aggravated stalking is a Class 3 felony. A second or subsequent conviction for aggravated stalking is a Class 2 felony. **720 ILCS 5/12-9 Threatening Public Officials.** (a) A person commits the offense of threatening a public official when: (1) that person knowingly and willfully delivers or conveys, directly or indirectly, to a public official by any means a communication: (i) containing a threat that would place the public official or a member of his or her immediate family in reasonable apprehension of immediate or future bodily harm, sexual assault, confinement, or restraint; or (ii) containing a threat that would place the public official or a member of his or her immediate family in reasonable apprehension that damage will occur to property in the custody, care, or control of the public official or his or her immediate family; and (2) the threat was conveyed because of the performance or nonperformance of some public duty, because of hostility of the

114

person making the threat toward the status or position of the public official, or because of any other factor related to the official's public existence. **Police Brutality** is the intentional use of excessive force, usually physical, *but potentially also in the form verbal attacks and psychological intimidation*, by a police officer, prison officer or other law enforcement officer. It may be carried out at the initiative of an individual officer, or in response to orders given to the officer, or in response to governmental or administrative policies. **720 ILCS 5/33-3 Official Misconduct.** A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts: (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is forbidden by law to perform; or (c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law. A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his office or employment or position as a special government agent. In addition, he commits a Class 3 felony. **720 ILCS 5/26-1. Disorderly Conduct.** (a) A person commits disorderly conduct when he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. *Gates v. Collier (1972)* *(See Exhibits in Appendix Section)*

### *Charge 19:  Wildlife Endangerment/Destruction, Official Misconduct & Disorderly Conduct*

In the middle of March 2008, two Chicago female police officers of Mexican decent; Miriam Martinez and/or Nassira Tokash, placed the leg off of an animal in the bird family within the plaintiff's path. The bird's leg was an emerald green mixed with an olive green. It had long claws. It was not a duck, goose or a pigeon. Ducks and geese have webbed feet and pigeons

have very small, red feet with claws. This was done to mock the plaintiff because Ronald Huberman had placed an illegal telephone tap on the plaintiff's friend's telephone and overheard a conversation. The plaintiff's friend; Diahanna Wiggins, found a dead bird in her basement and she believed that it was a sign of someone working witchcraft against her. Diahanna mentioned this in person to the plaintiff when the plaintiff came by her home in March of 2008. Diahanna also discussed the subject of witchcraft with others over her telephone. Miriam Martinez and/or Nassira Tokash performed this act of official misconduct with the intent to mock the plaintiff through aiding and abetting in an effort to coerce her into engaging in the act of fraud. Miriam Martinez's and/or Nassira Tokash's intent also was to receive a reward in the form of financial compensation from the defendants for performance of the acts. Their behavior was reckless because they disrupted the peace of the plaintiff as well as others who saw the bird's leg. The plaintiff's anxiety and depression heightened as a result. The leg was placed near the entrance door of the Post Office on the route that the plaintiff would take on a daily basis when she went to look for jobs. Miriam Martinez and/or Nassira Tokash were aware of this route because they constantly followed and stalked the plaintiff on a daily basis. The bird's leg remained in the plaintiff's path for several days until she emailed the media about Mayor Richard Daley and his entourage's intent to coerce her into engaging in fraud. A couple of days after the plaintiff emailed the media, the bird's leg was removed from where the defendants had placed it. Although Miriam Martinez was dismissed from PGM's homeless facility on January 25, 2008 for engaging in the act of police brutality, she continued to follow, stalk and harass the plaintiff. Because it became difficult for Miriam Martinez to follow the plaintiff every day and the fact that she was dismissed from the homeless facility, Ronald Huberman sent Nassira Tokash to live at the PGM in an effort to follow, stalk and harass the plaintiff. It was during the month of

116

March that Nassira Tokash came from behind the scene and made a physical appearance at PGM's homeless facility, fictitiously perpetrating a homeless woman. If in fact these officers destroyed this wildlife by causing it to die, then they are also capable of destroying the life of a human being through the act of murder.

Both officers violated the Endangered Species Act and the Illinois Endangered Species Protection Act by handling, transporting, carrying, delivering and disposing of wildlife that was more than likely on the endangered species list. They also engaged in official misconduct because they remained willfully and consciously indifferent while performing acts that they knew were forbidden by the law for them to perform. As public peace officers, Miriam Martinez and Nassira Tokash should have some knowledge of the law.

On April 15, 2008 a cougar was seen running loose through the streets of Chicago. Several police officers tried to detain the cougar and apprehend it. However, they shot and killed the cougar as opposed to properly sedating the animal. The cougar is also an animal which is on the endangered species list. Chicago Police Captain Mike Ryan stated that the cougar tried to attack the officers when they tried to contain it. However, when the cougar was examined, their was no physical evidence that the cougar had attacked anyone. Mike Ryan stated that the officers could not tranquilize the animal because police officers typically do not carry tranquilizer guns. This is also a violation of the Illinois Endangered Species Protection Act. The officers should have been proactive and not reactive seeing that the state of Illinois has at least two zoos. One zoo is located in Lincoln Park which is not too far from the downtown area. The officers should have been properly trained and been given the appropriate equipment needed for such an

emergency as this one. Many have questioned the officers' intent to kill the cougar. Some have wondered if it was intentional and deliberate. Others have wondered if the officers were coerced into killing the cougar with the promise of pay for their performance. Lastly, many have wondered if the cougar was secretly sold within a private auction in Chicago in an effort to gain filthy lucre.

Much like the drug-trade that is very difficult to stop, there is an illegal market in Mexico that captures endangered species and sells them at local markets. Unfortunately, Mexico is doing little to enforce their laws against the ownership of exotic/endangered animals. The United States based program in Mexico; Defenders of Wildlife, are very helpless in this situation. They simply do not have the funds or the man power to return all of these animals to their natural habitats. One of these such markets is the Sonora Market in Mexico City. It's quite difficult for the Defenders of Wildlife to catch vendors in the act because of the rate of corruption in the justice system. Crooked cops give vendors a heads up when the Defenders of Wildlife are coming for an inspection so that they can hide the animals. Some of the animals sold include squirrel monkeys, boas, yellow-headed parrots, jaquars, eagles, and crocodiles. Some of them are sold for as little as $200. The law in Mexico can imprison someone for 12 years if they are found having/selling/capturing an endangered animal. Unfortunately, this law is very rarely enforced as there are numerous cops patrolling the market who do nothing about this issue. Defenders of Wildlife estimated that up to 80,000 parrots were captured illegally in Mexico last year. A conservationist, Juan Carlos Cantu, said that around 80% of parrots in particular die before they are even sold. "It's like the drug trade: we know where they are but there is nothing we can do. As long as there is demand, there will be a market," Cantu said. I think that this situation needs to be resolved with a better system. Now that we know that this corruption is

118

going on, we can attack these criminals at their source, the markets. I think that more people should be involved in this problem, as the Defenders of Wildlife need help.  http://enn.com **The Illinois Human Rights Act (775 ILCS 5/1-102)** states that it is the public policy of the state of Illinois for: **(A) Freedom from Unlawful Discrimination.** To secure for all individuals within Illinois the freedom from discrimination against any individual because of his or her race, color, religion, sex, national origin, ancestry, age, marital status, physical or mental disability, military status, sexual orientation, or unfavorable discharge from military service in connection with employment, real estate transactions, access to financial credit, and the availability of public accommodations.  **(E) Public Health, Welfare and Safety.** To promote the public health, welfare and safety by protecting the interest of all people in Illinois in maintaining personal dignity, in realizing their full productive capacities, and in furthering their interests, rights and privileges as citizens of this State. **(F) Implementation of Constitutional Guarantees.** To secure and guarantee the rights established by Sections 17, 18 and 19 of Article I of the Illinois Constitution of 1970. **(G) Equal Opportunity, Affirmative Action.** To establish Equal Opportunity and Affirmative Action as the policies of this State in all of its decisions, programs and activities, and to assure that all State departments, boards, commissions and instrumentalities rigorously take affirmative action to provide equality of opportunity and eliminate the effects of past discrimination in the internal affairs of State government and in their relations with the public.  The 1970 Illinois Constitution states in Section 20:  Individual Dignity To promote individual dignity, communications that portray criminality, depravity or lack of virtue in, or that incite violence, hatred, abuse or hostility toward, a person or group of persons by reason of or by reference to religious, racial, ethnic, national or regional affiliation are condemned.  **520 ILCS 10/1**  This Act shall be known and may be cited as the "**Illinois Endangered Species**

119

**Protection Act". Section 3.** It is unlawful for any person: (1) to possess, take, transport, sell, offer for sale, give or otherwise dispose of any animal or the product thereof of any animal species which occurs on the Illinois List; (2) to deliver, receive, carry, transport or ship in interstate or foreign commerce plants listed as endangered by the federal government without a permit therefore issued by the Department as provided in Section 4 of this Act; (3) to take plants on the Illinois List without the express written permission of the landowner; or (4) to sell or offer for sale plants or plant products of endangered species on the Illinois List. **The Endangered Species Act (ESA)  7 U.S.C. § 136, 16 U.S.C. § 1531 et seq.** is a federal law passed by the United States Congress in 1973. The Act protects both endangered species, defined as those "in danger of extinction throughout all or a significant portion of their range," and threatened species, those likely to become endangered "within the foreseeable future." Under the Act, the term "species" includes species and subspecies of fish, wildlife and plants, as well as geographically distinct populations of vertebrate wildlife (including fish) even though the species as a whole may not be endangered. This flexibility in the Act allows action to be taken to protect certain members of a species before the entire population becomes threatened. **720 ILCS 5/33-3 Official Misconduct.** A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts:  (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is forbidden by law to perform; or (c) With intent to obtain a personal advantage for  himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance  of any act a fee or reward which he knows is not authorized by law.  A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his

office or employment or position as a special government agent. In addition, he commits a Class 3 felony. **720 ILCS 5/ 26-1. Disorderly Conduct.** (a) A person commits disorderly conduct when he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. *(See Exhibits in the Appendix Section)*

### Charge 20:  Attempted Murder, Conspiracy to Commit Murder, Solicitation for Hire, Solicitation for Murder, Poisoned by Attempted Drug-Induced Homicide, Attempted Drug-Induced Homicide, Attempted Premeditated Murder, Assault, Aggravated Assault, Battery, Aggravated Battery, Heinous Battery, Premeditated Arson

On or around December 12, 2007, at least two Chicago police officers with the aliases of Miriam Martinez and/or Nassira Tokash followed the plaintiff to Dominicks grocery store on 14th and Canal Street. The officers more than likely coerced and/or bribed a worker in the Dominicks' bakery section to add a drug(s) and/or chemical to the cinnamon rolls which were made fresh on a daily basis. This is evident because the plaintiff, Francine Y., purchased two cinnamon rolls on the morning of December 12, 2007 which she had done almost on a daily basis. The plaintiff ate the cinnamon rolls while walking to the Harold Washington Library. About two and one-half to three hours later, the plaintiff became deafly ill. Francine Y. vomited about ten times, contracted a very bad case of diarrhea, her eyes watered, her vision was blurred and she contracted a disgusting yeast infection from the poison that was introduced into her food. The plaintiff also keeled over because the trauma from the foreign substance(s) which was placed in her food made it difficult for her to stand up.

Somehow the plaintiff was able to restrain herself and regain her balance. She prayed and eventually recovered. Francine Y. did not die from the foreign substances which were introduced into her food. Francine Y. was conspired against and poisoned by the defendants because she would not engage in the act of fraud. In an effort to be sure that she was in fact drug

121

induced, she tested her hypothesis. The next day, the plaintiff did not eat at Dominicks, she ate at Whole Foods. The plaintiff did not get sick at all. On Friday, December 14, 2008, the plaintiff ate at Dominicks again. Francine Y. purchased a cinnamon roll. She ate the cinnamon roll and became deafly ill. The plaintiff vomited several times, contracted diarrhea and the yeast infection which was already present from the foreign substances within her system intensified. The plaintiff had not experienced a yeast infection in the magnitude such as the one the defendants intentionally created when they traumatized her from the drug(s) they infiltrated her food with. Francine Y. went to Fantus clinic to be treated for the yeast infection. Her hypothesis proved to be correct because Ronald Huberman harassed her by mentioning yeast infections within junk emails that he transmitted to her after she was poisoned by the drugs. Also, a week after the incident, an employee who works in the Dominicks' bakery section by the name of Lei Lei was sitting in the eatery section. Lei Lei came over and initiated a conversation with the plaintiff. It appeared that Lei Lei was planted in the eatery section, waiting for the plaintiff to come into Dominicks. Lastly, a white middle-aged female cashier told the plaintiff that her husband is a police officer. The plaintiff is not sure if this Dominicks' employee and her husband were involved in the conspiracy.

This incident was not a random case of food poisoning. The intent to have the foreign substances added to the cinnamon rolls on more than one day was the fact that the plaintiff ate at Dominick's on a daily basis. The conspirators wanted to make sure they succeeded in carrying out the act of premeditated murder. The plaintiff would appear in Dominicks around 6:30 a.m. when there were virtually no customers in the store. This made it easy to watch the plaintiff, remove the row of cinnamon rolls after the plaintiff had purchased one in an effort to keep the

other customers from becoming drug induced. The plaintiff made routine visits to Dominicks because she purchased her breakfast, lunch and dinner at the store. The officers and the defendants planned "in cold blood" the contemplation of acting out a premeditated murder against the plaintiff. The crime was conceived through conspiracy on behalf of the defendants and the police officers. During the time the plaintiff was placed under heavy surveillance by her assailants, they were constantly thinking about, planning, and plotting the crime beforehand. The underlying motive for the defendant's intent to conspire against the plaintiff was the fact that Francine Y. would not engage in the act of fraud by embezzling money from insurance companies and laundering the money for the defendants.

Because the plaintiff would not willfully engage in the act of fraud at the request of the defendants, the defendants made threats against the plaintiff's life and placed her life in imminent danger. These threats included telling the plaintiff that she would end up dead on the side of a road, sending junk emails relating to not having enough life insurance, junk emails relating to wheelchairs, one officer telling the plaintiff that she would tell on her because she wanted her out of the mission, having the plaintiff falsely arrested and involuntarily detained without just cause and the threat of officer Nassira Tokash carrying a razor blade and a blackberry on the night of May 25, 2008. The threats against the plaintiff's life heightened and intensified when at least two police officers continued to engage in the act of aggravated stalking by keeping the plaintiff under heavy surveillance.

Lastly, in May of 2008, the very night the plaintiff placed Nassira Tokash under investigation with the independent police review board, officer Nassira Tokash came into the homeless mission and she was extremely angry. Nassira Tokash looked at the plaintiff, took her wallet

123

from her toiletry bag and placed it into her bra. Nassira Tokash continued to direct her anger at the plaintiff because she took her finger and stuck it down her throat while looking at the plaintiff, making a reference to the fact that she knew about the poisoning, the vomiting and more than likely where the drug(s) had come from. The only way the officer could have knowledge of the intent to commit a premeditated drug-induced homicide was the fact that she had been a behind the scene conspirator and accomplice. Her nonverbal threats which were directed at the plaintiff proved that she concurred with the commission of the offense. The defendant's intent was not to poison the plaintiff. Their underlying motive was to carry out an act of premeditated murder. They wanted the murder to appear as a self-inflicted drug-induced homicide. The conspirators also wanted the murder to be classified as a suicide by drug overdose. This is evident because the drug(s) was placed in the plaintiff's food, making it difficult to trace where the drug had come from.

The defendants took concrete steps in an effort to carry out the act of premeditated murder by keeping the plaintiff under heavy surveillance and possibly bribing an employee who worked for Dominicks in an effort to introduce a foreign, extremely dangerous drug(s) into the plaintiff's food. The defendants calculated the plaintiff's every move with precise timing by soliciting the help of at least two Chicago police officers to carry out the premeditated acts. The officers were procured through solicitation with the promise of pay for performance. This was evident because both officers made references to the fact that they were going to or had received money from the harassment and surveillance they subjected the plaintiff to. The plaintiff also learned from someone outside of PGM's mission that the officers might have received between $1,000 and $2,000 in an effort to commit the premeditated crimes. Officer Miriam Martinez and officer

Nassira Tokash engaged in the acts of conspiracy, solicitation of murder and solicitation of murder for hire.    The procurement of the officers was derived from a verbal contract, understanding and agreement between the officers and the defendants.  The intent was to have the officers indulge in the concrete and extremely heinous crimes of gross official misconduct and premeditated murder through the use of a premeditated drug-induced homicide.  The defendants hoped that the drug-induced homicide would have been difficult to trace back to the perpetrators or the Pacific Garden Mission because the plaintiff rarely ate inside the mission.

Another motive for carrying out the act of premeditated murder through the use of a drug-induced homicide was the fact that the plaintiff had filed an internal EEOC employment discrimination charge against Frank Kruesi in the form of an attempted murder.  The plaintiff filed this charge against Frank Kruesi in 2004 because she emailed him and complained about the fact that Ron Durr was blocking her path and cursing her out within CTA's workplace.  The plaintiff called 911 because she felt that her safety was threatened within a work environment. Francine Y. was also afraid that Ron Durr would inflict serious harm upon her because this was the second time he blocked her path and exerted physical force in her presence.  Frank Kruesi remained willfully indifferent and the plaintiff was intentionally ignored.

Because the plaintiff was without legal representation, CTA decided to fraudulently dismiss her employment discrimination claim.  Their intention was not to settle the plaintiff's claim at all. The defendants conspired with the plaintiff's psychiatrist to diagnose the plaintiff with a fraudulent psychotic mental illness that she does not have.  The psychiatrist aided and abetted the defendants through the use of coercion and more than likely bribery.  He gave the plaintiff a

psychotic mental illness that she does not have and prescribed an extremely dangerous drug called Abilify for the plaintiff to induce. The drug the psychiatrist prescribed for the plaintiff had a contraindication of hypersensitivity. This information was never disclosed to the plaintiff but fraudulently concealed in an effort to defraud Francine Y. and dismiss her from society altogether. The motive behind the conspiracy was to create a self-inflicted drug-induced homicide. The plaintiff was taking four other prescription drugs during the time that the fraudulent drug was prescribed for her. If the plaintiff had died from the drug that was prescribed by the psychiatrist, the act of premeditated murder would have been difficult to trace back to the defendants. Most likely it would have been classified as a suicide from an overdose. *Cruzan v. Missouri Department of Health, 497 U.S. 261, 278 (1990).*

However; when Ronald Huberman came on board, the plaintiff's charge of discrimination went into appeal. Ronald Huberman calculated the damages which were owed to the plaintiff and ascertained that the damages were huge. Because the defendants were bound with a spirit of greed, they became desperate and quickly changed plans. They made a very dumb mistake by asking the plaintiff to indulge in the act of fraud. Essentially what they were doing was trying to steal money which rightfully belonged to the plaintiff.

About a week after the defendants committed the act of attempted murder through the use of a drug-induced homicide, Miriam Martinez made references that she needed to get cat scans from using the drug ecstasy. The plaintiff did not believe the officer because she told many lies while living in PGM's homeless mission. Miriam Martinez also mentioned several officers who had been busted for taking street drugs from drug dealers and reselling the drugs. Ronald Huberman

has sent the plaintiff emails relating to drug rehab, diabetes medicine, high cholesterol medication and an email making reference to a pharmacist holding a container of pharmaceutical medication. Also, Francine Y. learned from someone outside the mission that Ronald Huberman is a frequent user of the drug ecstasy. The plaintiff is not sure if this was a rumor, so she ignored it.

Ecstasy is one of the possible drugs the defendants may have introduced into the plaintiff's food in and effort to murder her. The risks from inducing the drug ecstasy are similar to those found in amphetamines, cocaine as well as the drug Abilify. These risks involve psychological difficulties which include confusion, depression, sleep problems, anxiety and paranoia. Some of the physical symptoms are blurred vision, faintness, nausea and sleepnessness. Long-term damage includes damage to critical thought processes within a person's memory. An overdose of the drug can cause hallucinations, muscle cramping and extremely high blood pressure. Ronald Huberman also sent the plaintiff junk emails harassing her about the fact that she was having trouble sleeping.

Similarly, the defendants defrauded the plaintiff by giving her the drug Abilify as a means of annihilating her. Some of the side affects of Abilify include vomiting, nausea, light-headedness, insomnia, a sudden increase in blood pressure and heart rate, hallucinations, ability to affect judgment, critical thinking and motor skills. As with both drugs, some side affects are not known because the drugs affect each person differently. Also, ecstasy is a sensual drug. The plaintiff was not sexually active at the time the drug was possibly induced within her system. The plaintiff had a very low sex drive before she became ill from the harassment and retaliation.

127

Her illnesses have made her sex drive even lower. Because the plaintiff was in relatively good physical health at the time the drug(s) was induced within her system, her body probably responded by expelling the foreign substances through all openings as a defense mechanism to fight off the chemicals. The plaintiff was in extreme agony at the time the premeditated act of attempted murder took place. Her depression became increasingly more severe and her anxiety heightened. The timing of the event was precise and calculated because it was derived from the defendant's ability to ascertain the plaintiff's whereabouts at any given moment. The conspirators used a blackberry cellular telephone to maintain contact with one another because they constantly stalked and followed the plaintiff. Based upon the plaintiff's given level of stress at the time the crime was committed, one possible cause for the heavy yeast infection may have been produced by the onset of the additional trauma. A second cause may be the fact that the defendants produced a heavy yeast infection with the mixture of drugs in an effort to get the plaintiff to go to the hospital. The motive for this would have been to insert a tracking device inside the plaintiff's vagina in an effort to keep her under heavy surveillance. This sounds ridiculous; however, Ronald Huberman made references to GPS tracking devices via the plaintiff's email. Also, the defendants were trying to use Francine Y. as a scapegoat to embezzle billions of dollars. This would have given them motive to do such a thing especially if the plaintiff would have been traveling abroad to launder money in foreign countries. Two facts which would help to explain where the tracking device came from is the fact the Jodi Weiss was a former FBI agent. Somehow, he breached his fiduciary responsibilities to the United States federal government and became an outcast. As a result, Mayor Richard Daley and his entourage embraced him as a family member under false pretenses. Their intent was to use him as a scapegoat, exploit him for his intellectual capabilities and knowledge of central intelligence. The

128

other fact is that a police officer was witnessed spreading rumors that Ronald Huberman's father is the head of the CIA in Israel. If this is true, Ronald Huberman would have been able to gain access to such a device. Lastly, the plaintiff still continues to experience recurring yeast infections which she has been treating with over-the-counter medications.

The drug(s) could have been acquired by the officers through several direct as well as indirect avenues. They could have come from having them in their personal possessions, drug busts, someone within PGM's homeless mission or possibly a mixture between a street drug and a pharmaceutical drug from Stroger's hospital. The Pacific Garden Mission has many homeless guests who are drug addicts, recovering drug addicts and persons who are afflicted with mental illnesses. Because of the type of individuals that live inside the mission, the fact that they may have had both street and pharmaceutical drugs in their possession, the fact that one could easily gain access to the homeless guests drugs and the fact that Mayor Richard Daley and his entourage have control over Stroger's hospital gave the defendants motive to stage this heinous crime against the plaintiff.

Francine Y. was repeattedly assaulted by both officers through the use of verbal abuse and the violent act of making physical contact with her by introducing foreign substances into her food without her knowledge or consent. This act of assault became aggravated when the perpetrators possessed the apparent and present ability to carry out this unlawful attempt which they knew was forbidden by law. Their intent was to inflict bodily harm upon the plaintiff through a violent and malicious mental and physical injury.

This act of premeditated murder was essentially a domestic battery because the crime was intentionally and knowingly carried out without legal justification by any means against the

the jury, prosecutors should not normally add it to the indictment, but should draw to the attention of counsel that the alternative count' may be available. In this particular case, the defendants words and actions were more than preparatory; their words and threats provided *prima facie* evidence of an intent to kill. There was no doubt that they were uttered seriously.

Lastly, there were many times that Miriam Martinez and Nassira Tokash hung around the mission to gather evidence because Mayor Richard Daley's office has received many complaints relating to the Pacific Garden Mission. Also, the plaintiff believed that the officers's motive for hanging around the mission was to stage a drug bust and eventually set the mission on fire. The drug bust would have provided a substantial amount of evidence against the mission to help diminish its credibility. The hot box would have been the perfect alibi for setting the Pacific Garden Mission on fire. The hot box contained clothing which was steamed at pressures greater than 300 degrees Fahrenheit and some women were often caught smoking cigarettes in the mission's dormitory. The officers were more than likely going to attribute the cause of the fire to PGM's own negligence due to a lit cigarette that was left burning. The homeless guests would not have been able to escape the fire because the doors to the dormitory as well as the doors in the stair wells open and lock with the use of electronic touch keypads. Only the staff members and some of the program women have access to the key cards. Also, someone which has knowledge of the blue prints like the developer and construction company which built the mission could have easily disengaged the locks inside the mission in an effort to keep the homeless people from escaping the fire. Also, Ronald Huberman sent the plaintiff an email relating to becoming a fireman. Lastly, Francine Y. has witnessed some of the staff members sleeping on the job while the guests are asleep. If a fire breaks out and the workers are asleep, then this negligence can also be attributable to the Pacific Garden Mission.

131

plaintiff. The crime was planned in advance, committed by defendants which were members of the plaintiff's household and the act caused bodily harm to Francine Y. This malicious act also proved itself to be an aggravated battery as well. An aggravated battery is a serious form of a battery as well as a felony. The perpetrators used a deadly weapon in the form of a drug(s), the plaintiff was inflicted with serious bodily injury, and the battery was carried out against the plaintiff who is a woman. Another factor which is extremely important is the fact that the plaintiff does not know what the long-term psychological or physical side affects from the drug(s) may produce.

Lastly, the officers also committed the act of a heinous battery by inducing the plaintiff's system with a foreign, deadly chemical. Their intent to do so was willful and they knowingly caused severe and permanent mental disability to the plaintiff. Francine Y. could develop a potential fear of police officers and Mexicans as a result. Francine Y. also experienced great bodily harm from the chemical contaminant. The drug(s) which were induced into the plaintiff's system caused grievous harm to the plaintiff because she became deafly ill after they were induced into her system and has experienced recurring yeast infections. Francine Y. could have died due to the fact that she was suffering from high blood pressure, heightened anxiety and an extreme amount of depression. Also, the plaintiff was experiencing a great deal of trauma because of the harassment and retaliation that she was being subjected to.

In *R v Morrison (2003) 1 W.L.R.1859*, on a single count of attempted murder, the Court of Appeal held that the trial judge had been right to leave to the jury an alternative count of attempting to cause grievous bodily harm with intent, because a defendant could not intend to kill without also intending to cause grievous bodily harm. If an alternative count can be left to

130

The underlying motive behind destroying PGM was to remove the mission from its current downtown Chicago location and resell the land to another developer once the mission was destroyed. Officer Nassira Tokash made trips to the clothing room, the kitchen, the bathroom, the shower room, the changing area and the dorms while she lived at the PGM. She made mental notes for the defendants while she kept PGM under surveillance.

This would have also been a random act of premeditated murder. Most Mexicans, if not all, do not like African-Americans. Some are developing a perpetual racial hatred for African-Americans because they feel as if African-Americans are competing for jobs. The Pacific Garden Mission houses primarily blacks who are African-Americans. This would have also been another motive for the officer's willful intent to engage in the act of premeditated arson.

**720 ILCS 5/8  Conspiracy.** (a) Elements of the offense. A person commits conspiracy when, with intent that an offense be committed, he agrees with another to the commission of that offense. No person may be convicted of conspiracy to commit an offense unless an act in furtherance of such agreement is alleged and proved to have been committed by him or by a co-conspirator. (b) Co-conspirators. It shall not be a defense to conspiracy that the person or persons with whom the accused is alleged to have conspired: (1) Has not been prosecuted or convicted, or (2) Has been convicted of a different offense, or (3) Is not amenable to justice, or (4) Has been acquitted, or (5) Lacked the capacity to commit an offense. (c) Sentence. A person convicted of conspiracy may be fined or imprisoned or both not to exceed the maximum provided for the offense which is the object of the conspiracy, except that if the object is an offense prohibited by Sections 11-15, 11-16, 11-17, 11-19, 24-1(a)(1), 24-1(a)(7), 28-1, 28-3 and

132

28-4 of the "Criminal Code of 1961", approved July 28, 1961, as amended, or prohibited by Sections 404 or 406 (b) of the "Illinois Controlled Substances Act", enacted by the 77th General Assembly, or an inchoate offense related to any of the aforesaid principal offenses, the person convicted may be sentenced for a Class 3 felony however, conspiracy to commit treason, first degree murder, aggravated kidnapping, aggravated criminal sexual assault, or predatory criminal sexual assault of a child is a Class 1 felony, and conspiracy to commit any offense other than those specified in this subsection, and other than those set forth in Sections 401, 402, or 407 of the Illinois Controlled Substances Act, shall not be sentenced in excess of a Class 4 felony. A person convicted of an attempt may be fined or imprisoned or both not to exceed the maximum provided for the offense attempted but, except for an attempt to commit the offense defined in Section 33A-2 of this Act, (1) the sentence for attempt to commit first degree murder is the sentence for a Class X felony, except that (A) an attempt to commit first degree murder when at least one of the aggravating factors specified in paragraphs (1), (2) and (12) of subsection (b) of Section 9-1 is present is a Class X felony for which the sentence shall be a term of imprisonment of not less than 20 years and not more than 80 years; (B) an attempt to commit first degree murder while armed with a firearm is a Class X felony for which 15 years shall be added to the term of imprisonment imposed by the court; (C) an attempt to commit first degree murder during which the person personally discharged a firearm is a Class X felony for which 20 years shall be added to the term of imprisonment imposed by the court; (D) an attempt to commit first degree murder during which the person personally discharged a firearm that proximately caused great bodily harm, permanent disability, permanent disfigurement, or death to another person, is a Class X felony for which 25 years or up to a term of natural life shall be added to the term of imprisonment imposed by the court. (2) the sentence for attempt to commit a Class X felony is

133

the sentence for a Class 1 felony; (3) the sentence for attempt to commit a Class 1 felony is the sentence for a Class 2 felony; (4) the sentence for attempt to commit a Class 2 felony is the sentence for a Class 3 felony; and (5) the sentence for attempt to commit any felony other than those specified in subsections (1), (2), (3) and (4) hereof is the sentence for a Class A misdemeanor. **775 ILCS 5/6-101 Part (B) Aiding and Abetting; Coercion.** It is illegal to aid, abet, compel or coerce a person to commit any violation of the Human Rights Act. **720 ILCS 5/31-4 Obstructing Justice.** A person obstructs justice when, with intent to prevent the apprehension or obstruct the prosecution or defense of any person, he knowingly commits any of the following acts: (a) Destroys, alters, conceals or disguises physical evidence, plants false evidence, furnishes false information. **720 ILCS 5/33-1 Bribery.** A person commits bribery when with intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (b) With intent to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to one whom he believes to be a public officer, public employee, juror or witness, any property or personal advantage which a public officer, public employee, juror or witness would not be authorized by law to accept; or (c) With intent to cause any person to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness, he promises or tenders to that person any property or personal advantage which he is not authorized by law to accept; or (d) He receives, retains or agrees to accept any property or personal advantage which he is not authorized by law to accept knowing that such property or personal advantage was promised or tendered with intent to cause him to influence the performance of

any act related to the employment or function of any public officer, public employee, juror or witness; or (e) He solicits, receives, retains, or agrees to accept any property or personal advantage pursuant to an understanding that he shall improperly influence or attempt to influence the performance of any act related to the employment or function of any public officer, public employee, juror or witness. (f) Sentence. Bribery is a Class 2 felony. **720 ILCS 5/29A-2 Commercial Bribe Receiving.** An employee, agent or fiduciary commits commercial bribe receiving when, without consent of his employer or principal, he solicits, accepts or agrees to accept any benefit from another person upon an agreement or understanding that such benefit will influence his conduct in relation to his employer's or principal's affairs.      **Extortion, Outwresting,** or **Exaction** is a criminal offense, which occurs, when a person unlawfully obtains either money, property or services from a person, entity, or institution, through coercion. Refraining from doing harm is sometimes euphemistically called *protection*. Extortion is commonly practiced by organized crime groups. The actual obtainment of money or property is not required to commit the offense. Making a threat of violence or a lawsuit which *refers* to a requirement of a payment of money or property to halt future violence or lawsuit is sufficient to commit the offense. Exaction refers not only to extortion or the unlawful demanding and obtaining of something through force, additionally, exact in its formal definition means the infliction of something such as pain and suffering or to make somebody endure something unpleasant. In the United States, extortion may also be committed as a federal crime across a computer system, phone, by mail or in using any instrument of "interstate commerce". Extortion requires that the individual sent the message "willingly" and "knowingly" as elements of the crime. The message only has to be sent (but does not have to reach the intended recipient) to commit the crime of extortion. Extortion is distinguished from blackmail. In blackmail, the

135

blackmailer threatens to do something which would be legal or normally allowed.  **720 ILCS 5/8 1.2 Solicitation of Murder for Hire.** (a) A person commits solicitation of murder for hire when, with the intent that the offense of first degree murder be committed, he procures another to commit that offense pursuant to any contract, agreement, understanding, command or request for money or anything of value. (b) Penalty. Solicitation of murder for hire is a Class X felony and a person convicted of solicitation of murder for hire shall be sentenced to a term of imprisonment of not less than 20 years and not more than 40 years.  **720 ILCS 5/8 1.1 Solicitation of Murder.** (a) A person commits solicitation of murder when, with the intent that the offense of first degree murder be committed, he commands, encourages or requests another to commit that offense.  (b) Penalty. Solicitation of murder is a Class X felony and a person convicted of solicitation of murder shall be sentenced to a term of imprisonment for a period of not less than 15 years and not more than 30 years, except that in cases where the person solicited was a person under the age of 17 years, the person convicted of solicitation of murder shall be sentenced to a term of imprisonment for a period of not less than 20 years and not more than 60 years.  **720 ILCS 5/8-4 Attempted Murder.**   A person commits an attempt when, with intent to commit a specific offense, he does any act which constitutes a substantial step toward the commission of that offense.  **720 ILCS 5/9-3.3 Drug-induced homicide.**  (a) A person who violates Section 401 of the Illinois Controlled Substances Act or Section 55 of the Methamphetamine Control and Community Protection Act by unlawfully delivering a controlled substance to another, and any person's death is caused by the injection, inhalation or ingestion of any amount of that controlled substance, commits the offense of drug-induced homicide. (b) Sentence. Drug-induced homicide is a Class X felony. (c) A person who commits drug-induced homicide by violating subsection (a) or subsection (c) of Section 401 of the Illinois Controlled Substances Act or Section 55 of the

Methamphetamine Control and Community Protection Act commits a Class X felony for which the defendant shall in addition to a sentence authorized by law, be sentenced to a term of imprisonment of not less than 15 years and not more than 30 years or an extended term of not less than 30 years and not more than 60 years. **720 ILCS 5/12-3.2 Domestic Battery.** (a) A person commits domestic battery if he intentionally or knowingly without legal justification by any means: (1) Causes bodily harm to any family or household member as defined in subsection (3) of Section 112A-3 of the Code of Criminal Procedure of 1963, as amended; (2) Makes physical contact of an insulting or provoking nature with any family or household member as defined in subsection (3) of Section 112A-3 of the Code of Criminal Procedure of 1963, as amended. (b) Sentence. Domestic battery is a Class A misdemeanor. Domestic battery is a Class 4 felony if the defendant has any prior conviction under this Code for domestic battery (Section 12-3.2) or violation of an order of protection (Section 12-30), or any prior conviction under the law of another jurisdiction for an offense which is substantially similar. When a battery is committed with intent to do serious harm or murder, or when it is done with a dangerous weapon, it is described as aggravated. **720 ILCS 5/12-3.3 Aggravated Battery.** A weapon is considered dangerous whenever the purpose for using it is to cause death or serious harm. State statutes define aggravated battery in various ways, such as assault with intent to kill. Under such statutes, assault means both battery and assault. It is punishable as a felony in all states. **720 ILCS 5/12-4.1 Heinous Battery.** (a) A person who, in committing a battery, knowingly causes severe and permanent disability, great bodily harm or disfigurement by means of a caustic or flammable substance, a poisonous gas, a deadly biological or chemical contaminant or agent, a radioactive substance, or a bomb or explosive compound commits heinous battery. (b) Sentence. Heinous battery is a Class X felony for which a person shall be sentenced to a term of

imprisonment of no less than 6 years and no more than 45 years.  **720 ILCS 5/20-1 Arson.**  A person commits arson when, by means of fire or explosive, he knowingly:  (a) Damages any real property, or any personal property having a value of $150 or more, of another without his consent; or  (b) With intent to defraud an insurer, damages any property or any personal property having a value of $150 or more.  Property "of another" means a building or other property, whether real or personal, in which a person other than the offender has an interest which the offender has no authority to defeat or impair, even though the offender may also have an interest in the building or property.  (c) Sentence. Arson is a Class 2 felony.  *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.  (See Exhibits in Appendix Section)*

### Charge 21: Racketeering, Illegal Search & Illegal Wire Taps

The plaintiff, Francine Y.'s storage lockers, secured from Eastbank Storage were illegally searched between December 2007 and April 2008.  The plaintiff's lockers contained many valuable possesions such as fur coats, purfume, expensvie handbags, designer shoes, designer silk scarves, jewelry, new designer clothing, furniture and legal documents. Ronald Huberman made references in an email about some items contained within the plaintiff's backpack that only she knew had been placed there.  He also sent the plaintiff emails about Victoria Secret's lingerie. The plaintiff had a new collection of Victoria Secret's lingerie that she had collected over a number of years. These items were also contained within her storage locker. Francine Y. was  planning on getting married before the employment discrimination occurred; however, the collection of lingerie was a hobby for the plaintiff.  The plaintiff is not sure at this time if the conspirators have removed or stolen any articles from her storage lockers.

Because the plaintiff's unemployment benefits expired, she was not able to make any payments on her storage lockers after the month of November, 2007. The plaintiff emailed the owner of Eastbank Storage asking him if he would be able to hold onto her lockers until she received her first paycheck from a new job that she was in the process of obtaining. It turned out that the plaintiff had not made any payments on the storage lockers since November of 2007 and as of May 5, 2008, Eastbank Storage still had possession of the plaintiff's storage lockers. The owner of Eastbank Storage created a fraudulent contract which would allow the plaintiff to buy back her storage lockers from the company at a cheaper price. The plaintiff never accepted the contract, nor did she execute the contract. Holding onto the plaintiff's articles for five months after she made her last payment seemed like a long time considering the value of the articles which were contained in the lockers. The plaintiff called Eastbank Storage in the month of June 2008 to ask if her storage lockers were still available because she finally secured a job. The owner told the plaintiff that the items in the storage locker were gone.

Francine Y. believed that Mayor Richard Daley and his entourage's intent for illegally opening her storage lockers was to provoke the plaintiff into filing a lawsuit against Eastbank Storage. The plaintiff also believed that Mayor Richard Daley and his entourage wanted to gain control of the Eastbank Storage facility through the filing of a lawsuit on behalf of the plaintiff against Eastbank Storage. Francine Y. believed that the conspirators were going to buy the building from her after she won it in the lawsuit because it was sitting on the river in a prime area in Bridgeport where a lot of recent development has taken place. Also, there was a Project Manager within Mayor Daley's organzation which had lost his job due to managing a project that was involved with the fraudulent selling of land along the river in the Bridgeport area.

The plaintiff also believed that Ronald Huberman was impressed with her petition for rehearing brief, so he had the plaintiff's storage lockers illegally accessed in an effort to coerce her into filing a lawsuit against Eastbank Storage. The conspirator's intent was to have Eastbank Storage pay out the claim to the plaintiff, not have enough insurance to cover the claim and surrender the building to the plaintiff in order to satisfy the remaining liability from the claim. Lastly, because the building is located in Bridgeport which is not a primarily African-American community and the fact that they did not believe the plaintiff would want to keep the building, the defendants goal was to have the plaintiff sell the building. In the process of selling the building, Mayor Richard Daley and his entourage hoped to gain something financial from the sell of the building between the owner, the developers and the contractors. This is what one would call "new age racketeering." More than likely Chicago police officers assisted with the illegal search as well as the illegal search warrant. The plaintiff is not sure if the officers which opened the lockers were Miriam Martinez and Nassira Tokash. If so, they were involved in conspiracy to commit fraud as well as racketeering.

Ronald Huberman also had an illegal wire tap placed on the plaintiff's home telephone and her two cellular telephones in an effort to keep the plaintiff under heavy surveillance and invade her privacy. This is evident because CTA had knowledge of the plaintiff's telephone numbers and Ronald Huberman kept asking for the plaintiff's telephone numbers via the emails he sent her which requested that she embezzle money for the defendants. The plaintiff's telephone numbers are (708) 841-5612 and (312) 351-5635 respectively. Also, the plaintiff's colleague; Diahanna Wiggins, had an illegal wire tap placed on her telephone (773) 737-6451 in the month of

December 2007 under the direction of Ronald Huberman as well.  This is evident because in March of 2008, the plaintiff's friend; Diahanna, found a dead bird that had fallen through her basement window.  She believed that the incident with the bird was a sign of witchcraft. Diahanna Wiggins told the plaintiff about the incident in person and she also discussed the incident with others over her telephone.  During the month of March 2008, Ronald Huberman sent the plaintiff an email relating to witchcraft in an effort to inform the plaintiff that he was invading her privacy through the use of an illegal wire tap.  This is also why Ronald Huberman had the officer Miriam Martinez place the green leg of a dangerous bird in the plaintiff's path in March of 2008.  It was done to harrass the plaintiff in the form of a sick joke.

The **Racketeer Influenced and Corrupt Organizations Act** (commonly referred to as **RICO Act** or **RICO**) is a United States federal law that provides for extended penalties for criminal acts performed as part of an ongoing criminal organization. It also provides a civil cause of action for those injured by violations of the act. RICO was enacted by section 901(a) of the Organized Crime Control Act of 1970 (Pub.L. 91-452, 84 Stat. 922, enacted 1970-10-15). RICO is codified as Chapter 96 of Title 18 of the United States Code, 18 U.S.C. § 1961–1968. It was intended to make it easier to prosecute organized crime figures, but has been applied in several other cases as well. Under the law, **racketeering activity** means: Any violation of state statutes against gambling, murder, kidnapping, arson, robbery, bribery, extortion, dealing in obscene matter, or dealing in a controlled substance or listed chemical (as defined in the Controlled Substances Act);    Any act of bribery, counterfeiting, theft, embezzlement, fraud, dealing in obscene matter, obstruction of justice, slavery, racketeering, gambling, money laundering, commission of murder-for-hire, and several other offenses covered under the Federal criminal code (Title 18);  Embezzlement of union funds; Bankruptcy or securities fraud; Drug trafficking;

Money laundering and related offenses; Bringing in, aiding or assisting aliens in entering the country (if the action was for financial gain); Acts of terrorism. **The Illinois Constitution** states the following: **Section 6: Searches, Seizures, Privacy and Interceptions** The people shall have the right to be secure in their persons, houses, papers and other possessions against unreasonable searches, seizures, invasions of privacy or interceptions of communications by eavesdropping devices or other means. No warrant shall be issued without probable cause, supported by affidavit particularly describing the place to be searched and the persons or things to be seized. The United States Constitution states the following: **Amendment 4: Search and Seizure.** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall be issued, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. **720 ILCS 145/1 Telecommunication Line Tapping.** Any person who shall within this state wrongfully tap or connect a wire with the telegraph or telephone wires of any person, company or association engaged in the transmission of news or telegraph or telephone lines between the states or in this state for the purpose of wrongfully taking or making use of the news dispatches of such person, company or association, or of its customers, shall be deemed guilty of a Class A misdemeanor. . *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107.* *(See Exhibits in Appendix Section)*


**Charge 22:  Invasion of Privacy**
The plaintiff; Francine Y. has been homeless for about three years because she opposed unlawful discrimination. She could not obtain suitable employment so she had no other choice but to live in a homeless facility. While living within the Pacific Garden Mission's Christian facility for the

homeless, the plaintiff was placed under heavy surveillance by Ronald Huberman and Mayor Richard Daley. Ronald Huberman conspired against the plaintiff by having some of PGM's staff, at least two police officers and some homeless guests, constantly watch the plaintiff, listen to the plaintiff's conversations, watch the clothing the plaintiff wore, watch the food the plaintiff ate, watch the plaintiff while she disrobed, showered and searched through the plaintiff's bag of personal items. The Pacific Garden Mission was Francine Y.'s home while she endured homelessness. The plaintiff was also followed when she left PGM's homeless facility to look for jobs, attend outings and church sessions. The plaintiff's right to privacy was severely violated.

Also, Ronald Huberman illegally gained access to the plaintiff's medical file from Stroger's hospital. He sent the plaintiff a yeast infection junk email. This was done to mock the plaintiff because she was treated for a yeast infection the defendants gave her on purpose. Also, he had Pastor Phil harassing the plaintiff about notes that were contained within her psychiatric file after he coerced PGM into sending the plaintiff for an evaluation. The only way he could have known this is the fact that she was treated at Stroger's hospital for the condition and notes relating to the treatment were placed within the plaintiff's medical file. Francine Y. had the right to have her medical records help confidential. He also placed illegal telephone taps on the plaintiff's telephones as well as her friend's telephone.

Lastly, the plaintiff's storage lockers at Eastbank Storage were also illegally and unreasonably searched in an effort to invade the plaintiff's privacy and harass her. The defendants were looking for additional evidence that they perceived the plaintiff might have against them. Eastbank Storage is located on 35th and Racine in Bridgeport, IL. Mayor Daley used to live in

Bridgeport so this gave the defendants an even greater motive to search the the plaintiff's lockers because the location of the storage facility would have necessitated easy access. Ronald Huberman was made aware that that the plaintiff had storage lockers at Eastbank Storage because the plaintiff emailed him and told him. Francine Y. emailed Ronald Huberman the information relating to her storage lockers because her unemployment had run out and she was angry because CTA had not settled the charges from her employment lawsuit. This is evident because Ronald Huberman sent the plaintiff an email detailing items that only the plaintiff could have known were in her backpack which was stored within the lockers. The defendants did not have probable cause to have a search warrant issued in an effort to gain illegal access into the plaintiff's lockers. The possesions contained within the storage lockers were personal items that belonged to the plaintiff along with legal documents from the plaintiff's employment lawsuit. The plaintiff was not a suspect in any crime nor was she currently incarcerated during the time that the lockers were searched. The plaintiff had the right to be secure in her home as well as indulge in the right to have her personal possessions secure inside the storage lockers that she purchased for a predefined price.

**The United States Constitution** states the following: **Amendment 4: Search and Seizure.** The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall be issued, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized. *Francine Yates v. The Illinois Department of Human Rights, The Chief Legal Counsel, The Chicago Transit Authority 1-06-3107. (See Exhibits in the Appendix Section)*

**_Charge 22:  Failure to Investigate, Arrest & Assist in Civil Court Proceedings_**

As a resident of the Pacific Garden Mission; the plaintiff, Francine Y. called 911 between July and August of 2007 and requested assistance from Chicago police officers because a PGM homeless guest made verbal threats to do physical harm to the plaintiff.  The officers were dispatched to 955 W. Grand Avenue in Chicago, IL.  They arrived on the scene, listened to the complaint, made a formal report and gave the plaintiff a copy of the police report.  The person to whom the complaint was made against; Gail Craig, was never arrested.  The plaintiff had witnesses that could attest to the threats.  The officers intentionally failed to perform mandatory duties which were required by law and their intent to do so was deliberate and intentional.  They never conducted a formal investigation, nor was a court date given to the plaintiff.  Also, the plaintiff was never notified of any court proceedings regarding the complaint.

On February 4, 2008 at 7:15 a.m.; Barbara Rawlings, a homeless guest living in PGM's facility, deliberately cut the line in front of the plaintiff while waiting in line to retrieve coats and bags which was done on a daily basis.  Francine Y. moved to the end of the line to keep down the confusion and avoid her.  Barbara Rawlings stated twice that she would put her foot up the plaintiff's ass and also stated "you got a death wish, I'll be your death wish, meet me outside, I'm outside all the time."  The plaintiff reported the incident to one of PGM's staff members by the name of Ms. Gurlean.  Ms. Gurlean did not take appropriate disciplinary action against Barbara Rawlings.  PGM has a rule that a guest is to be barred out for ninety days as a result of making threats or engaging in physical fighting.  On February 5, 2008, the plaintiff walked to the 17th and State Street Chicago Police Department to make a formal assault charge against Barbara Rawlings.  The police officer; a fat, white male, took the plaintiff's charge, and asked if she wanted Barbara Rawlings arrested.  The plaintiff stated, "yes, I do."  The officer told the plaintiff

to call the police and have her arrested. This was a very dumb statement considering the fact that the plaintiff was already at the police station. Francine Y. made the officer aware that she was homeless, the fact that she had walked to the station because she did not have any money to take CTA or purchase a prepaid card for her cell phone. The plaintiff informed the officer that PGM has a policy that the overnight guests cannot use their cell phones inside the mission and that she was broke and did not have any money to use the mission's pay phone. Also, the plaintiff informed the officer that she was working on school items and did not need to be there for them to have Barabara Rawlings arrested. The police officer to whom the complaint was made failed to send a patrol car to the Pacific Garden Mission to make the arrest nor was a formal investigation conducted. Also, the plaintiff was never given a court date to appear in a court of law nor was she notified of any court proceedings. The motive for the officer not making the arrest was the fact that Barbara Rawlings was friends with Chanel and/or acquaintances. Also, Barabara Rawlings did not like Miriam Martinez because she was creating conflicts within the mission. Lastly, another motive for not making the arrest was the fact that Barbara Rawlings might have had some criminal charges in her background as well as other reasons which were related to the Pacific Garden Mission. On January 9, 2008 through January 21, 2008, the plaintiff left the Pacific Garden Mission to avoid all confrontations with Barbara Rawlings. Barbara Rawlings has repeatedly assaulted the plaintiff on purpose by physically bumping into her since November of 2007. The officer intentionally failed to perform mandatory duties which were required by law and his intent to do so was to obtain a personal advantage from Mayor Richard Daley and his entourage. The personal favor might have been something which was monetary and/or non-monetary in value. This is evident because Ronald Huberman was sent an email by the plaintiff telling him about the failure to arrest and the confrontation with Barbara

Rawlings. Ronald Huberman was also instrumental in having the plaintiff sent to Stroger's hospital after she complained about Barbara Rawlings.

Lastly, when Francine Y. came to the 17th and State street location to file a complaint against Kenyatta, the officer which made the complaint for the plaintiff against Barbara Rawlings was present. He recognized the plaintiff, listened to her complaining and quickly made his way to the back room. The plaintiff asked officer King what the officer's name was and officer King responded through the use of coercion in the form of a lie, "I don't know."

**The 1970 Illinois Constitution** states the following: **Article I, Section 8.1: Crime Victim's Rights** (a) Crime victims, as defined by law, shall have the following rights as provided by law: (1) The right to be treated with fairness and respect for their dignity and privacy throughout the criminal justice process. (2) The right to notification of court proceedings. (3) The right to communicate with the prosecution. (4) The right to make a statement to the court at sentencing. (5) The right to information about the conviction, sentence, imprisonment, and release of the accused. (6) The right to timely disposition of the case following the arrest of the accused. (7) The right to be reasonably protected from the accused throughout the criminal justice process. (8) The right to be present at the trial and all other court proceedings on the same basis as the accused, unless the victim is to testify and the court determines that the victim's testimony would be materially affected if the victim hears other testimony at the trial. (9) The right to have present at all court proceedings, subject to the rules of evidence, an advocate or other support person of the victim's choice. (10) The right to restitution. (b) The General Assembly may provide by law for the enforcement of this Section. (c) The General Assembly may provide for an assessment against convicted defendants to pay for crime victims' rights. (d) Nothing in this

Section or in any law enacted under this Section shall be construed as creating a basis for vacating a conviction or a ground for appellate relief in any criminal case. **Section 12: Right To Remedy And Justice** Every person shall find a certain remedy in the laws for all injuries and wrongs which he receives to his person, privacy, property or reputation. He shall obtain justice by law, freely, completely, and promptly. **Section 13: Trial By Jury** The right of trial by jury as heretofore enjoyed shall remain inviolate. **Section 23: Fundamental Principles** A frequent recurrence to the fundamental principles of civil government is necessary to preserve the blessings of liberty. These blessings cannot endure unless the people recognize their corresponding individual obligations and responsibilities. **Section 24: Rights Retained** The enumeration in this Constitution of certain rights shall not be construed to deny or disparage others retained. **720 ILCS 5/33-3 Official Misconduct.** A public officer or employee or special government agent commits misconduct when, in his official capacity or capacity as a special government agent, he commits any of the following acts: (a) Intentionally or recklessly fails to perform any mandatory duty as required by law; or (b) Knowingly performs an act which he knows he is forbidden by law to perform; or (c) With intent to obtain a personal advantage for himself or another, he performs an act in excess of his lawful authority; or (d) Solicits or knowingly accepts for the performance of any act a fee or reward which he knows is not authorized by law. A public officer or employee or special government agent convicted of violating any provision of this Section forfeits his office or employment or position as a special government agent. In addition, he commits a Class 3 felony. **720 ILCS 5/ 26-1. Disorderly Conduct.** (a) A person commits disorderly conduct when he knowingly: (1) Does any act in such unreasonable manner as to alarm or disturb another and to provoke a breach of the peace. *(See Exhibits in Appendix Section)*

148

## III. CONCLUSION

The plaintiff; Francine Y., was intentionally discriminated against by the Chicago Transit Authority, the City of Chicago and the State of Illinois because she opposed unlawful discrimination.   The parties' intent to do so was reckless, malicious and overwhelmingly destructive.  The defendants were all in a position of power. They knew the plaintiff was a homeless, mentally disabled, single, African-American, Christian woman without effective legal representation.   As a result, they took advantage of the plaintiff as well as the situation. However, the plaintiff took a stand in the face of adversity and opposed unlawful discrimination, enduring a great deal of persecution. They were in a position of power, fully enabled to help the plaintiff; however, they chose to break the law by intentionally ignoring the plaintiff's complaints, violating her rights, aiding, abetting and obstructing justice.  This case should be an embarrassment, a shame and a disgrace to Ronald Huberman, Lisa Madigan, Mayor Richard Daley and Governor Rod Blajoevich as well as all other accomplices.


Francine Y.; the plaintiff, is asking for a summary judgment to be rendered in favor of the plaintiff with no appeals granted on behalf of the defendants. The plaintiff is also seeking relief from the district court in the form of the following remedies:  injunctive relief, all harassers to be disciplined and separated from service, permanent disbarment, damages for mental anguish/mental cruelty, psychological & emotional pain from suffering, shame, indignity, disgrace, embarrassment, humiliation, demoralization, anger, discomfort, inconvenience, delay, worry, distress, anxiety, stress, malice, oppression, conscious indifference, willful indifference, deep depression, homelessness & side affects, feelings of sorrow, torment, powerlessness and exclusion, future continued indefinite suffering, damages for intentional infliction of emotional

and mental distress, damages for negligent intentional infliction of emotional and mental distress, damages for a diminished quality of life, loss of opportunity potential, attorney fees, expert witness fees, punitive damages, pecuniary/non-pecuniary damages, reimbursement of all fees, all workplace torts, damages for fraud & conspiracy to commit fraud, all actions enabling the plaintiff to be made whole, 100% refund of tuition, books, fees from DePaul University based on the present value of a DePaul University four year finance degree, all other compensatory damages.   This brief is respectfully submitted by Francine Yates.

Francine Yates

## <u>PROOF OF SERVICE</u>

I, the undersigned plaintiff, certify that on the _____ day of _____, _____, I served a copy of this _____ to each person to whom it is directed by way of _____.

DePaul University
Attn:  Legal Department
25 E. Jackson Blvd
Chicago, IL  60602

The City of Chicago
Attn:  Mayor Richard Daley
121 N. LaSalle Street
Chicago, IL  60602

Eastbank Storage
Attn:  Legal Department
1200 W. 35th Street
Chicago, IL  60609

The Chicago Transit Authority
Attn:  Ronald Huberman
567 W. Lake Street
Chicago, IL  60661

The State of Illinois
Attn:  Rod Blajoevich
100 W. Randolph Avenue
Chicago, IL  60602

John H. Stroger Hospital
Attn:  Legal Department
1901 W. Harrison Avenue
Chicago, IL  60612

Francine Yates, Pro Se
14114 S. Edbrooke Avenue
Riverdale, IL  60827
(312) 351-5635

# APPENDIX

ORDER

## IN THE APPELLATE COURT OF ILLINOIS
### FIRST JUDICIAL DISTRICT

| | |
|---|---|
| FRANCINE YATES, ) | |
| ) | |
| Petitioner-Appellant, ) | |
| ) | |
| v. ) | No. 1-06-3107 |
| ) | |
| THE DEPARTMENT OF HUMAN RIGHTS, ) | |
| CHIEF LEGAL COUNSEL, and THE CHICAGO ) | |
| TRANSIT AUTHORITY, ) | |
| ) | |
| Respondents-Appellees. ) | |

## O R D E R

This cause coming to be heard on the Petition For Rehearing of petitioner-appellant,

FRANCINE YATES, and the court being fully advised in the premises;

IT IS HEREBY ORDERED that the Petition For Rehearing is **DENIED.**

_____
Justice

**ORDER ENTERED**

DEC 1 4 2007

APPELLATE COURT, FIRST DISTRICT

_____
Justice

_____
Justice

EXHIBIT A

**INDEPENDENT POLICE REVIEW AUTHORITY**



10 W. 35th St. 12th Fl.
Chicago, IL 60616
(312) 745-3609
**ILANA B. R. ROSENZWEIG,** Chief Administrator

July 1, 2008
Reference: Log No.1017804

FRANCINE YATES
14114 EDBROOKE
RIVERDALE, IL 60827

Dear Francine Yates,

The Independent Police Review Authority ("IPRA") received your information on 30-JUN-2008, and gave it Log Number 1017804. It has been forwarded to the Internal Affairs Division of the Chicago Police Department.

IPRA intakes and registers all complaints against Chicago Police Department members. By ordinance, IPRA investigates only specific categories of complaints. All other complaints are forwarded to the Internal Affairs Division.

For additional information on the status of your complaint, you may contact the Internal Affairs Division at (312) 745-6310.

Sincerely,

ILANA B. R. ROSENZWEIG
Chief Administrator
Independent Police Review Authority

\* IN EFFORT TO save money the other INvestigation #'s are: 1015123
1016506
1017802

EXHIBIT B

# PACIFIC GARDEN MISSION
## SECURITY DIVISION

**TO:**     Whom it may concern

**FROM:**   Security Department, Pacific Garden Mission

**RE:**     Medical / Mental Health Evaluation

**DATE:** Feb 6- 08

---

Mr. /Ms Frarcine Yates, an overnight guest in our facility, is being

referred to you due to displayed behavior, of which we perceive as needing an expert opinion.

Please assess this person and advise us how to best help and meet his / her needs.

EXHIBIT C
(No EX. D)

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS          Page 001

PEOPLE OF THE STATE OF ILLINOIS

                    VS                        NUMBER 08123628501

    FRANCINE    YATES

            CERTIFIED STATEMENT OF CONVICTION / DISPOSITION

    I, DOROTHY BROWN, Clerk of the Circuit Court of Cook County, Illinois,
and keeper of the records and seal thereof do hereby certify that the
electronic records of the Circuit Court of Cook County show that:

The States Attorney of Cook County/Local Prosecutor has filed a complaint
with the Clerk of the Circuit Court.

Charging the above named defendant with:

    720-5/12-3-A-2
The following disposition(s) was/were rendered before the Honorable Judge(s):
                                    M       BATTERY - MAKE PHYSICAL C

05/27/08 BOND SET BY RULE OF COURT
07/09/08 DEF DEMAND FOR TRIAL                    07/09/08 9143
    LUCKMAN, MARVIN P.
07/09/08 STRICKEN OFF - LEAVE REINSTATE    C001
    LUCKMAN, MARVIN P.

                        I hereby certify that the foregoing has
                        been entered of record on the above
                        captioned case.
                        Date 07/15/08

                            DOROTHY BROWN
                    CLERK OF THE CIRCUIT COURT OF COOK COUNTY

EXHIBIT E

432
(Court Branch #
or District #)

(Court Date/Time)

(Arresting Agency #)

**Misdemeanor Complaint**   (This form replaces CCG-0655, CCMC-0222 & CCMC-0225)       CCCR N654-100M-10/10/06 (        )

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

The People of State of Illinois,

                         Plaintiff

        v.        }  No. _____

FRANCINE YATES

                         Defendant

NASSIRA H. TOKASH
(Complainant's Name Printed or Typed)
, complainant, now appears before

the Circuit Court of Cook County and states the following:

That: FRANCINE YATES (Defendant) of 1458 So CANAL (Address) has, on or about

26 MAY 08 (Date), at the location of 1458 So CANAL (Place of Offense)

committed the offense(s) of BATTERY

in that s/he WITHOUT LEGAL JUSTIFICATION KNOWINGLY AND INTENTIONALLY CAUSED bodily HARM TO NASSIRA H. TOKASH IN THAT SHE HIT NASSIRA H TOKASH WITH HER FIST ON HER upper Body.

in violation of 720 (Chapter) Illinois Compiled Statutes 5/12-3(a)(i) (Act) (Sub Section)

＋ Nassira Tokash
(Complainant's Signature)

(Complainant's Address)

(Complainant's Telephone)

NASSIRA H. TOKASH
(Complainant's Name Printed or Typed)

**AOIC Code** ☐☐☐☐☐☐☐

**STATE OF ILLINOIS**
**COOK COUNTY** } ss:

The complainant, being first duly sworn on oath, deposes and says that s/he read the foregoing complaint by him/her subscribed and that the same is true.

＋ Nassie Tokash
(Complainant's Signature)

Subscribed and sworn to before me on this 26TH day of MAY, 2008

D. Brown G Mellon
(Judge's/Clerk's/Law Enforcement Officer's Signature)

(Law Enforcement Officer's Badge No.)

I have examined the above complaint and the person presenting the same and have heard evidence thereon, and am satisfied that there is probable cause for filing same. Leave is given to file said complaint.

**SUMMONS ISSUED,** Judge _____
or

**WARRANT ISSUED,** Bail set at: _____       Judge's No.
or

**BAIL SET AT:** _____ Judge _____       Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

EXHIBIT 5 F

Book your next flight on a private jet  Inbox - Yahoo! Mail    Page 1 of 2

Case 1:08-cv-04597   Document 1-4   Filed 08/12/2008   Page 54 of 95



Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out    All-New Mail

Help

## YAHOO! MAIL
Classic

Search    **WEB SEARCH**


**DISCOVER WEIGHT LOSS FREEDOM**
Flexible Points Plan or No Counting Plan.
WeightW
Stop Dieting.
**GO!**

| Mail | Contacts | Calendar | Notepad | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**    **Search Mail**    **Search the Web**

Netflix
Try for Free!

**Folders**    [Add - Edit]

**Inbox (41451)**

Drafts (4)

Sent

**Spam (13631)**    [Empty]

Trash    [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT


**YAHOO! OFFERS**
**ADS THAT RESPECT**
**YOUR PRIVACY**

**AND SUIT YOUR TASTE.**

YAHOO!

Previous | Next | Back to Messages

**Delete**    **Reply** ▾    **Forward**    **Spam**    **Move...** ▾

### Book your next flight on a private jet

**From:**  "Private Jets" <PrivateJets@dustinseats.com>

**To:**  beyondtheregular@yahoo.com

Book your next flight on a private jet



my direct
**WEB**
BE SMART. GET DIRECT.

## Private Jets
Book your next flight on a private jet her

**Private Jet**
Any Jet, Any Time, Any Place: Low Rates on Private Jet Charters.
bluestarjets.com

**ACS : Private Jet Charter Experts**
ACS. For private jet charter-professional personal service call 24-7

**Charte**
No Posi
Fees G
24/7/36
marquis

Find and Compare prices on Wheelchair Vans - Inbox - Yahoo! Mail    Page 55 of 93    Page 1 of 2

Case 1:08-cv-04397    Document 4    Filed 08/12/2008

Yahoo!   My Yahoo!   Mail   More       Make Yl My Home Page       Hi, beyondtheregular       Sign Out   All-New
                                                                     Help                                  Mail



**YAHOO!** MAIL Classic

Search    **WEB SEARCH**



WIN' A MACBOOK AIR

AND GET YOUR FREE' ACUVUE TRIAL PAIR CERTIFICATE

ACUVUE
THE DIFFERENCE

| Mail | Contacts | Calendar | Notepad |  | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**   **Compose**          **Search Mail**   **Search the Web**


Netflix
Only $4.99/mo.

Previous | Next | Back to Messages

**Delete**   **Reply** ▾   **Forward**   **Spam**   **Move...** ▾

### Find and Compare prices on Wheelchair Vans
**From:** "Wheelchair Van" <WheelchairVan@talecents.com>
**To:** beyondtheregular@yahoo.com

**Folders**    [Add - Edit]
**Inbox (41482)**
Drafts (4)
Sent
**Spam (13622)**   [Empty]
Trash              [Empty]

**Search Shortcuts**
My Photos
My Attachments

ADVERTISEMENT


Find and Compare prices on Wheelchair Van

my direct WEB
BE SMART. GET DIRECT.

# Wheel Chair Van
In the market for a wheel chair van?



**Great Deals on New/Used Wheelchair Vans** click here Fanstastic deals. Shop online. Get factory direct

**New/Used Wheelchair Vans** click here 200+ Wheelchair Vans, Lifts, Financing, Rentals. Call 866-711-5071

**Wheel Van** Cruise Our Wh Dealer

$250,000 Policy for for around $10 a month! - Inbox - Yahoo! Mail   Page 56 of 93   Page 1 of 3

Case n:08-cv-04597   Document 9x4   Filed 08/12/2008



Yahoo!   My Yahoo!   ·Mail   More   **Make Y! My Home Page**   **Hi, beyondtheregular**   Sign Out   All-New Mail

Help

# YAHOO!® MAIL
### Classic

Search                                    **WEB SEARCH**

**Online exclusive**
**Get a Free Chocolate™** by LG
**while supplies last!**
with new 2yr activation

veri**z**

**Learn M**

| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**   **Compose**                          **Search Mail**   **Search the Web**

See online
trading in action

Previous | Next | Back to Messages                    Mark as Unread |

**Delete**   **Reply ▾**   **Forward**   **Spam**   **Move... ▾**

**Folders**   [Add – Edit]

**Inbox (41450)**
Drafts (4)
Sent
**Spam (13634)**  [Empty]
Trash        [Empty]

**Search Shortcuts**

My Photos
My Attachments

ADVERTISEMENT



**Feel Beautiful
and Sexy!**
This Chinese Secret
will shock you!
**Click Here to Find Out**

### Attention Medicare Recipients: Regain Mobility - Low Cost
Tuesday, July 1, 2008 4:

**From:** "The Scooter Store" <TheScooterStore@patiocoverage.com>

**To:** beyondtheregular@yahoo.com

Attention Medicare Recipients:
Regain your Mobility at Little to No Cost to You.

Do the things you love, whenever you want - independently.

The Scooter Store can help you get a Medicare-covered
power chair at little to no cost to you.
Visit us online or call to regain your mobility today.

Visit us online today:
http://DAddachbaimbcfAL.patiocoverage.com/link.asp?
a=c&u=140717374&s=1836&e=33027108

Or call 1-866-693-5094 to get details.

Imagine doing the things you love - going to the
park, being with your family, or making yourself
a snack. Imagine the joy of getting around without
assistance. Imagine going where you want, when
you want independently.

http://DAddachbaimbcfAL.patiocoverage.com/link.asp?
a=c&u=140717374&s=1836&e=33027108

You no longer have to feel trapped by your limited



Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out    All-New Mail

Help

# YAHOO!® MAIL
### Classic

Search                    **WEB SEARCH**



Online Exclusive
**FREE Camera Phone**
from America's Most
Reliable Wireless Network

FREE SHIPPING    MOTOROLA W388  SAMSUNG U410  SAMSUNG U340

veri

Learn

| **Mail** | Contacts | Calendar | Notepad | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                    **Search Mail**    **Search the Web**

Netflix
Try for Free!

Previous | Next | Back to Messages                Mark as Unread |    Print

**Delete**    **Reply** ▼    **Forward**    **Spam**    **Move...** ▼

**Folders**    [Add - Edit]

**Inbox (41324)**

Drafts (4)

Sent

**Spam (13689)**    [Empty]

Trash    [Empty]

### Ditch your glasses. Get Lasik and see clearer.
Wednesday, March 19, 2008 5:24 PM

**From:** "LasikForYou" <a@partpeg.com>

**To:** jaddun@yahoo.com

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT



Huge Shoe Sale!

FREE SHIPPING

Click Here    like.com

If your tired of wearing glasses, the Lasik Vision Institute may have the right solution for you.

Prices are now starting at $299 per eye, so follow the link below for more info.

http://www.osjig.com/lasikd/

To stop getting offers from Forest Bay Net Services :

http://www.osjig.com/larem/

215 Paul bunyan Dr. N.W. #228, Bemidji, 56601

You may also call to remove your address at:
+1.888.575.3216

Sponsor Info:
Lasik Vision Institute
3801 South Congress Avenue
Lake Worth, FL 33461

Procedures performed by an independent surgeon. No fee if candidacy determined by an independent doctor located within or adjacent to The LASIK Vision

Phenterthin - Now Available Without a Prescription - Trial Offer - Inbox - Yahoo! Mail    Page 1 of 2

Case 1:08-cv-04597    Document 4    Filed 08/12/2008    Page 89 of 96



Yahoo!   My Yahoo!   Mail   More        **Make Y! My Home Page**        **Hi, beyondtheregular**        Sign Out    All-New Mail

Help

   **YAHOO!** MAIL
Classic                    Search                                        **WEB SEARCH**

■ **ASSOCIATE'S DEGREES**         ■ **BACHELOR'S DEGREES**          ■ **MASTER'S DEGREES**
University of                ■ Associate of Arts in Business      ■ Bachelor of Science in          ■ Master of Arts in Educat
Phoenix                      ■ Associate of Arts in Health          Business / Management             Curriculum and Instructi
Thinking ahead                  Care Administration               ■ Bachelor of Science in          ■ Master of Business Adm
                             ■ Associate of Arts in                 Criminal Justice Administration  ■ Master of Information S
UNLINE PROGRAMS                 Information Technology            ■ Bachelor of Science in Management

| Mail | Contacts | Calendar | Notepad | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                                    **Search Mail**    **Search the Web**

   See your credit
score - free

**Folders**        [Add - Edit]

**Inbox (41517)**

Drafts (4)

Sent

**Spam (13313)**   [Empty]

Trash          [Empty]

---

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT

Why Pay Retail?
BUY DIRECT
Get Your
FREE
Insider's
Guide

Previous | Next | Back to Messages                              Mark as Unread

**Delete**   **Reply ▾**   **Forward**   **Spam**   **Move... ▾**

### Phenterthin - Now Available Without a Prescription - Trial Offer
Friday, January 18, 203

**From:** "Drop the Pounds" <DropThePounds@www8.sandcarmade.com>

**To:** beyondtheregular@yahoo.com

Drop the Pounds

Phenterthin - Now Available Without a Prescription

Trial Offer - Try it Before You Buy It!

http://www8.sandcarmade.com/r/2181/9477418/2649.htm

-------------------------------------------------------------
To stop receiving announcements:
http://www8.sandcarmade.com/r/2181/9477418/2650.htm

Pure Energy Products, Inc.
1025 SW 59th St.
Oklahoma City, OK
73109
You have received this message because you signed up with
woodenhinged.com or one of its partners. We are a service
and not the seller of the product(s) or service(s) contain
the message.
If you prefer not to receive messages from us:
http://www8.sandcarmade.com/remove.php?

Flush up to 20 lbs from your Colon & Enjoy a Flatter Tummy - Inbox - Yahoo! Mail   Page 1 of 2

Case 1:08-cv-04597   Document 1-4   Filed 08/12/2008   Page 60 of 95



Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**        **Hi, beyondtheregular**        Sign Out    All-New Mail

Help

 **YAHOO!** MAIL
Classic

Search                                    **WEB SEARCH**

 **Get rewarded for your excellent credit with a**
**Capital One No Hassle Miles Card.**
✓ No miles expiration    ✓ Fly any airline, any seat, any time    ✓ No annual fee        **Apply Now**

**Mail**    **Contacts**    **Calendar**    **Notepad**        **What's New?**    **Mobile Mail**    **Options**

**Check Mail**    **Compose**                                **Search Mail**    **Search the Web**

See your credit score - free

Previous | Next | Back to Messages                                Mark

**Delete**   **Reply ▼**   **Forward**   **Spam**   **Move... ▼**

**Folders**    [Add - Edit]

Inbox (41520)

Drafts (4)

Sent

Spam (13309)   [Empty]

Trash   [Empty]

### Flush up to 20 lbs from your Colon & Enjoy a Flatter Tummy
Friday, Januar

From: "Colon Cleanse Support" <ColonCleanseSupport@www16.bricklighter.com>

To: beyondtheregular@yahoo.com

**Search Shortcuts**

My Photos

My Attachments

Did you know the average American has 6-10 undigested meal
the colon?

Flush up to 20 lbs from your Colon & Enjoy a Flatter Tummy

We'll show you how!

http://www16.bricklighter.com/r/1843/9477418/2078.htm68116

ADVERTISEMENT

"2008 Diet Pill of the Year"
Pounds To Lose?
Choose ▼
Zap Belly Fat &
Boost Libido Fast
AS SEEN ON CNN,
NBC & FOX NEWS
Achieve Amazing Results
Get Your FREE Trial,
**CLICK HERE**
slimassociation.com

To stop receiving announcements about this offer:
http://www16.bricklighter.com/r/1843/9477418/2077.htm

Colon Cleanse
1246 Linden Ave
Glendale CA
91201

You have received this message because you signed up with
woodenhinged.com or one of its partners. We are a service
not the seller of the product(s) or service(s) contained i
If you prefer not to receive messages from us:
http://www16.bricklighter.com/remove.php?e=beyondtheregula

----- Forwarded Message ----
From: Work Savers <Aletha@intprod006.info>
To: beyondtherainbow2oz@yahoo.com
Sent: Saturday, April 5, 2008 12:54:16 AM
Subject: Free Sample of Kaboom NeverScrub

# Try it FREE
### Just Pay Shipping & Handling

## Never Scrub Your Toilet Bowl Again!

The new **Kaboom® NeverScrub!®** attaches easily out of sight within your toilet tank and provides powerful cleaning continuously for up to 3 months.

- Easy to Install - Less than 1 Minute
- Refillable
- Prevents Rust & Hard Water Stains
- Safe for Septic Systems
- Won't Harm Tank Parts
- Cleans Completely. Even Under the Rim

**TRY IT FREE...**

**CLICK HERE**





Yahoo!   My Yahoo!   Mail   More        **Make Y! My Home Page**        Hi, beyondtheregular       Sign Out    All-New
                                                                                   Mail
                                                                            Help

# YAHOO!® MAIL
### Classic



|  Search  |  | **WEB SEARCH** |



**FIND OUT HOW YOU CAN LOSE WEIGHT
ONLINE AND START LIVING**

LEARN MORE ▶

---

**Mail** | **Contacts** | **Calendar** | **Notepad** | **What's New?** | **Mobile Mail** | **Options**



**Check Mail** | **Compose**                          **Search Mail** | **Search the Web**

---

Previous | Next | Back to Messages                                            Mark

**Delete**   **Reply ▾**   **Forward**   **Spam**   **Move... ▾**

### Men, Re-grow your hair, plus get a complimentary 8GB iTouch
                                                               Friday, J

**From:** "MedicalHairRestoration" <MedicalHairRestoration@pokerjackp.com>

**To:** beyondtheregular@yahoo.com

Men, Re-grow your hair, plus get a complimentary 8GB iT
This offer expires 7/31.
Get control of your hair loss. Schedule your procedure or a complimenta
analysis.



It has a sharp, modern and powerful look.
# The iTouch is pretty cool as well.

MEDICAL HAIR
RESTORATION™

hector Bustamante



GET A
8GB IT(
A S299

**Folders**          [Add - Edit]

**Inbox (41456)**

Drafts (4)

Sent

**Spam (13630)**   [Empty]

Trash              [Empty]

---

**Search Shortcuts**

My Photos

My Attachments

---

ADVERTISEMENT



**Feel Beautiful
and Sexy!**
*This Chinese Secret
will shock you!*
Click Here to Find Out

---

**Get your edge back and re-grow your hair,
plus get a complimentary 8GB iTouch.**
We help thousands of men each year continue to
recapture what they've lost. So why not you? Take
advantage of this limited time offer and receive a
new, sleek iTouch to complement your new, sleek,
younger look.
Take advantage of the best-looking, most natural
and undetectable results in the industry during our
most affordable season.
We're offering a special graft price and this
complimentary iTouch on a first come, first serve
basis. You must have your procedure before July

Free Wild Cherry LG™ Washer & Dryer - Inbox - Yahoo! Mail    Page 63 of 93    Page 1 of 2

Case 1:08-cv-03369    Document 1    Filed 08/12/2008



Yahoo!    My Yahoo!    Mail    More    **Make Y! My Home Page**    **HI, beyondtheregular**    Sign Out    All-New Mail

Help

## YAHOO!® MAIL
Classic

Search    **WEB SEARCH**

650    740    820    **WHAT'S YOUR**    Experia

**Credit Score?**    **Find O**

© 2007 Consumer Info

| **Mail** | **Contacts** | **Calendar** | **Notepad** | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**    **Search Mail**    **Search the Web**

Netflix
Only $4.99/mo.

Previous | Next | Back to Messages

**Delete**    **Reply ▾**    **Forward**    **Spam**    **Move... ▾**

**Folders**    [Add - Edit]

**Inbox (41503)**

Drafts (4)

Sent

**Spam (13314)**    [Empty]

Trash    [Empty]

**Search Shortcuts**

My Photos

My Attachments

### Free Wild Cherry LG™ Washer & Dryer
**From:** "See Details" <promotions@shufflefeudal.net>

**To:** beyondtheregular@yahoo.com

ADVERTISEMENT

NETFLIX
Click here

## You've Been Selected to Rece
# FREE Wild Cherry ● LG Wasl
Participation required. See offer details.

LG TROMM Front Load
SteamWasher™

Get your laundry extra clean with the
power of steam. LG's Front Load
Washers use steam in the wash
cycle for better washing performance
and higher water and energy
efficiency. A separate SteamFresh
cycle lets you get rid of wrinkles and
refresh your clothes anytime.



# FREE



# CLICK HERE



Yahoo!   My Yahoo!   Mail   More     **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out   All-New Mail

Help

**YAHOO!** MAIL Classic     Search     **WEB SEARCH**



| Mail | Contacts | Calendar | Notepad | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**   **Compose**       **Search Mail**   **Search the Web**

Netflix Try for Free!

Previous | Next | Back to Messages      Mark as Unread |   P

**Delete**   **Reply ▼**   **Forward**   **Spam**   **Move... ▼**

**Folders**   [Add - Edit]

**Inbox (41518)**

Drafts (4)

Sent

**Spam (13310)**   [Empty]

Trash    [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT

Over for Obama?
Vote Here Now!

### Old Witchcraft Secrets - make your wildest dreams come true

Friday, January 18, 2036 6:59

From: "Old Witchcraft Secrets"
&lt;OldWitchcraftSecrets@www16.bricklighter.com&gt;

To: beyondtheregufar@yahoo.com

"Old Witchcraft Secrets" will show you in detail, how you can cast powerful spells, to make your wildest dre come true.

http://www16.bricklighter.com/r/1775/9477418/1944.htm

It's NOT your fault that your spells and rituals aren't turning out like you want... YET.

The truth is... you've been misled by self-proclaimed powerful wizards and witches... and the truth is that 99% of these 'professionals' are DEAD WRONG!

In fact, a lot of what they say will actually diminish you powers.

They don't want you to know the right way to cast spells because if you did, you'd never need them again and they would lose their power!

You cannot invent 'new' spells like you cannot invent a new tree. Everything is old. But not everything is known in the right way.

Get 3 Spells just for visiting our site

http://www16.bricklighter.com/r/1775/9477418/1944.htm

As you know, many witches and wizards are FURIOUS about th

Let us help find you the perfect local daycare - Spam - Yahoo! Mail        Page 1 of 2

Case 1:08-cv-04597    Document 112    Filed 09/12/2008    Page 65 of 95

Yahoo! · My Yahoo!   Mail · More        Make Y! your        Welcome, **beyondtheregular** Sign Out · All-New Mail · Help
home page

**YAHOO!** MAIL
Classic

Search: [                    ]        **Web Search**

| Mail | Contacts | Calendar | Notepad |        **What's New?   Mobile Mail   Options**

**Check Mail    Compose**        **Search Mail      Search the Web**

**Folders**    [Add - Edit]

Inbox (41484)

Drafts (4)

Sent

Spam (13337)   [Empty]

Trash          [Empty]

**Search Shortcuts**

My Photos

My Attachments

Previous | Next | Back to Messages                    Mark as Unread

**Delete**  |  **Reply ▾**  |  **Forward**  |  **Not Spam**  |  **Move... ▾**

**Let us help find you the perfect local daycare**    Saturday, July 12, 2008
From: "Daycare" <Kathline@bosall.com>

To: yoyomanchester1957@yahoo.com

If you've had a hard time finding the right daycare for yo
children you're a click away!

We can put you in touch with some of the best local daycar
your area.  It's fast and easy!

Just click on the following link for more info:
http://www.tripdow.com/dacaas/


We value your privacy.  If you wish to be removed from all
contact from us, please choose from the options below.

SKFF Networks - 3215 Fayetteville Rd #326, Lumberton, NC 2

If you wish, you may also call to be removed from mailings
888-219-0345

The following link will take you to the sponsors remove pa
directly:

http://www.tripdow.com/RM6402

whenRsRszd8,$F?AmHv2iRd$ss0,szI_dmm[8 _d,F9s?8iRd$ss0,szI3
[ [8d3sAQmiRd$ss0,szIOFRs893$FAF nSdAiRd$ss0,szId|S_AFd]
iRd$ss0,szI=S[|8=S[9FmW%iRd$ss0,szIOAs?8A[,d8vqiRd$ss0,szI
uAiRd$ss0,szI|N6uAs,]iRd$ss0,szIuS|dA]FAQ%
iRd$ss0,szIdSSRdSsNF6QQWiRd$ss0,szIudzF=z,9d9F6QQQiRd$ss0,
[,FP=Sd33s8iRd$ss0,szI$FdA3OAn[8iRd$ss0,szI sS93sss3$6QQ%
iRd$ss0,szI=zs]F$sn=FusFiRd$ss0,szIA[3d,As?
FSSiRd$ss0,szI3s,,dAd8?iRd$ss0,szI[SsNF3
$FSsA9mHvHiRd$ss0,szI_Ad8,[=,sS8-iRd$ss0,szI,AR=S8[,sSFOd]
FAiRd$ss0,szIus=F=|F=3,s83AsSiRd$ss0,szIOAF89d$n

----- Forwarded Message ----
From: franki yates <beyondtheregular@yahoo.com>
To: beyondtheregular@yahoo.com
Sent: Wednesday, April 2, 2008 7:48:39 AM
Subject: Fw: UPDATE


----- Forwarded Message ----
From: UNION BANK NIGERIA PLC <management@unionbankng.net>
To: beyondtheregular@yahoo.com
Sent: Wednesday, April 2, 2008 6:07:44 AM
Subject: UPDATE

Dear Ronayolande,
It is paramount that you know that I got your contact from my Assistance whom I asked to seach for one
who can be credible to handle transactions of large volumes,well from what you now say it seems that
your ability to work in this regard is limited,as I was wondering why I had not heard from you for I
suppose that the paying house was to have contacted you with verification modalites,or have they
not?.Well you let me know all these and your ability to respond to them as quick as possible.If you are
not ready any more let me know so that I can see what to do as I cannot be held waiting till this times.

Regards,

Freeman

---

You rock. That's why Blockbuster's offering you one month of Blockbuster Total Access, No Cost.

---

You rock. That's why Blockbuster's offering you one month of Blockbuster Total Access, No Cost.

Note: forwarded message attached.


-----Inline Message Follows-----


----- Original Message ----
From: franki yates <beyondtheregular@yahoo.com>
To: management@unionbankng.net
Sent: Monday, April 21, 2008 10:57:14 AM
Subject: Fw: CONFIRM

dear freeman:

r u the antichrist?  if not, tell me who is?  i need to know!  i know you know who he is!

i wish you were ronald and not freeman!!

regards,

ronayolanda hubertson

p.s. call me  312 351-5635
----- Forwarded Message ----
From: franki yates <beyondtheregular@yahoo.com>
To: UNION BANK NIGERIA PLC <management@unionbankng.net>
Sent: Tuesday, April 15, 2008 9:33:45 AM
Subject: Re: CONFIRM

dear mr. waziri and mr. freeman;

stop emailing me.  i am not interested.  you are exremely ignorant.  get a life, you crook!!!

----- Original Message ----
From: UNION BANK NIGERIA PLC <management@unionbankng.net>
To: franki yates <beyondtheregular@yahoo.com>
Sent: Tuesday, April 15, 2008 7:57:11 AM
Subject: Re: CONFIRM

Well sorry this is not Ronald as you think but some one else and I do not know about this your lawsuit
thing you say,but if you want us to speak let me have your number and we could speak.
Thanks.
Freeman

On Tue, Apr 15, 2008 at 12:42 AM, franki yates <beyondtheregular@yahoo.com> wrote:
  my money is my lawsuit check and it is worth millions.  ronald huberman stop emailing me.  you are going to have your
  day.  bye

    ----- Original Message ----
    From: UNION BANK NIGERIA PLC <management@unionbankng.net>

Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**        **Hi, beyondtheregular**    Sign Out    All-New Mail

Help

**YAHOO! MAIL** Classic

Search                                    **WEB SEARCH**



WHO'S GOT YOUR VOTE?

JOHN MCCAIN

VOTE NOW FOR A CHANCE TO

| **Mail** | **Contacts** | **Calendar** | **Notepad** | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                                    **Search Mail**    **Search the Web**

 See your credit score - free

Previous | Next | Back to Messages                    Mark as Unread |    Print

**Delete**    **Reply**    **Forward**    **Spam**    **Move...**

**Folders**        [Add - Edit]

Inbox (41509)
Drafts (4)
Sent
Spam (13314)    [Empty]
Trash            [Empty]

**Search Shortcuts**

My Photos
My Attachments

 ADVERTISEMENT
**How do I become a...**

 Graphic Designer    Psychologist
Criminal Investigator    Counselor
Health Care Manager    Teacher
Medical Billing Specialist    More

**Dear Francine Yates**                    Tuesday, July 29, 2008 7:53 AM

**From:** "Mrs.Nazek Rafiq Hariri" <nazekhariri11@live.com>

**To:** beyondtheregular@yahoo.com

Dear Francine Yates ,

I am Mrs.Nazek Hariri, wife of the late Prime Minister of Lebanon, Mr Rafiq Hariri, who was assassinated on 14 February 2005, along with 20 others, near the St. George Hotel in Beirut. It's my pleasure to contact you for a business venture which I intend to establish in your country, though I have not met with you before but I believe one has to risk,confounding in someone to succeed sometimes in life.

I have a profiling amount in an excess of US$25million, which I seek your Partnership in accommodating for me the deposite made by my late husband in a security company in EUROPE before he was assasinated by unknown people suspected to be his opposition political parties .You will be rewarded with 20% of the total sum for your partnership. Can you be my partner on this?

I want you to assist me in retrieving this money from the security company. Due to the up rising of political crisis in Lebanon, please i would want you to warned that the security company did not know the content of the metallic box deposited by my husband because he deposited it as the family valuables.

All I need from you is to stand as the beneficiary of the Above quoted Sum and I will re-profile the funds with your Name, which will enable The European Firm transfer the sum to you and equally invest it on his behalf in your country.

Please do contact me via my private email:
Personal Name:Mrs.Nazek Hariri
Email:nazekhariri11@live.com



Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**        **Hi, beyondtheregular**        Sign Out    All-New Mail

Help

 **YAHOO!** MAIL
Classic

Search

**WEB SEARCH**

FIND OUT HOW YOU CAN LOSE WEIGHT
ONLINE AND START LIVING

LEARN MORE

Wei
Wat


| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                    **Search Mail**    **Search the Web**

Netflix
Try for Free!

Previous | Next | Back to Messages                    Mark as Unread | Print

**Folders**        [Add – Edit]

**Inbox (41463)**

Drafts (4)

Sent

**Spam (13629)**   [Empty]

Trash          [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT

 OBAMA'08
Visit the Official
Campaign Website
JOIN US

**Delete**    **Reply** ▼    **Forward**    **Spam**    **Move...** ▼

**urgent(From Iraq)**                    Monday, July 7, 2008 7:46 PM

**From:** "JAWAD MANDEEL HAMZA" <jawmanhama33@yahoo.com>

**To:** undisclosed-recipients

DEAR FRIEND,

THIS LETTER IS NOT INTENDED TO CAUSE ANY EMBARRASMENT IN
WHATEVER FORM ,RATHER I WAS COMPELLED TO CONTACT YOUR
ESTEEMED SELF, FOLLOWING KNOWLEDGE OF YOUR HIGH REPUTE AND
TRUSTWORTHINESS, TO BORN US OUT OF THIS DIFFICULT
SITUATION THAT MY COUNTRY HAS BEEN ENGULFED IN.

Let me first start by introducing myself properly to you.
My name is name Jawad Mandeel Hamza Son of Abdul Rahman
Hamza a member of (WCPI) Worker-communist Party of Iraq
for the Total Independence of IRAQ)
http://www.wpiraq.net .I got your email address from
network directory. I apologize if I infringed on your
privacy.

My Father Died on the 15th march 2003 on our way to Syria
because of the ₒ misunderstanding our late Ex. President
Saddam Hussein a dictator of Iraq from 1979 until 2003,
when his regime was overthrown by a United States-led
invasion. Who was sentenced to death by hanging on the
30th of December, 2006

Some time ago some money where found and which was
discovered by the u.s marines , those our part of our
country's money that the evil regime of Saddam Hussein and
his men stole from us . For more information please
check :
http://news.bbc.co.uk/2/hi/middle east/2988455.stm



Yahoo!   My Yahoo!   Mail   More        **Make Y! My Home Page**        **Hi, beyondtheregular**        Sign Out    All-New
Mail

Help



**YAHOO!** MAIL
Classic

Search ⌄                                              **WEB SEARCH**



FIND OUT HOW YOU CAN LOSE WEIGHT
ONLINE AND START LIVING

LEARN
MORE ▶

| Mail | Contacts | Calendar | Notepad | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                    **Search Mail**    **Search the Web**

---

Netflix
Only $4.99/mo.

Previous | Next | Back to Messages                    Mark as Unread | Print

**Delete**    **Reply ▾**    **Forward**    **Spam**    **Move... ▾**

**Folders**    [Add – Edit]

**Inbox (41460)**

Drafts (4)

Sent

Spam (13630)   [Empty]

Trash          [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT



Jewelry Auctioned
Up to 95% Off

Click to
Discover          bidz

**From: Mrs Mabel Shinider**                    Sunday, July 6, 2008 5:40 AM

**From:**    "Mabel Shinider" <duefund004@earthlink.net>

**To:**  undisclosed-recipients

From: Mrs Mabel Shinider
Westeinde Ziekenhuis
Netherland.
Dear Beloved in Christ,

   I am the above named person but now undergoing medical
treatment in Netherland.I know you  will definitely take
this as a deceptive email,because of the swindle news we
hear everyday and  now it happens am from Netherlands
where it seems to happen more often.Let me first of all
inform you, i got your e.mail id from a mail directory and
decided to e.mail you for a permission to  go ahead.  I am
Mrs Mabel Shinider from Netherlands.I am married to
Dr.Patrick Shinider  who  worked with Chevron/Texaco in
Nigeria for twenty years before he died in the year
2003.We were  married for twenty-seven years without a
child,He died during one of the riots in the Niger Delta
region of Nigeria.He was held hostage and slain to death
by protesting youths of the region  before his death we
were both born again christians.

   Since his death I decided not to re-marry.When my late
husband was alive he deposited the sum  of 9.8 million
dollars (Nine Million eight hundred thousand U.S.Dollars)
with a Security Company  in Nigeria. Presently this money
is still with the Security Company and the management just
wrote  me as the beneficiary to come forward to receive
the money or rather issue a letter of  authorisation to
somebody to receive it on my behalf if I can not come
over.

I am presently with my laptop in a hospital where I have been undergoing treatment for Cardiac  surgery for Parkinsons Disease and Rheumatic heart disease, I have since lost my ability to talk  and my doctors have told me that I have only a few months to live.It is my last wish to see that this  money is invested and at the end of every year distributed among charity organisation.

I want a person that is God fearing that will use this money to fund churches,Help For Local  Hurricane Victims and the word of God and to ensure that the house of God is maintained. The  Bible made us to understand that Blessed

is the hand that giveth.I took this decision because i know that there are alot of poor people suffering from different kind of disease and nobody to  come to their aid.With God all things are possible. As soon as I receive your reply I shall give you the contact of the Security Company.I will also issue  you a letter of authority that will prove you as the new beneficiary of this fund.You will be entitled to  10% of every profit you make in a year.

Lastly, I want you to be praying for me as regards my entire life and my health because I have  come to find out since my spiritual birth lately that wealth acquisition without Jesus Christ in one's  life is vanity upon vanity. If you have to die says the Lord, keep fit and I will give you the crown of  life. May the Grace of our Lord Jesus Christ, the love of God, and the sweet fellowship of the Holy  Spirit be with you.

Please assure me that you will act accordingly as I stated

Copyright © 1994-2008 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

Endeavour to use it as Faith of Donation

Yours in Christ,
Mrs Mabel Shinider

Previous | Next | Back to Message   Select Message Encoding                | Full Headers

Connect with Jewish Singles in the US. - Inbox - Yahoo! Mail    Page 73 of 95    Page 1 of 2

Case 1:08-sv-01459r    Document    Filed 08/12/2008

Yahoo!    My Yahoo!    Mail    More    **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out    All-New Mail

Help

YAHOO!, MAIL Classic

Search    WEB SEARCH

DEPRIVE YOURSELF
OF DIETS
NOT REAL FOOD

WeightWa

LEARN
MORE

Mail | Contacts | Calendar | Notepad    **What's New?**    **Mobile Mail**    **Options**

Check Mail | Compose    Search Mail | Search the Web



Netflix
Try for Free!

**Folders**    [Add - Edit]

**Inbox (41459)**
Drafts (4)
Sent
**Spam (13630)**    [Empty]
Trash    [Empty]

**Search Shortcuts**
My Photos
My Attachments

ADVERTISEMENT
BIDS START AT $1
bidz

Previous | Next | Back to Messages

Delete    Reply ▼    Forward    Spam    Move... ▼

**Connect with Jewish Singles in the US.**    Saturda
**From:** "Jewish Singles" <JewishSingles@nightdesert.com>
**To:** beyondtheregular@yahoo.com

Connect with Jewish Singles in the US.
Looking for that perfect someone? Access 1000's of pictures of Jewish

Find
Your T

**Meet Other Je**
Connect with thousa
members - photos,
more. Join today!

Start

**Find Your Jew**
Take advantage of e
dating services. Imn
potential partners, a
Start Now!

Start

Want do date someone wealthy? - Inbox - Yahoo! Mail    Filed 08/12/2008    Page 74 of 95 Page 1 of 2

Case 1:08-cv-04597   Document 1   Filed 08/12/2008

Yahoo!   My Yahoo!   Mail   More    **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out   All-New Mail

Help

# YAHOO!® MAIL
Classic

Search     **WEB SEARCH**

 

**University of Phoenix**
Thinking ahead.

Earn your degree in one of the
most convenient and efficient
ways possible.

University of next level, here I come

**Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options**

**Check Mail**   **Compose**      **Search Mail**   **Search the Web**

Netflix
Only $4.99/mo.

**Folders**    [Add - Edit]

**Inbox (41493)**

Drafts (4)

Sent

**Spam (13319)**   [Empty]

Trash    [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT



Previous | Next | Back to Messages      Mark as Unread |   Print

**Delete**   **Reply ▾**   **Forward**   **Spam**   **Move... ▾**



**Want do date someone wealthy?**    Wednesday, March 19, 2008 5:44 PM

**From:** "Marry Rich" <Veda@oohper.com>

**To:** furryhamster2@yahoo.com

Women AND men can now join a personals site with
successful men and women who make over $100k a year. Check
out some of our exclusive site features below.

-Men receive many more emails from women than from any
other dating site.
-Men are verified using our patented WM Verification
System.
-Our sophisticated user interface makes checking messages
& browsing new members a snap.
-Connect with thousands of new members every month.

Sound good?  Then check out the link below

http://www.okehex.com/wemen/


The above message is an informational advertisement.  If
you with to be removed from further mailings, please use
one of the methods below.  Thank you.

http://www.okehex.com/wemerem/
You may also call to remove your address 1.888-517-4270.

Beedolak Networks. 1160 Vierling Dr #105 Shakopee, Mn
55379.

SEXUALLY-EXPLICIT: Hot Black Booty - Inbox 4 Yahoo! Mail    Page 75 of 95 Page 1 of 2

Case 1:08-cv-04597    Document x-4    Filed 08/12/2008

Yahoo!    My Yahoo!    Mail    More    **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out    All-New Mail

Help



**YAHOO! MAIL**
Classic

Search    WEB SEARCH

| Mail | Contacts | Calendar | Notepad | | What's New? | Mobile Mail | Options |

Check Mail    Compose    Search Mail    Search the Web

See your credit score - free

**Folders**    [Add - Edit]

**Inbox (41468)**

Drafts (4)

Sent

**Spam (13627)**    [Empty]

Trash    [Empty]

**Search Shortcuts**

My Photos

My Attachments

Previous | Next | Back to Messages    Mark as Unread | P

Delete    Reply ▾    Forward    Spam    Move... ▾

**SEXUALLY-EXPLICIT: Hot Black Booty**    Friday, January 18, 2030 6:59

**From:** "Black Booty" <blackbooty@www6.seagreenpass.com>

**To:** beyondtheregular@yahoo.com

SEXUALLY-EXPLICIT:
You must be at least 18 years of age to view the mature
content in the offer below and on the linked webpages.

ADVERTISEMENT



Smarter Than BOTOX®

dramati

TRY IT FREE

Beautiful black babes getting what they deserve!

http://www6.seagreenpass.com/r/50/3378240/53.htm

<a

I'm bored and SO horny;)let's meet at www.meganfun dot com - Inbox - Yahoo! Mail    76 of 98   Page 1 of 1

Case 1:08-cv-04997    Document 1    Filed 09/02/2008    Page 1 of 1



Yahoo!    My Yahoo!    Mail    More    **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out    All-New Mail

Help

# YAHOO!® MAIL Classic

Search    **WEB SEARCH**

**Mail**    **Contacts**    **Calendar**    **Notepad**    **What's New?**    **Mobile Mail**    **Options**

**Check Mail**    **Compose**    **Search Mail**    **Search the Web**

Netflix
Try for Free!

**Folders**    [Add - Edit]

**Inbox** (41492)
Drafts (4)
Sent
**Spam** (13319)    [Empty]
Trash    [Empty]

**Search Shortcuts**

My Photos
My Attachments

ADVERTISEMENT

Previous | Next | Back to Messages    Mark as Unread |    Print

**Delete**    **Reply ▼**    **Forward**    **Spam**    **Move... ▼**

### Women love men that take this little Blue pill

Saturday, March 22, 2008 3:06 AM

**From:** "Orexis" <Orexis@roostide.com>

**To:** beyondtheregular@yahoo.com



Women love men that take this little Blue pill

This moment made possible by...

## The All-Natural

Meet Orexis.™ The ONLY all-natural Male Sexual Enhancement product with *guaranteed* immediate and long-term results. Experience the difference Orexis can make in your love life. Click here for more information.

SHE LOVES THAT HE TAKES *OREXIS*™





| Mail | Contacts | Calendar | Notepad | | What's New? | Mobile Mail | Options |

**Check Mail**   **Compose**                          Search Mail   Search the Web



Netflix
Only $4.99/mo.

Previous | Next | Back to Messages                   Mark as Unread

**Delete**   **Reply ▼**   **Forward**   **Spam**   **Move... ▼**

**Folders**        [Add - Edit]

**Inbox (41449)**

Drafts (4)

Sent

**Spam (13635)**   [Empty]

Trash            [Empty]

### FRANCINE, meet me tonight?                    Monday, June 30, 200

**From:** "Naughty or Nice"
<ybnyavedlywdezv@americanplatinumnews.com>

**To:** beyondtheregular@yahoo.com

This is an Advertisement.

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT





# Naughty or Nice

Search and view millions of naughty and nice singles for

CLICK HE







Thick an
what this
monster
black ch
stuff full. A
big black
Black's

V

WAT

**BLACK BOOTY** STACY ADAMS



Lacey Du
knows
showing
spread wi
side and
brown ass
that says "
one

V

WAT

JOI

**BLACK BOOTY** SKYY BLACK



I want to make love to you so bad! tell me how u feel at www.injannet.com - Inbox - Yahoo!  Page 1 of 1

Case 1:08-cv-04539   Document 1   Filed 08/12/2008   Page 83 of 98

Yahoo!    My Yahoo!    Mail    More          **Make Y! My Home Page**          Hi, **beyondtheregular**          Sign Out    All-New Mail

Help

**YAHOO!® MAIL**
Classic

Search                                    **WEB SEARCH**

**DISCOVER WEIGHT LOSS FREEDOM**
**Flexible Points Plan or No Counting Plan.**                    WeightW
                                                                Stop Dieting. S

GO!

| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                                    **Search Mail**    **Search the Web**

Netflix
Only $4.99/mo.

Previous | Next | Back to Messages                    Mark as Unread |    Print

**Delete**    **Reply ▼**    **Forward**    **Spam**    **Move... ▼**

**Folders**    [Add - Edit]

**Inbox (41450)**          ## I want to make love to you so bad! tell me how u feel at
                           www.injannet.com
Drafts (4)
                                            Monday, June 30, 2008 9:50 AM
Sent                       **From:**    "Wilson Woods" <wilsonwoods57@yahoo.com>

**Spam (13635)**  [Empty]   **To:**  beyoncac@yahoo.com
Trash            [Empty]

                           That's--that's all.
**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT

| 😊 | **Excellent** | 750 - 840 |
| 😊 | **Good** | 660 - 749 |
| 😐 | **Fair** | 620 - 659 |
| 🙁 | **Poor** | 340 - 619 |
| 😞 | **I Don't Know** | ????? |

**Find out INSTANTLY!**

**Delete**    **Reply ▼**    **Forward**    **Spam**    **Move... ▼**

Previous | Next | Back to Messages  Select Message Encoding                    | Full Headers

**Check Mail**    **Compose**                                    **Search Mail**    **Search the Web**

Copyright © 1994-2008 Yahoo! Inc. All rights reserved. Terms of Service - Copyright/IP Policy - Guidelines
NOTICE: We collect personal information on this site.
To learn more about how we use your information, see our Privacy Policy

Yahoo!   My Yahoo!   Mail   More     **Make Y! My Home Page**     **Hi, beyondtheregular**     Sign Out   All-New Mail

Help

## YAHOO!® MAIL Classic

Search                                                    **WEB SEARCH**


**REMODELING?**
Never Pay Retail Again.
**BUY DIRECT!**

| Mail | Contacts | Calendar | Notepad | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**   **Compose**                              **Search Mail**   **Search the Web**

Netflix
Try for Free!

Previous | Next | Back to Messages                     Mark as Unread |     Print

**Delete**   **Reply ◆**   **Forward**   **Spam**   **Move... ▼**

**Folders**        [Add - Edit]

**Inbox (41518)**          **Get your sex drive back**              Friday, January 18, 2030 6:59 PM

Drafts (4)              From:  "Love Machine" <LoveMachine@mx8.curleap.com>

Sent                   To:  beyondtheregular@yahoo.com

**Spam (13312)**  [Empty]

Trash          [Empty]     Ready to feel 18 again sexually?
                           Enjoy sex to the FULLEST!

                           Easy to apply wipes give rock hard erections!
**Search Shortcuts**       Try it FREE now!

My Photos                  http://mx8.curleap.com/r/79/3378240/83.htm

My Attachments
                           Let women use it to have more orgasms!

ADVERTISEMENT
                           http://mx8.curleap.com/r/79/3378240/83.htm

                           <a href="http://mx8.curleap.com/r/79/3378240/83.htm">Get
                           your free bottle here.</a>

                           ======================================================
                           Please visit http://mx8.curleap.com/remove.php?
                           e=beyondtheregular@yahoo.com
                           to delete your email address.


                           PCM | 1324 Seven Springs Blvd | New Port Richey, Fl 34655



Yahoo!   My Yahoo!   Mail   More        **Make Y! My Home Page**    **HI, beyondtheregular**    Sign Out    All-New Mail

Help

# YAHOO! MAIL
### Classic

Search                                                    **WEB SEARCH**

classmates.com          <u>Chicago, IL</u>                    Search Your Sc

<u>Lakewood High School</u>          <u>Winter Park High School</u>          <u>Union High School</u>
Members : 15438                       Members : 12155                        Members : 11697

**Mail**  |  **Contacts**  |  **Calendar**  |  **Notepad**          **What's New?**  **Mobile Mail**  **Options**

**Check Mail**   **Compose**                              **Search Mail**   **Search the Web**

---

Previous | Next | Back to Messages                    Mark as Unread |   Print

**Delete**   **Reply**▾   **Forward**   **Spam**   **Move...**▾

 See your credit score - free

**Folders**   [Add - Edit]

**Inbox (41480)**

Drafts (4)

Sent

**Spam (13623)**   [Empty]

Trash          [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT



**Home-Based Christian Opportunity**    Wednesday, July 9, 2008 2:44 AM
From: "Christian Biz Opp" <Odette@teecase.com>

To: hubbapriest@yahoo.com

Get up to $7,828* a month or more working from home! No Experience Necessary! Full training provided!

Start making money in as little as 72 hours! Finally, A business opportunity to match your Christian Values! Watch your free video.  Just follow the link below:

http://www.teecase.com/cbocx/


To be removed from future communications:

http://www.teecase.com/cborem/

To stop receiving offers immediately from QARTFZ Enterprises
1544 Oakland Ave, Indiana, PA, 15701

You may also call to remove your address at: 1-866-584-0677

Sponsor Information:
Digital Productions (a DBA)
1128 Royal Palm Beach Blvd. #222
Royal Palm Beach, FL 33411

Yahoo!    My Yahoo!    Mail    More       **Make Y! My Home Page**       **Hi, beyondtheregular**       Sign Out    All-New
                                                                                    Help                                   Mail

 **MAIL**
*Classic*

Search                                    **WEB SEARCH**



**roll over** to check out
this week's **hot deals!**

CVS/pharma
for all the wa

| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                          **Search Mail**    **Search the Web**

See your credit
score - free

Previous | Next | Back to Messages

**Delete**   **Reply**   **Forward**   **Spam**   **Move...**

**Folders**    [Add - Edit]

**Inbox (41481)**

Drafts (4)

Sent

**Spam (13622)**   [Empty]

Trash    [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT

**FREE* Dinner for
Two at Olive Garden***

*Olive
Garden*   Complete
         1 offer

*see offer details
@2008 Reward-City.com

**Francine get an electronic bible in your pocket**                          Wednes

From: "Its on us" <itsonus@faddishness.com>

To: beyondtheregular@yahoo.com

Get an electronic and traditional bible today Francine



To unsubscribe from future advertisements from e-ConsumerGi
http://www.e-ConsumerGift.com/u.cgi?config=4347

eSolutionsMedia.net, Inc. | 4001 Kennett Pike, Suite 134 #527 | Greenv

Do You Need Help Sleeping? - Inbox - Yahoo! Mail          Page 1 of 2

Case 1:08-cv-04597   Document 1-4   Filed 08/12/2008   Page 87 of 95

Yahoo!   My Yahoo!   Mail   More          **Make Y! My Home Page**     **Hi, beyondtheregular**        Sign Out    All-New
                                                                                      Mail
                                                                              Help

**YAHOO!**® **MAIL**
                 Classic                     Search                                          **WEB SEARCH**

**Get email alerts to key changes to your credit file.**          **EQUIF**

                                                                  **GET PROTECT**

| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**   **Compose**                                   **Search Mail**   **Search the Web**

Netflix
Only $4.99/mo.

Previous | Next | Back to Messages                    Mark as Unread |

**Delete**   **Reply ▼**   **Forward**   **Spam**   **Move... ▼**

**Folders**          [Add - Edit]

**Inbox (41516)**              **Do You Need Help Sleeping?**            Sunday, April 26, 2009 6:5
Drafts (4)                     **From:** "Sleep Aid" <SleepAid@dailydealrewardszone.net>
Sent
                               **To:** beyondtheregular@yahoo.com
**Spam (13314)**   [Empty]
Trash              [Empty]
                                    [x]

**Search Shortcuts**                     If you can't read or see this email, Click Here
My Photos                           [x]
My Attachments

ADVERTISEMENT

**Huge Shoe Sale!**

**FREE**
SHIPPING

**Click Here**   like.com

                                     [x]

                                     [x]



Yahoo!    My Yahoo!    Mail    More              **Make Y! My Home Page**        **HI, beyondtheregular**        Sign Out        All-New Mail

Help

 **YAHOO!** MAIL Classic                    Search                              **WEB SEARCH**

  Thieves don't have to steal your mail anymore
**They get it hand delivered**                                    **LifeLo**

| **Mail** | **Contacts** | **Calendar** | **Notepad** | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                                            **Search Mail**    **Search the Web**

Netflix
Try for Free!

Previous | Next | Back to Messages

**Delete**    **Reply** ▾    **Forward**    **Spam**    **Move...** ▾

**Folders**    [Add - Edit]

**Inbox (41449)**        **Donate your car to charity**                              Monda
Drafts (4)              From: "Car Donation Department" <CarDonationDepartment@zoomisle.com>
Sent                    To: beyondtheregular@yahoo.com
**Spam (13635)**  [Empty]
Trash          [Empty]

**Search Shortcuts**

My Photos
My Attachments

ADVERTISEMENT


RUNNING WITH
THE GENERAL
STEER CLEAR
OF OBSTACLES!

Donate your car to charity

# Donate your car to Charit



WebsEngine.com

Receive a full tax
deduction from your
local charity!

**CLICK HERE**

Donate your car to
Cancer Research and
receive a tax deducti

**CLICK HERE**

To unsubscribe from receiving further e-mails from ConsumerReportsN
ConsumerReportsNow.com, 2443 Filmore St #529, San Francisco

Your privacy is important to us. You have received this mailing as a result of your registration with

Don't Let Depression Keep You Down. Answers Inside. - Inbox - Yahoo! Mail   Page 90 of 95   Page 1 of 2

Case 1:08-cv-04597   Document 154   Filed 08/12/2008



Yahoo!   My Yahoo!   Mail   More      **Make Y! My Home Page**      Hi, beyondtheregular      Sign Out   All-New Mail

Help



Search      **WEB SEARCH**

| Mail | Contacts | Calendar | Notepad | | What's New? | Mobile Mail | Options |





WACHOVIA                MEMBER

**Check Mail**   **Compose**                    **Search Mail**   **Search the Web**



Netflix
Only $4.99/mo.

Previous | Next | Back to Messages

**Delete**   **Reply** ▼   **Forward**   **Spam**   **Move...** ▼

**Folders**   [Add - Edit]

**Inbox (41454)**

Drafts (4)

Sent

Spam (13630)   [Empty]

Trash   [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT



### Don't Let Depression Keep You Down. Answers Inside.

**From:** "Depression Center" <DepressionCenter@dancingframe.com>

**To:** beyondtheregular@yahoo.com

Don't Let Depression Keep You Down. Answer



# Depression
Don't Let Depression Ke

Depression Symptom Relief          Info on Depressi
Learn About a Therapy in Treating & Managing      Learn about a depr
Depression.                range of symptom:
morefordepression.com            cymbalta.com

**Click Here**

To unsubscribe or "opt-out" from receiving further e-mails from MyDirectWeb.com, go to http://c.MyDirectWeb.c
My Direct Web, 5718 Westheimer Suite 1240, Houston, TX 77057

Your email address has been verified to receive offers from one of our affiliates. We res
to abuse your email address. If you prefer not to receive further emails of this type, click

Mail Services - List V1
601 Van Ness Ave., Suite E, #739, San Francisco, CA 941

Yahoo!    My Yahoo!    Mail    More    **Make Y! My Home Page .**    **Hi, beyondtheregular**    Sign Out    All-New Mail

Help

# YAHOO!. MAIL
### Classic

Search    [ WEB SEARCH ]



| Mail | Contacts | Calendar | Notepad | | What's New? | Mobile Mail | Options |

[ Check Mail ]    [ Compose ]    [ Search Mail ]    [ Search the Web ]

 See your credit score - free

Previous | Next | Back to Messages

[ Delete ]  [ Reply ▾ ]  [ Forward ]  [ Spam ]  [ Move... ▾ ]

**Folders**    [Add - Edit]

**Inbox (41467)**
Drafts (4)
Sent
**Spam (13627)**  [Empty]
Trash  [Empty]

**Two Delicious Eating Plans, One Healthy Solution**    Tuesday, A

From:    "Prevention" <PreventionBooks@rodalenews.com>

To:    BEYONDTHEREGULAR@YAHOO.COM

**Search Shortcuts**

My Photos
My Attachments

ADVERTISEMENT




## WIN War WITHIN
Prevention's

## 30 DISEASES. ONE SOLUTION. RESULTS IN AS LITTLE AS 7 DAYS

What if you had the power to: BEAT Heart Disease, HEAL Arthritis, RESIST Diab
Cancer, CONTROL Allergies, CALM Digestive Problems, SOOTHE Arthritis pain, R
And more... all in JUST 7 DAYS?

Now you do, with the breakthrough solution in **WIN THE WAI**
**Try it FREE for 21 days! Click here.**


GET 5 FREE GIFTS!
CLICK HERE NOW

Dear Francine,
**Which of these conditions would YOU like to help**
## Arthritis. Heart disease. Cancer. Diabetes.
## Asthma. Digestive problems. Skin problem
## Liver & Kidney problems. *And dozens mor*
Is it the alarming tightness of a coming asthma attack?
your arteries that leaves you defenseless against strok
The daily misery of chronic digestive problems? The a
arthritic joints? Or maybe the deadly threat of cancer?
**Why choose just one?**
Why NOT help erase, reduce, and even *reverse* your
**conditions** (and many more) at the *same* time?
For centuries, doctors and scientists have assumed th
triggers for *different* diseases. That's why we have so
prescription drugs these days. But thanks to recent res
community has begun to suspect that **there is a singl**
**for many of the major diseases and chronic condit**

Statin companions help you feel better - Inbox - Yahoo! Mail    Page 1 of 2

Case 1:08-cv-04597   Document 1-4   Filed 08/12/2008   Page 92 of 95

Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**        **Hi, beyondtheregular**        Sign Out    All-New
                                                                                Mail

                                                                Help

**YAHOO!® MAIL**                    Search                                    **WEB SEARCH**
Classic



Making Your Kitchen Cook
*with* Sara Moulton
Click now to watch the web series

| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**    **Compose**                                    **Search Mail**    **Search the Web**

See your credit              Previous | Next | Back to Messages                    Mark as Unread |    Print
score - free
                             **Delete**   **Reply ▾**   **Forward**   **Spam**   **Move... ▾**

**Folders**    [Add · Edit]
                             **Statin companions help you feel better** Tuesday, April 1, 2008 11:36 PM
**Inbox (41487)**            **From:** "Statin Companion" <Rashida@doxspec.com>

Drafts (4)                      **To:** beyondtheregular@yahoo.com
Sent

**Spam (13327)** [Empty]
Trash          [Empty]

                             Are you currently taking cholesterol lowering medication?
**Search Shortcuts**
My Photos                    Some Common Medications:
My Attachments               -Lipitor
                             -Crestor
ADVERTISEMENT                -Lescol
                             -Tricol
                             -Zocor
                             -Mevacor

                             Common Symptoms:
                             Fatigue
                             Muscle Soreness
                             Constipation or Digestive Problems
                             Memory or Mood Issues

                             Feel better with Statin Companion with Co Q10!

                             Follow the link below for more information:

                             http://www.doxspec.com/stco/


                             This has been a net advertisement.  If you wish to be
                             removed from all future mailings, please utilize any of
                             the options below.  Thank you.

Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**        Hi, **beyondtheregular**        Sign Out    All-New
                                                                                                                      Mail
                                                                            Help

# YAHOO!® MAIL
**Classic**

Search                                                    **WEB SEARCH**



University of
Phoenix™

Earn your degree in one of the
most convenient and efficient
ways possible.

University of  next level, here I come

| Mail | Contacts | Calendar | Notepad | | What's New? | Mobile Mail | Options |

**Check Mail**    **Compose**                                          **Search Mail**    **Search the Web**


Netflix
Only $4.99/mo.

Previous | Next | Back to Messages                         Mark as Unread |    Print

**Delete**    **Reply ↓**    **Forward**    **Spam**    **Move... ▼**

**Folders**        [Add - Edit]

**Inbox (41509)**

Drafts (4)

Sent

**Spam (13314)**    [Empty]

Trash            [Empty]

**Search Shortcuts**

My Photos

My Attachments

ADVERTISEMENT
**How do I become a...**


Graphic
Designer        Psychologist

Criminal
Investigator    Counselor

Health Care
Manager         Teacher

Medical Billing
Specialist      More

### Diabetics on Medicare: We Connect You to Care and Savings.
Monday, July 28, 2008 8:37 PM

**From:** "SuppliesForDiabetics" <Shondra@leyvac.com>

**To:** ericbball_2004@yahoo.com

Diabetics on Medicare - Get your testing supplies at
little or no cost to you.
Plus, receive a free testing meter when you qualify.

Get a free  Guide to Controlling Your Diabetes just for
requesting a free consultation.

A ClickOnHealth partner can help you find a way to save on
your diabetic testing supplies.

Get Started Now.  Click on the following link to begin:
http://www.leyvac.com/dialaz/


This has been an advertisement by Leaningwind Web
Partners.

If you'd like to be removed from all future ads, please
choose from the options below.

4470 W. Sunset Blvd. #426, Los Angeles, CA 90027

You may call the following number to be removed:
888.229.6177

Or, you may click on the following link for removal:



Yahoo!   My Yahoo!   Mail   More          **Make Y! My Home Page**       **Hi, beyondtheregular**       Sign Out   All-New
                                                                                                Mail
                                                                    Help

**YAHOO!** MAIL
              Classic                    Search                                    **WEB SEARCH**



| **Mail** | **Contacts** | **Calendar** | **Notepad** | | **What's New?** | **Mobile Mail** | **Options** |

**Check Mail**   **Compose**                                          **Search Mail**   **Search the Web**

See your credit           Previous | Next | Back to Messages
score - free
                          **Delete**   **Reply** ▼   **Forward**   **Spam**   **Move...** ▼

**Folders**   [Add - Edit]
                             **Demand for skilled technicians is high. Get your degree**        Monda
**Inbox (41463)**          **From:** "Pharmacy Tech Online" <Rodney@piratesoftheindiaocean.com>
Drafts (4)
                              **To:** beyondtheregular@yahoo.com
Sent
**Spam (13628)** [Empty]
                                        Demand for skilled technicians is high. Get your Degree
Trash         [Empty]                        This email contains an advertisement.
                                          For subscription changes, see the bottom of this message.

**Search Shortcuts**
My Photos
My Attachments

ADVERTISEMENT


OBAMA'08
Visit the Official
Campaign Website
JOIN US



Your Local FD Department is Seeking New Recruits. - Inbox - Yahoo! Mail    Page 95 of 95    Page 1 of 2

Case 1:08-cv-04957 Document 4 Filed 08/12/2008

Yahoo!    My Yahoo!    Mail    More        **Make Y! My Home Page**    **Hi, beyondtheregular**    Sign Out    All-New Mail

Help

 **YAHOO!** MAIL
Classic

Search                                   **WEB SEARCH**

 **BOOM**    **Try it FREE' Hurry!** Limited Time Offer Only!
**Flush Away Pounds &**
**Toxins** to Look Your Best!    FREE TRIAL!    

| Mail | Contacts | Calendar | Notepad | | **What's New?** | **Mobile Mail** | **Options** |
|------|----------|----------|---------|---|---|---|---|

**Check Mail**    **Compose**                                   **Search Mail**    **Search the Web**

Netflix
Only $4.99/mo.

**Folders**    [Add - Edit]

**Inbox (41464)**
Drafts (4)
Sent
**Spam (13628)**    [Empty]
Trash    [Empty]

**Search Shortcuts**

My Photos
My Attachments

ADVERTISEMENT

 **OBAMA'08**
Visit the Official
Campaign Website
JOIN US

Previous | Next | Back to Messages                    Mark as Unread |

**Delete**    **Reply** ▼    **Forward**    **Spam**    **Move...** ▼

### Your Local FD Department is Seeking New Recruits.

Monday, July 7, 2008 8

**From:** "Fight Fires" <Korey@hurtlay.com>

**To:** ttufly1986@yahoo.com

The fire department is looking for new recruits.

The academy is accepting new applicants now.

Enter the fire academy, get more info
http://www.atvlcds.com/burning/